IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Edward Lang,                                    Case No. 5:12 CV 2923

                    Petitioner,                 MEMORANDUM OPINION
                                                AND ORDER DENYING PETITION
          -vs-
                                                JUDGE JACK ZOUHARY
David Bobby, *Warden*,

                    Respondent.


### INTRODUCTION

A jury convicted Petitioner Edward Lang of the 2006 murders of Jaron Burditte and Marnell Cheek, recommending that Petitioner be sentenced to death for Cheek's murder and life imprisonment without the possibility of parole for Burditte's murder.  He now challenges the constitutionality of his convictions and sentence, pursuant to 28 U.S.C. § 2254.  For the reasons below, this Court denies the Petition for Writ of Habeas Corpus (Doc. 16).

### FACTUAL BACKGROUND

On direct appeal from his convictions and sentence, the Ohio Supreme Court described Lang's crimes as follows:

> The state's case revealed that at 9:36 p.m. on October 22, 2006, Canton police officer Jesse Butterworth was dispatched to a traffic accident with injuries on Sahara Avenue in Canton.  At the scene, Butterworth observed that a Dodge Durango had crashed into the back of a parked car.  He discovered that the two people inside the Durango had been shot in the back of the head.  They were later identified as Jaron Burditte, the driver, and Marnell Cheek, the front-seat passenger.

Police investigators found a bag of cocaine in Burditte's hand.  Investigators examining the inside of the Durango recovered two shell casings in the backseat area and a spent bullet in the driver's side door pocket.  Additionally, two cell phones were found in the car, and a third cell phone was found in Burditte's pocket.

One of the cell phones recovered from the Durango showed that calls had been received at 9:13 p.m. and 9:33 p.m., which was close to the time of the murders.  Police learned that these calls had been made from a prepaid cell phone that was not registered in anyone's name.  Phone records for the cell phone showed that two calls had been made to the phone number of Teddy Seery on the afternoon and evening of the murders.

On October 24, 2006, Sergeants John Gabbart and Mark Kandel interviewed Seery.  Following that interview, the police identified Lang as a suspect in the murders.

At trial, Seery testified that he and Lang were together almost every day during the summer of 2006.  Lang called Seery on the evening of October 22, but Seery did not recall what they discussed.  On the morning of October 23, Seery was informed by another friend that someone had been murdered on Sahara Avenue.  Lang came to Seery's house later that day.

During the visit, Seery asked Lang "what happened at Sahara," because Lang stayed in that area. Lang told Seery that "he killed two people up there" that "[t]hey were going to rob."  Lang then described what had occurred: "[H]e had called the guy up and the guy came and he saw there was a girl in the car.  The guy passed him up.  He called him back. The guy came back around, and he got in the car."  Lang then said that he had gotten into the car and had "shot them * * * [t]wice."  However, Lang did not tell Seery whom he was with or explain why he had shot the two people.

The police obtained a warrant for Lang's arrest.  On the evening of October 24, 2006, the police stopped Lang as he was parking his girlfriend's car at a local apartment.  Lang gave police a false name when asked his identity, but police established his identity and arrested him.  Police officers seized a 9 mm handgun and ammunition that had been wrapped inside a towel and were resting on the rear passenger floorboard of the car.

On October 25, 2006, Sergeants Gabbart and Kandel interviewed Lang.  After waiving his Miranda rights, Lang told police that on October 22, Antonio Walker had come to his house and had told him "he had somebody that [they] could rob." Lang agreed to join him.  After Walker gave him Burditte's phone number, Lang called Burditte and made arrangements to purchase a quarter-ounce of crack cocaine for $225.  Burditte and Lang agreed to meet later that night "off of 30th Street and Sahara," and Burditte said he would call Lang when he got close to that location.

2

Lang stated that he gave his gun to Walker before they left the house because Walker had told him, "[A]ll [Lang] had to do was just be in the car with him basically."  As they walked to the meeting location, Walker told Lang how the robbery was going to take place: Walker said they were going to get in the car and hold Burditte up, and he told Lang which direction to run afterwards.

After reaching the meeting location, Burditte called Lang and told him that he was "right around the corner."  After Burditte drove past them, Lang said that Walker had called Burditte on Lang's cell phone and told him where they were.  The car then pulled up in front of Lang and Walker.  Lang then described what happened: "I walked like on the other side of the car [and] I get in the back seat behind the passenger and he got in the back seat behind the driver. * * * We jumped in the car and he put the gun up dude head [sic] and told dude that he wanted everything and like in a moment of seconds he fired two shots.  And I jumped out the car."

Lang stated that they went to Walker's apartment after the shootings.  Lang asked Walker why he shot the two people, and Walker said that "he felt as though dude was reachin' for somethin'. * * * And he wasn't * * * sure."  Lang stated that he vomited in a bag. Lang also called "[his] home boy E" to get the gun melted down and disposed of. In the meantime, Walker wiped down the gun.  Walker also told Lang that they needed to get rid of the cell phone, and Lang gave it to him.  Walker then dismantled the phone and went outside to throw it in the dumpster.

During the interview, Lang told police that he was surprised that Walker had shot the victims because the "plan was just to rob him."  Lang also said, "I did not wanna do it. * * * He wanted to do it. * * * I just went with him for, that was my gun I needed some money."

On October 26, 2006, Walker turned himself in to the police after learning that the police were looking for him. Walker then talked to the police about the murders.

At trial, Walker testified that on the evening of October 22, 2006, he, Lang, and Tamia Horton, a girlfriend of Lang, were at Horton's apartment. Lang had a gun out and said that he "needed to hit a lick" (commit a robbery) because he "needed some money." Lang mentioned that they could rob "Clyde," who was Jaron Burditte.  Walker knew Burditte because they had been in the same halfway house together in 2004.

Walker agreed to help Lang rob Burditte because he was also "short on money."  Their plan was to arrange to buy drugs from Burditte and then rob him when he showed up for the sale.  Lang then called Burditte and arranged to buy a quarter ounce of crack cocaine from him later that night.

Shortly thereafter, Lang and Walker walked to their meeting location on Sahara Avenue.  Lang loaded his 9 mm handgun while they waited for Burditte to arrive.

3

When Burditte's Durango drove past them, Lang called Burditte and told him where they were.  Burditte then arrived at their location and stopped in front of Lang and Walker.

According to Walker, Lang got into the backseat on the driver's side of the Durango. Walker did not get into the Durango, explaining, "It didn't feel right to me."  Walker then heard two gunshots and saw Lang get out of the vehicle and start running. Walker saw the Durango "crash[ ] up into the yard."

Lang and Walker separately ran to Horton's apartment. Lang vomited in the bathroom. Walker asked whether Lang was all right, and Lang said, "[E]very time I do this, this same thing happens."  Walker testified that he never saw Lang's handgun after they reached his apartment.  He also denied throwing away Lang's cell phone.

Michael Short, a criminalist with the Canton–Stark County crime lab, testified that none of the fingerprints collected matched Lang's or Walker's.  Short also examined the handgun seized from Lang's vehicle and the spent bullet recovered from the Durango.  He testified that testing showed that the handgun had fired the spent bullet. Testing also showed that the two cartridge cases found in the Durango's backseat had been ejected by this handgun.

Michele Foster, a criminalist with the Canton–Stark County crime lab, examined Lang's clothing. Blood was found on Lang's red T-shirt and pants, but DNA testing showed that it was Lang's blood.  No blood was found on Lang's coat, knit hat, white T-shirt, or the athletic shoes that were taken from the car.  Soiling was also noticed on Lang's athletic shoes, jacket, and pants.

Foster also examined Walker's clothing.  She found no blood on the hooded sweatshirt or the athletic shoes that Walker said he was wearing on October 22.  But tan-colored soiling with fragments of dried plant material was noticed on the exterior of both his shoes.

Foster conducted DNA testing of a swab taken from the trigger grips, slide, and magazine release on the 9 mm handgun.  Foster detected low levels of DNA from at least two individuals on the swab. Foster testified, "Walker is not the major source of DNA that we detected from the swabbing of the pistol."  She also testified, "[W]e can say that Edward Lang cannot be excluded as a possible minor source to the DNA that we found on the weapon."  Because of the low level of DNA, Foster testified, "we can't say to a reasonable degree of scientific certainty that this person is the source. In this particular case, the chance of finding the major DNA profile that we found on that pistol is 1 in 3,461," which is to say that "1 of 3,461 people could possibly be included as a potential source of the DNA."

4

Dr. P.S.S. Murthy, the Stark County coroner, conducted the autopsies on Cheek and Burditte. Murthy testified that Cheek was shot at close range above the left ear. The gunshot traveled "left to right, downwards, and slightly backwards" and exited behind Cheek's right ear. Cheek's toxicology report was negative for the presence of any drugs or alcohol.

Dr. Murthy testified that Burditte was shot in the back of the head. The trajectory of the shot was downward, and the bullet exited through the left side of the victim's mouth. Dr. Murthy determined that the gunshot was a "near contact entrance wound" to the head. Burditte's toxicology report was positive for benzoylecognine, which is the metabolite for cocaine, and THCA, which is marijuana. Dr. Murthy concluded that a gunshot wound to the head was the cause of death for both victims.

The defense presented no evidence during the guilt phase.

*State v. Lang*, 129 Ohio St. 3d 512, 513–516 (2011) (footnote omitted).

## PROCEDURAL BACKGROUND

### State Court Proceedings

In December 2006, a grand jury charged Lang with the murders of Burditte and Cheek, returning an indictment with two counts of aggravated murder in violation of Ohio Rev. Code § 2903.01(B), and one count of aggravated robbery in violation of Ohio Rev. Code § 2929.04(A)(7). For each aggravated-murder charge, the grand jury returned two capital specifications. First, the grand jury charged that each murder was part of a course of conduct involving the purposeful killing of two or more persons in violation of Ohio Rev. Code § 2929.04(A)(5). Second, the grand jury charged that each murder was committed in the course of an aggravated robbery in violation of Ohio Rev. Code § 2929.04(A)(7). All counts included a firearm specification under Ohio Rev. Code § 2941.145 (Doc. 17-1 at 47–52).[1]

---

[1]

References to the Return of Writ's Appendices are to the electronic court filing ("ECF") number, designated as "Doc" and using the Appendix pagination. References to the trial transcript use the original transcript pagination. References to the Petition, Return, or Traverse use the ECF pagination, not the native pagination or Page ID for these documents.

Lang's trial began on July 10, 2007 (Doc. 22-2 at 348).  Attorneys Frank Beane and Anthony Koukoutas served as Lang's trial counsel.  On July 14, 2007, a jury found Lang guilty of all charges and specifications.  Lang's mitigation hearing ended four days later, with the jury recommending the death penalty for Cheek's murder, and life imprisonment, without the possibility of parole, for Burditte's murder.  The trial court adopted the jury's sentencing recommendation on July 26, 2007 (Doc. 17-5 at 1362–73).  The court also sentenced Lang to a ten-year term of imprisonment for the aggravated-robbery count, and merged the gun specifications imposing an additional three-year term of imprisonment (*id*.).

Lang, represented by Joseph Wilhelm, Rachel Troutman, Benjamin Zober, and Jennifer Prillo, timely appealed his convictions and sentence to the Ohio Supreme Court raising twenty-one propositions of law:

1. A defendant's right to due process is violated when a juror who is related to one of the victims, and has a prejudice and bias, is seated on the jury. U.S. Const. amends. VI, XIV; Ohio Const. art. I, §§ 5, 10.

2. Expert scientific testimony that is not established to a reasonable degree of scientific certainty is unreliable and inadmissible.  Admission of evidence that does not meet this standard violates a defendant's rights to equal protection, due process, and his rights to confrontation and to present a defense. U.S. Const. amends. V, XIV.  It also violates Ohio R. Evid. 401–403.

3. A defendant's right to [a] [g]rand [j]ury indictment under the Ohio Constitution, and his rights to due process under both the State and Federal Constitutions are violated when the indictment fails to allege a mens rea element for the offense of aggravated robbery. U.S. Const. amends. V, XIV; Ohio Const. art. I, §§ 10, 16.  This error also denies the defendant his rights against cruel and unusual punishment because it affects the jury's verdict on the O.R.C. § 2929.04(A)(7) specification. U.S. Const. amends. VIII, XIV; Ohio Const. art. I, § 9.

4. When a defendant is charged with aggravated felony murder and the O.R.C. § 2929.04(A)(7) specification as either the principal offender or an aider and abetter [sic], the jury must be given the option to find the defendant guilty

6

under either the principal offender element or the prior calculation and design element of that specification.  U.S. Const. amends. VIII, XIV, Ohio Const. art. I, §§ 9, 16.

5.  An accused is deprived of substantive and procedural due process rights when a conviction results despite the State's failure to introduce sufficient evidence. U.S. Const. amends. VI, XIV; Ohio Const. art. I, §§ 9, 16.

6.  The accused is denied the rights to due process and effective assistance of counsel when a trial court refuses to grant access to grand jury materials prior to trial.  U.S. Const. amends. V, VI, VIII, IX, and IIV; Ohio Const. art. I, §§ 1, 2, 5, 9,10,16, and 20.

7.  Admission of the prior consistent statements of a witness violates Ohio R. Evid. 801 and deprives a criminal defendant of a fair trial and due process. U.S. Const. amend. XIV; Ohio Const. art. I, § 16.

8.  Admission of irrelevant and prejudicial evidence during a capital defendant's trial deprives him of a fair trial and due process.  U.S. Const. amend. XIV; Ohio Const. art. I, § 16.

9.  A capital defendant is denied his substantive and procedural due process rights to a fair trial and reliable sentencing as guaranteed by U.S. Const. amends. VIII and XIV; Ohio Const. art. I, §§ 9 and 16 when a prosecutor commits acts of misconduct during the trial phase of his capital trial.

10.  The defendant's right to the effective assistance of counsel is violated when counsel's performance during the culpability phase of a capital trial is deficient to the defendant's prejudice.  U.S. Const. amends. VI and XIV; Ohio Const. art. I, § 10.

11.  Where the jury recommends the death sentence for one count of aggravated murder, but recommends a life sentence on another count, and the aggravating circumstances and mitigating factors are identical, the resulting death sentence is arbitrary and must be vacated.  U.S. Const. amends. VIII, XIV.

12.  A capital defendant's rights to due process and a fair trial are denied when a prosecutor engages in misconduct during the penalty phase.  U.S. Const. amends. VIII, XIV; Ohio Const. art. I, § 10.

13.  The defendant's right to the effective assistance of counsel is violated when counsel's performance, during the penalty phase of his capital trial, is deficient to the defendant's prejudice.  U.S. Const. amend. VI; Ohio Const. art. I § 10.

7

14.    A capital defendant's rights to due process and against cruel and unusual punishment are violated by instructions that render the jury's sentencing phase verdict unreliable. U.S. Const. amends. VIII, XIV, Ohio Const. art. I, §§ 9, 16.

15.    A capital defendant's rights against cruel and unusual punishment and to due process are violated by the admission of prejudicial and irrelevant evidence in the penalty phase of the trial. U.S. Const. amends. VIII, XIV, Ohio Const. art. I, §§ 9, 16.

16.    A capital defendant's death sentence is inappropriate when the evidence in mitigation outweighs the aggravating circumstances. O.R.C. §§ 2929.03, 2929.04; U.S. Const. amends. VIII, XIV; Ohio Const. art. I, §§ 9, 16.

17.    When the trial judge trivializes and minimizes mitigating evidence, it violates a capital defendant's right to a reliable sentence. O.R.C. §§ 2929.03, 2929.04; U.S. Const. amends. VIII, XIV; Ohio Const. art. I, §§ 9, 16.

18.    The cumulative effect of trial error renders a capital defendant's trial unfair and his sentence arbitrary and unreliable. U.S. Const. amends. VI, XIV; Ohio Const. art. I, §§ 5, 16.

19.    Imposition of costs on an indigent [d]efendant violates the spirit of the Eighth Amendment. U.S. Const. amends. VIII[,] XIV; Ohio Const. art. I, §§ 10, 16.

20.    The accused's right to due process under the Fourteenth Amendment to the United States Constitution is violated when the State's burden of persuasion is less than proof beyond all doubt.

21.    Ohio's death penalty law is unconstitutional. O.R.C. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05 do not meet the prescribed constitutional requirements and are unconstitutional on their face and as applied to Edward Lang. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 2, 9, 10, and 16. Further, Ohio's death penalty statute violates the United States' obligations under international law.

(Doc. 18-1 at 1519–21). On November 1, 2010, with leave of court, Lang presented an additional

proposition of law, arguing that the trial court erred by failing to properly notify him of the penalty

for noncompliance with the terms of post-release control (Doc. 18-3 at 2028–35).

The Ohio Supreme Court affirmed Lang's convictions and sentence on August 31, 2011, but

remanded his case to the trial court to impose the appropriate term of post-release control pursuant

8

to Ohio Rev. Code § 2929.191. *State v. Lang*, 129 Ohio St. 3d 512 (2011). Lang filed a motion for reconsideration, which the court denied on November 2, 2011 (Doc. 18-3 at 2107–16).

Lang next filed an application to reopen his direct appeal on January 27, 2012, asserting five propositions of law:

I.    Trial Counsel Are Ineffective For Failing To Request, And A Trial Court Errs By Failing To *Sua Sponte* Provide, A Limiting Instruction To The Jur[y] Related To The Proper Use Of The Co-Defendant's Plea Of Guilty To Complicity To Commit Murder. U.S. Const. amends. VI And XIV.

II.    The Trial Court's Treatment Of A *Batson v. Kentucky*, 476 U.S. 79 (1986) Objection Was Error, And Trial Counsel's Conduct During The Consideration Of The *Batson* Objection Was Prejudicially Ineffective. U.S. Const. amends. VI And XIV.

III.    The Trial Court Improperly Excluded Access To Mitigation In Violation Of *Eddings v. Oklahoma*, 455 U.S. 104 (1992) And *Lockett v. Ohio*, 438 U.S. 586 (1978) By Denying Access to the Grand Jury Transcripts of the Co-defendant's Indictment. U.S. Const. Amend. VII, XIV.

IV.    Gang Evidence Simply Is Not Allowed in a capital trial pursuant to *Dawson v. Delaware*, 503 U.S. 159 (1992). U.S. Const. amends. VI, VIII and XIV.

V.    Trial Counsel Were Ineffective In Failing To Request Further Inquiry Regarding Potential Prejudice From A Victim's Family Member Sitting As A Juror In Lang's Capital Trial. U.S. Const. amends. VI and XIV.

(Doc. 18-3 at 2146, 2147, 2149, 2150, 2152). The Ohio Supreme Court denied the application on September 5, 2012 (Doc. 18-4 at 2158).

While his direct appeals were pending, Lang filed a petition for postconviction relief in the trial court on May 15, 2008, now represented by Richard Vickers and Tyson Fleming. He presented the following fourteen grounds for relief:

1.    Petitioner's convictions and sentences are void or voidable because Ohio's post-conviction procedures do not provide an adequate corrective process in violation of the [C]onstitution. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

9

2.     Petitioner's convictions and sentence are void or voidable because his trial counsel failed to reasonably investigate, prepare, and present compelling evidence to mitigate the sentence of death.  Therefore, Petitioner's rights were denied under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and §§ 1, 2, 5, 9, 10, 16, and 20 of Article I of the Ohio Constitution.  Petitioner's trial counsel failed to timely obtain and utilize available records regarding Petitioner's history and background that prevented his sentencing jury from learning: that Petitioner was severely physically and sexually abused as a child; that Petitioner suffers from a severe mental illness with an onset early in his childhood; that his mental illness made him appear to be psychotic at times; that there is intergenerational mental illness in Petitioner's family; that Petitioner's family of origin was highly dysfunctional; and that Petitioner's home was a place of danger and chaos.

3.     Petitioner Lang's death sentence is voidable because he was denied the effective assistance of counsel at the penalty phase of his capital trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and he was thereby prejudiced. . . .  Petitioner was prejudiced by defense counsel's unreasonable failure to investigate and present the testimony of Abigail Duncan.

4.     Petitioner Lang's death sentences are voidable because he was denied the effective assistance of counsel at the penalty phase of his capital trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and he was prejudiced. . . . [T]here were available facts regarding Petitioner's life long mental health deficits that would have been presented to the sentencing jury if Petitioner's trial counsel had conducted a reasonable investigation.

5.     Petitioner Lang's death sentence is voidable because he was denied the effective assistance of counsel at the penalty phase of his capital trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and he was thereby prejudiced. . . . As early as age three Petitioner was the victim of highly traumatic physical and sexual abuse as a child.

6.     Petitioner Lang's death sentence is voidable because he was denied the effective assistance of counsel at the penalty phase of his capital trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and he was thereby prejudiced. . . .  Records from the Baltimore Department of Social Services document that Petitioner's mother Tracie Robinson Carter, her mother and grandmother had histories of mental health problems, including diagnosis of bi-polar effective disorder.

7.    Petitioner Lang's death sentence is voidable because he was denied the effective assistance of counsel at the penalty phase of his capital trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and he was thereby prejudiced. . . . [T]here were available facts regarding Petitioner's life long mental health deficits that would have been presented to the sentencing jury if Petitioner's trial counsel had conducted a reasonable investigation.

8.    Petitioner Lang's death sentence is voidable because he was denied the effective assistance of counsel at the penalty phase of his capital trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and he was thereby prejudiced. . . . There was available evidence that could have been presented to the jury concerning Petitioner's in utero exposure to alcohol if trial counsel would have conducted a reasonable investigation.

9.    Petitioner Lang's death sentence is voidable because he was denied the effective assistance of counsel at the penalty phase of his capital trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and he was thereby prejudiced. . . . There was available evidence that could have been presented to the jury concerning the Petitioner's prenatal exposure to extreme stress and that his birth was complicated by meconium staining if trial counsel would have conducted a reasonable investigation.

10.   Petitioner Lang's convictions and sentences are voidable because he was denied the effective assistance of counsel at the penalty phase of his capital trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and he was prejudiced. . . . . The failure of Petitioner's trial counsel to present available mitigating evidence through a psychologist at the penalty phase of Petitioner's capital trial prejudiced Petitioner.

11.   Petitioner Lang's convictions and sentences are voidable because he was denied the effective assistance of counsel at the penalty phase of his capital trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and he was prejudiced. . . . . Petitioner's counsel failed to obtain the funds for, and secure the administration of[,] a neurological assessment of Petitioner's brain to adequately prepare the defense case in mitigation of the death penalty at Petitioner's trial.

12.   The convictions and sentence imposed against Petitioner are void and/or voidable because trial counsel rendered ineffective assistance of counsel at Petitioner's trial.  The trial court failed to act to ensure the inclusion of African

11

American jurors on the panel that was to decide his guilt or innocence and whether he should live or die.

13.     Petitioner Lang's death sentence is voidable because he was denied the effective assistance of counsel at the penalty phase of his capital trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and he was thereby prejudiced. . . . Petitioner's trial counsel . . . waited until shortly before his trial to begin investigating any mitigating evidence and therefore only uncovered a minute amount information. Had trial counsel conducted a reasonable investigation in Petitioner's case they would have discovered that the effects of his bipolar disorder would make him become extremely aggressive and violent especially when he was not taking his psychotropic medication.

14.     Petitioner Lang's convictions and sentences are void or voidable because, assuming *arguendo* that none of the Grounds for Relief in this Post-Conviction Petition individually warrant the relief sought from this court, the cumulative effects of the errors and omissions as presented in the Petition in paragraphs one through thirteen have been prejudicial to the Petitioner and have denied the Petitioner his rights as secured by the United States and Ohio Constitutions.

(*id*. at 2210, 2212, 2215, 2218, 2220, 2223, 2226, 2228, 2231, 2234, 2237, 2239, 2242, 2245).  Lang requested discovery and an evidentiary hearing on all grounds (s*ee id*. at 2247).

On May 23, 2008, Lang filed amendments to two of his postconviction claims with additional exhibits (Doc. 19-3 at 2647–55).  Lang also moved for funds for a neurological examination (*id*. at 2656–65).  On June 15, 2009, the trial court issued a thirty-one page decision granting the State's motion to dismiss Lang's petition, and denying the petition and motion regarding the neuropsychological examination (Doc. 19-5 at 2873–2903).

Lang, represented by Troutman and Fleming, appealed the trial court's denial of postconviction relief.  He asserted the following assignments of error:

I.     Appellant's due process rights were violated because the trial court denied him essential mechanisms for off-record fact development despite sufficient operative facts presented by Appellant to justify his requests to further develop the factual basis for his claims.

12

II.    The trial court erred in dismissing Lang's post-conviction petition when he presented sufficient operative facts to merit relief or, at a minimum, an evidentiary hearing.

(Doc. 20-1 at 2953).  The Ohio court of appeals affirmed the trial court judgment on August 23, 2010.

*State v. Lang*, 2010-Ohio-3975 (Ct. App.).

Lang then appealed to the Ohio Supreme Court, presenting two propositions of law:

I.    Capital post-conviction petitioners are entitled to discovery and expert assistance when the petition presents sufficient operative facts and exhibits in support of claimed violations of constitutional rights that render a capital conviction and/or death sentence void or voidable.

II.    Capital post-conviction petitioners are entitled to relief, or at least an evidentiary hearing, when the petition presents sufficient operative facts and exhibits in support of claimed violations of constitutional rights that render a capital conviction and/or death sentence void or voidable.  Considered together, the cumulative errors set forth in appellant's substantive grounds for relief merit reversal or remand for a proper post-conviction process.

(Doc. 20-1 at 3097).  The court declined to accept jurisdiction to hear the appeal on March 21, 2012 (Doc. 20-2 at 3149).

**Federal Habeas Proceedings**

On November 27, 2012, Lang filed a notice of intent to initiate this habeas action, and requested appointment of counsel and leave to proceed in forma pauperis (Docs. 1–3).  This Court granted both motions and appointed Laurence Komp and Michael Benza to represent Lang (Docs. 7–8).

On September 16, 2013, Lang filed his Petition for Writ of Habeas Corpus (Doc. 16), the State of Ohio ("the State") filed a Return of Writ (Doc. 23), and Lang filed his Traverse (Doc. 33).

In May 2014, Lang filed three motions.  First, he asked to supplement the record with certain missing portions of the state-court record (Doc. 36 at 1).  Second, he sought discovery on his first

13

through fourth, seventh, eighth, fourteenth, and sixteenths grounds for relief, and discovery of facts concerning whether his fifth, tenth, eleventh, and thirteenth grounds for relief had been procedurally defaulted (Doc. 37 at 9).  Third, he requested an evidentiary hearing regarding his postconviction claims and his procedural default arguments (Doc. 38 at 4–6).

On October 23, 2014, this Court denied Lang's motions for evidentiary hearing and discovery as to his first through fourth, eighth, and fourteenth claims without prejudice, and denied with prejudice all remaining requests for discovery.  This Court granted Lang's motion to supplement the record (*see* Doc. 47).

### PETITIONER'S GROUNDS FOR RELIEF

Lang asserts seventeen grounds for relief.  They are:

1.  Mr. Lang was deprived of his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments when counsel failed to adequately and properly investigate, develop, and present significant mitigation evidence.

2.  Lang's due process rights and rights under the Sixth and Fourteenth Amendments to an unbiased jury were violated when a juror who is related to one of the victims, and has a prejudice and bias, is seated on the jury.

3.  The defendant's right to the effective assistance of counsel is violated when counsel's performance during the culpability phase of a capital trial is deficient to the defendant's prejudice under the Sixth and Fourteenth Amendments.

4.  Lang's direct appeal counsel were constitutionally ineffective.

5.  Lang's rights to equal protection, due process, and his rights to confrontation and to present a defense as protected by the Fifth, Sixth and Fourteenth Amendments were violated by the admission of unreliable scientific evidence.

6.  The State failed to introduce sufficient evidence to convict Lang in violation of the Sixth and Fourteenth Amendments.

7.  The State suppressed favorable exculpatory evidence; and improperly destroyed potentially exculpatory evidence.

14

8. The accused is denied the rights to due process and effective assistance of counsel when a trial court refuses to grant access to grand jury testimony.

9. Admission of the prior consistent statement of the co-defendant violated Lang's rights under the Sixth and Fourteenth Amendments.

10. Admission of irrelevant and prejudicial evidence during Lang's trial deprived him of a fair trial and due process under the Fourteenth Amendment.

11. Lang's substantive and procedural due process rights to a fair trial and reliable sentencing as guaranteed by the Eighth and Fourteenth Amendments were violated due to prosecutorial misconduct during the trial phase.

12. Where the jury recommends the death sentence for one count of aggravated murder, but recommends a life sentence on another count, and the aggravating circumstances and mitigating factors are identical, the resulting death sentence is arbitrary and must be vacated under the Eighth Amendment.

13. A capital defendant's rights to due process and a fair trial are denied when a prosecutor engages in misconduct during the penalty phase in violation of the Eighth and Fourteenth Amendments.

14. The defendant's right to the effective assistance of counsel is violated when counsel's performance, during the penalty phase of his capital trial, is deficient to the defendant's prejudice under the Sixth and Fourteenth Amendments.

15. When the trial judge trivializes and minimizes mitigating evidence, it violates a capital defendant's right to a reliable sentence under *Eddings*.

16. The trial court failed to act to ensure the inclusion of African-American jurors on the panel of potential jurors.

17. The cumulative effect of trial error renders a capital defendant's trial unfair and his sentence arbitrary under the Sixth, Eighth, and Fourteenth Amendments.

(Doc. 16 at 32, 45, 50, 61, 70, 76, 80, 82, 84, 86, 88, 95, 98, 103, 108, 112, 115).

## STANDARD OF REVIEW

Filed in 2012, Lang's Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Murphy v. Ohio*, 551 F.3d 485,

15

493 (6th Cir. 2009).  AEDPA, which amended 28 U.S.C. § 2254, was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'"  *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *(Michael) Williams v. Taylor*, 529 U.S. 420, 436 (2000)).  AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights."  *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).  The Act "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court."  *Id.*

Section 2254(d) forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Habeas courts review the "last explained state-court judgment" on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis omitted).  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 784–85 (2011).

A state-court decision is contrary to "clearly established Federal law" under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *(Terry) Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated

16

the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). "Clearly established Federal law" for purposes of the provision "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003). *See also White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (explaining that "only the holdings, as opposed to the dicta, of Supreme Court decisions" qualify as clearly established Federal law for purposes of § 2254(d)) (internal quotation marks and citations omitted). "And an 'unreasonable application of' those holdings must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *Woodall*, 134 S. Ct. at 1702 (quoting *Lockyer*, 538 U.S. at 75–76). "The critical point is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *Id*. at 1706–07 (quoting *Harrington,* 131 S. Ct. at 786).

A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) only if the court made a "clear factual error." *Wiggins v. Smith*, 539 U.S. 510, 528–29 (2003). This Court's review of state court factual findings is limited to "the evidence presented in the State court proceeding," and the petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 134 S. Ct. at 15; *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). *See also* 28 U.S.C. § 2254(e)(1). "[I]t is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice*, 660 F.3d at 250. "'[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Burt*, 134 S. Ct. at 15 (quoting *Wood*, 558 U.S. at 301).

17

Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Harrington*, 131 S. Ct. at 785 (internal quotation marks omitted).  Thus, a petitioner "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786–87.

But AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id*.  "[E]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  Rather, "under AEDPA standards, a federal court can disagree with a state court's factual determination and 'conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.'" *Baird v. Davis*, 388 F.3d 1110, 1123 (7th Cir. 2004) (quoting *Miller-El*, 537 U.S. at 340).  Moreover, the deference AEDPA demands is not required if (for example) § 2254(d) does not apply to a claim.  Federal habeas courts may review *de novo* an exhausted federal claim that was not adjudicated on the merits in state court.  *See Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005).

### EXHAUSTION AND PROCEDURAL DEFAULT

#### Exhaustion

Section 2254(b)(1) provides that a federal court may not grant habeas relief to an applicant in state custody "unless it appears that the applicant has exhausted the remedies available in the courts of the State . . .  or there is an absence of available State corrective process . . . or circumstances exist that render such process ineffective to protect the rights of the applicant."  28 U.S.C. § 2254(b)(1);

18

*see also Rose v. Lundy*, 455 U.S. 509 (1982).  "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  "This requirement, however, refers only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982).  A habeas court cannot review a federal claim if the petitioner can still present the claim to a state court for merits consideration.  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).  And *res judicata* bars an Ohio court from considering any issue that a petitioner could have, but did not, raise on direct appeal from his conviction or sentence.  *State v. Perry*, 10 Ohio St. 2d 175 (1967).

For good cause, a habeas court may stay the action so that the petitioner may present his unexhausted claim to state court, then return to federal court for review of his perfected petition. *Rhines v. Weber*, 544 U.S. 269, 277 (2005).  But if the habeas court determines a return to state court would be futile, it need not wait for exhaustion to occur.  *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001).  Where appropriate, § 2254(b)(2) also allows a habeas court to deny an unexhausted federal claim on the merits.  *See also Hanna v. Ishee*, 694 F.3d 596, 610 (6th Cir. 2012) (denying petitioner's claim on the merits "notwithstanding a failure to exhaust" the claim).

### Procedural Default

Further, a federal court may not consider "contentions of general law which are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure."  *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  If a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and

19

actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  A procedural bar is "independent" when a state court applies the rule without relying on federal law, *id.* at 732–33, and "adequate" when the procedural rule is "firmly established and regularly followed" by state courts, *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009).  If a petitioner fails to fairly present a federal habeas claim to the state courts and no longer can present that claim to a state court, the claim is procedurally defaulted.  *O'Sullivan*, 526 U.S. at 848; *Rust*, 17 F.3d at 160.

This Court employs a four-step analysis to assess procedural default, examining the last explained state-court decision.  *See Ylst*, 501 U.S. at 805; *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000):

> First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule.  Second, the federal court must determine whether the state courts actually enforced the state procedural sanction -- that is, whether the state courts actually based their decisions on the procedural rule.  Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (internal citations omitted).  If the last state court rendering a reasoned opinion on a federal claim "clearly and expressly states that its judgment rests on a state procedural bar," then the claim is procedurally defaulted and barred from consideration on federal habeas review.  *Harris v. Reed*, 489 U.S. 255, 263 (1989).

Even if a claim is procedurally defaulted, a federal court may excuse the default and consider the claim on the merits if the petitioner demonstrates either (1) cause for the petitioner not to follow

the procedural rule and prejudice from the alleged constitutional error, or (2) that a fundamental miscarriage of justice would result from denying federal habeas review. *Coleman*, 501 U.S. at 750.

A petitioner can establish cause to excuse procedural default in two ways. A petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by state officials that made compliance with state procedural rules impracticable. *Id.* If the procedural default can be attributed to counsel's constitutionally inadequate representation, that failing can serve as cause, so long as the ineffective-assistance-of-counsel claim was presented to the state courts. *Id.* at 488–89. If the ineffective-assistance claim was not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and only can be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective-assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000).

To establish prejudice, a petitioner must demonstrate that the constitutional error "'worked to his *actual* and substantial disadvantage.'" *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)) (emphasis in original). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000).

A narrow exception to the cause-and-prejudice requirement exists where a constitutional violation "probably resulted" in the conviction of one who is "actually innocent" of the crime for which the person was convicted in state court. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 495–96). The petitioner must show "'by clear and convincing evidence that, but

21

for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" *Id.* (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

DISCUSSION

**First, Third, and Fourteenth Grounds for Relief**
***Ineffective Assistance of Trial Counsel***

Lang claims that his trial counsel's performance denied him his Sixth Amendment right to effective assistance of counsel. Specifically, he complains that counsel:

1.   Failed to investigate, develop, and present significant mitigation evidence;

2.   Failed to challenge weak DNA evidence;

3.   Compared the jury to a lynch mob;

4.   Failed to question the entire jury regarding Juror 386, who was related to Cheek;

5.   Failed to contest prejudicial testimony;

6.   Failed to test Walker's clothing;

7.   Failed to move to seal the prosecutor's file;

8.   Failed to object to instances of prosecutorial misconduct and improper evidence admitted during the culpability phase of trial;

9.   Failed to object to Walker's prior consistent statement;

10.  Referred to Lang's childhood as "normal";

11.  Broke promises made to the jury during opening argument in the mitigation phase of trial; and

12.  Failed to object to various instances of prosecutorial misconduct during the mitigation phase of trial.

(Doc. 33 at 12–45, 59–74, 119–26). Because Lang presented each of these claims to a state court, which adjudicated each claim on its merits, each claim is preserved for federal habeas review.

22

**Ineffective Assistance of Counsel: Standard**

The Sixth Amendment right to the effective assistance of counsel at trial "is a bedrock principle in our justice system." *Martinez v. Ryan*, 132 S. Ct. 1309, 1317 (2012). The Court announced a two-part test for claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, a petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id* at 687. Counsel's performance must fall "below an objective standard of reasonableness." *Id.* at 688. A reviewing court must "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time." *Id*. at 689.

Second, a petitioner must show that he or she was prejudiced by counsel's errors with "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693 (citation and quotation marks omitted). Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. Because ineffective-assistance-of-counsel claims are mixed questions of law and fact, *id.* at 698, a habeas court reviews such claims under AEDPA's "unreasonable application" prong, § 2254(d)(1), *see, e.g*., *Mitchell v. Mason*, 325 F.3d 732, 737–38 (6th Cir. 2003).

Prevailing on an ineffective-assistance-of-counsel claim is no easy task. *See Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 788 (2011):

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.

23

*Id.* (citations and internal quotation marks omitted).  "Judicial scrutiny of a counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689.  "*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment,'" recognizing "the constitutionally protected independence of counsel and . . . the wide latitude counsel must have in making tactical decisions." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1406–07 (2011) (quoting *Strickland*, 466 U.S. at 689–90).

The Supreme Court has observed that the standards imposed by *Strickland* and § 2254(d) are both "highly deferential;" applying both standards together results in review that is "doubly" deferential.  *Harrington*, 131 S. Ct. at 788.

### Failure to Investigate and Present Mitigating Evidence

In his first ground for relief, Lang complains that his trial counsel were ineffective for failing to adequately investigate, develop, and present mitigating evidence.  On postconviction review, the Ohio court of appeals was the last court to address this claim on its merits.  Lang submitted forty-one exhibits with his petition to support the claim, comprising nearly 300 pages (Docs. 18-4, 18-5, 19-1, 19-2, 19-3 at 2248–2508, 2608–39; Doc. 19-3 at 2553–2655).[2]  The Ohio court of appeals ruled:

---

[2] These exhibits included: records pertaining to Lang's history of behavioral and emotional difficulties, as well as that of his mother and brother, including records from Johns Hopkins Hospital, family services agencies and child welfare services in Baltimore, Maryland, the Baltimore City Public Schools, Kennedy Krieger Children's Hospital, Baltimore City Counseling Center, Universal Counseling Services, Inc., Mercy Medical Center, the Gundry Glass Hospital, and Baltimore City Local Coordinating Counsel; affidavit of Abigail Duncan, a psychiatric therapist who provided therapy to Lang from January to October 2002; affidavit of Bob Stinson, a psychologist who evaluated Lang in conjunction with the post-conviction proceedings; affidavit of his mother, Tracie Carter; affidavit of Dorian Hall, a mitigation specialist employed by the Office of the Ohio Public Defender; and records reflecting the efforts of Lang's trial team to obtain mitigating evidence.

Our standard of review for ineffective assistance claims is set forth in *Strickland v. Washington*.  Ohio adopted this standard in the case of *State v. Bradley*.  These cases require a two-pronged analysis in reviewing a claim for ineffective assistance of counsel.  First, we must determine whether counsel's assistance was ineffective; i.e., whether counsel's performance fell below an objective standard of reasonable representation and was violative of any of his essential duties to the client.  If we find ineffective assistance of counsel, we must then determine whether or not the defense was actually prejudiced by counsel's ineffectiveness such that the reliability of the outcome of the trial is suspect.  This requires a showing that there is a reasonable probability that but for counsel's unprofessional error, the outcome of the trial would have been different.

As an initial matter, we note that shortly after appellant was indicted in December 2006, death penalty-qualified counsel was retained and/or appointed to represent him.  That same month, counsel filed a request for discovery and a motion for funds to hire a defense investigator, a psychological expert and a mitigation expert.  According to the court's docket, before the month of January 2007 was over, defense counsel had filed thirty seven motions on appellant's behalf.  In all, counsel filed over eighty-two motions, including a motion to permit defense to admit all relevant mitigating evidence. . . .

The focus of appellant's present argument pertains to his representation at his mitigation hearing.  At that time, appellant's counsel called two witnesses, appellant's mother and half-sister, to relate the harsh circumstances of appellant's childhood.  Appellant's mother, Tracie Carter, first described how she met Edward "Coffee" Lang, Sr., appellant's father, who was her landlord when she was a 19-year-old single mother of a two-year-old.  Unable to afford the rent, she exchanged sex with Lang, Sr. (hereinafter "Coffee") for being able to stay in her apartment.  According to Carter, she maintained a relationship with Coffee, even though he was physically abusive to her and abused heroin, cocaine, and alcohol.  Carter, as well as his half-sister Yahnena, proceeded at the mitigation hearing to portray appellant's abuse-filled childhood.

As part of his PCR petition, appellant provided additional documentation of his troubled life.  Evidence was supplied that Coffee was around appellant for part of his toddler years, before Coffee went to prison.  But during this period of time, according to a 1991 report, Coffee sexually abused appellant.  During that same time period, appellant and his siblings also "witnessed Coffee tying their mother up [for] 3-4 days, ordering her to perform fellatio, stabbing her in [the] chest with a pair of scissors, shooting her in the back of her leg, shooting windows out, cursing at her, beating her up, and attempting to set the house on fire with them in it."  In addition, the children reportedly had "witnessed Coffee raping [their mother] on several occasions."

Furthermore, appellant's older brother began acting out towards his siblings and mother.  When the brother was 6 years old, he reportedly attempted to smother his

25

mother to death and "brutally beat his siblings," including pushing his half-sister Yahnena Robinson down the stairs and hitting appellant (then 3 years old) in the head with a baseball bat.  He also reportedly acted out sexually towards appellant and Yahnena, ordering them to perform oral sex on him.  The brother was eventually admitted to a psychiatric hospital.

This phase of appellant's childhood ended when he was about ten years old.  Because of court-ordered parenting time, Coffee took appellant from Maryland at that time on what was supposed to be a two-week visitation in Delaware.  However, Coffee did not return appellant to his mother, Tracie Carter, for nearly two years.  During the time appellant lived with his father, he endured physical, sexual, and emotional abuse.  Appellant was forced to stay in his bedroom for days at a time, and he was repeatedly beaten with "anything in reach."  In addition to enduring the physical abuse, appellant was falsely told by Coffee that his mother was dead.  Appellant, at this young age, began using drugs.

When he was reunited with his mother, appellant was wearing the same clothes that he had been wearing when he left two years before.  Tracie Carter described him at that time as "fragile" and undernourished.  He was covered in bruises, had a cigarette burn on his back, and he had a gash on his hand.  Emotionally, he was withdrawn, moody, and defiant.

The years that followed appellant's stay with his father included numerous psychiatric hospitalizations and more than one suicide attempt.  During those years, appellant described to his counselors the abuse he suffered at the hands of his father, and he acknowledged anger and hatred toward him.  Appellant's counselors observed his ongoing fear that his mother would abandon him, and they observed his inability to restrain himself from "'acting first' as a defense."

Apparently, appellant did experience frequent periods of abandonment by his mother.  Appellant's psychiatric therapist, Abigail Duncan, who worked with appellant when he was approximately fourteen years old, recalled in her affidavit a time when Tracie Carter moved out of the family home with her boyfriend and appellant's youngest brother.  She left appellant alone with his older brother and his sister Yahnena, "and would return just to check on them."  According to Duncan, appellant's life lacked structure and consistent treatment.

Despite this, appellant later performed "well in school . . . when he was living in a group home receiving proper medication for his mood disorder."  When he received needed psychotropic medication, "[h]e attended all his classes and performed above average academically."  But as soon as "[h]e ceased taking his medication, his emotional and behavioral status quickly deteriorated."

26

In September 2004, appellant completed a residential treatment program at Woodbourne Residential Treatment Center in Maryland.  He was returned to his mother's care with instructions that he needed to deal with the trauma from his early childhood, but he never really did.  Furthermore, appellant never finished high school, but he got a job with the census department.  He moved in with his baby daughter and the child's mother.  But that potential for stability didn't last long, as appellant left the area he'd known his whole life and moved to Ohio.

Appellant's chief challenge under the *Strickland* standard for allegations of ineffective assistance is that his defense counsel allegedly waited until the last minute to gather mitigating evidence; thus, "compelling evidence was not available at the time of his mitigation hearing."  Appellant points to an order from the trial court, filed June 13, 2007, ordering release of records from Baltimore Social Services as proof of counsel's delay in seeking mitigation evidence.  Appellant also faults the allegedly brief time trial counsel spent with his mother, Tracie Carter, as another example of failing to fully investigate his background.  As evidence dehors the record to document these assertions, appellant submitted the affidavit of Dorian Hall, LSW, a mitigation specialist employed by the Ohio Public Defender.  In support, appellant directs us to *Rompilla v. Beard*, wherein the United States Supreme Court, quoting the 1982 version of the ABA Standards for Criminal Justice, recognized: "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction."

Nonetheless, our review of the additional documentation at issue leads us to conclude that the impact thereof is largely speculative.  Appellant's trial counsel had already presented mitigation evidence about appellant's youth and the horrors of his life growing up.  The record further does little to persuasively show a lack of investigation by trial counsel of appellant's background.  Regarding the release of records order, few conclusions can be reached therefrom as to what records were provided in 2007 based on appellant's authorization and what value, if any, the records provided to appellant's mitigation team.  Finally, in regard to the Ohio Public Defender affidavit, the evidence therein was given minimal weight because of the interest of the employee in the outcome of the litigation and because she had no direct knowledge of the conversations between Tracie Carter and the mitigation attorneys.

Furthermore, as the State correctly notes, appellant's mother and half-sister presented a detailed picture of his youth and development.  They testified to his various excursions into the mental health system and his treatment at the hands of his biological father.  Appellant does not deny that his trial counsel interviewed various members of his family.  Although Tracie Carter was able to recall that appellant had been in a psychiatric facility more than twenty-eight times, appellant points out that his mother was unable to articulate the identity of his mental health disorders, other

27

than in lay terms, and he calls into question trial counsel's decision not to utilize a psychologist or mental health counselor at mitigation.

However, we remain mindful that "[a] defendant is entitled to a fair trial but not a perfect one." Likewise, trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. In the case sub judice, the trial court determined that the strategy of trial counsel was to treat appellant's mother as a sympathetic character and not to portray her in a negative light, a strategy that easily could have been derailed with excessive information about her role in appellant's unfortunate upbringing. It is also not unreasonable to surmise that additional records may have also damaged appellant himself. As the trial court aptly noted, trial counsel's approach at mitigation was to "humanize" appellant's difficulties, rather than present them in detailed scientific terms. Trial counsel thus developed a mitigation strategy which allowed the jury to adequately weigh the mitigation evidence against the evidence of dual murder produced at the guilt phase of the trial. We reiterate that the Ohio Supreme Court has recognized the effect of hindsight and has warned against second-guessing as to counsel's assistance after a conviction.

Furthermore, considering the second prong of *Strickland*, we note that after reviewing the evidence presented by appellant in his PCR appendix, the trial court consistently reached the conclusion throughout its written decision that even if more evidence would have been presented at mitigation, the outcome would not have been different. We are unable to conclude the trial court's conclusions in this regard were unreasonable, arbitrary, or unconscionable. The record clearly indicates that appellant's mental illness and childhood were presented to the jury through the mitigation witnesses, which the jury most likely credited given its recommendation of a life sentence for the Burditte killing. We are unpersuaded that additional and more detailed evidence about appellant's upbringing and mental health issues would have created a reasonable probability that the jury would have recommended a life sentence, rather than the death penalty, for the Marnell Cheek killing.

*Lang*, 2010-Ohio-3975, at ¶¶ 31–46 (internal citations omitted).

Counsel in capital cases has an "obligation to conduct a thorough investigation of the defendant's background" for mitigation purposes. *Williams*, 529 U.S. at 396. In *Strickland*, the Court noted that a capital sentencing proceeding "is sufficiently like a trial in its adversarial format and in the existence of standards for decision" such that counsel's role in the two proceedings is comparable: "to ensure that the adversarial testing process works to produce a just result under the standards

28

governing decision." *Strickland*, 466 U.S. at 686. *See also Wiggins v. Smith*, 539 U.S. 510, 525 (2003) (counsel ineffective where petitioner had an "excruciating life history" but counsel focused exclusively on defendant's direct responsibility for murder). But, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.

Lang claims the state court of appeals decision denying his ineffective-assistance failure-to-investigate claim was contrary to, or an unreasonable application of, *Strickland*. Thus, this Court must examine whether the Ohio court of appeals acted unreasonably in finding that Lang: had not overcome the strong presumption of competence by proving his counsel's deficient performance in his preparation for, and presentation during, the sentencing phase of the trial; or failed to demonstrate a reasonable probability that a jury presented with this additional mitigating evidence would have recommended a different sentence. *See Pinholster,* 131 S. Ct. at 1403.

**Investigation.** Lang faults his trial counsel for failing to discover "'all reasonably available mitigating evidence'" (Doc. 16 at 88 (quoting *Wiggins*, 539 U.S. at 524) (emphasis removed)). He argues that trial counsel did not "meet with mitigation witnesses, ensure experts and the investigator had sufficient resources, including time, to collect and review records, evaluate Lang and his family, develop a coherent mitigation strategy, and seek appropriate expert evaluation of Lang" (Doc. 16 at 18). For support, Lang points to his mother's affidavit, in which she avers that she met with his trial counsel only briefly in April 2007 and again for about three hours the day before she testified. She

further states that she met with Lang's mitigation specialist, James Crates, for twenty-five minutes when he traveled to Baltimore in June 2007 requesting her help obtaining Lang's medical records (Doc.18-4 at 2255).  Lang also notes that his expert psychologist, Jeffrey Smalldon, sent a fax to Lang's counsel on July 9, 2007, asking, "No Lang records yet, I gather . . . ??" (Doc. 19-3 at 2654).  And, on July 18, 2007, Smalldon wrote in a note, "Per J. Crates – <u>lots</u> of case-relevant recs. just coming in now" (Doc. 19-3 at 2655).  Finally, Lang cites a letter that Crates received from the Baltimore Department of Social Services on July 12, 2007, two days after the trial had begun, stating it was providing records regarding Lang's foster care and that additional records would be "forthcoming shortly" (Doc. 19-3 at 2653).

First, as the Ohio court of appeals noted, Lang's claim is speculative, and the record fails to show a constitutionally inadequate investigation.  Rather, the record demonstrates that trial counsel, Crates, and Smalldon, did a substantial amount of mitigation investigation well before the trial began.  As the Ohio court noted, shortly after their appointment, trial counsel filed a request for discovery and a motion for funds to hire a defense investigator, a psychological expert, and a mitigation expert, which the court granted.  Within two months, trial counsel had filed thirty-seven motions on Lang's behalf.  And by the end of trial, they had filed over eighty-two motions, including a motion to permit the defense to admit all relevant mitigating evidence (Doc. 17-1 at 1–23).

Moreover, Crates' first invoice indicates that he began reviewing documents as soon as he was hired, on January 8, 2007.  He made consistent efforts to obtain records beginning with his "[i]nitial contact with Baltimore" on February 6, 2007.  But on June 14, he wrote a memo regarding "difficulties in [r]etrieval" (Doc. 17-3 at 807–09).  Similarly, Smalldon's invoice demonstrates that he spent several hours reviewing "discovery" soon after he was hired, repeatedly consulted with

30

Crates and trial counsel from January through July, reviewed records in June, and interviewed and assessed Lang twice, in January and June, for more than eighteen hours (Doc. 17-5 at 1398).

Finally, the trial court confirmed with trial counsel during pretrial hearings that the mitigation experts had "everything they need[ed]" to proceed to trial, and that the mitigation specialist in particular was "on top of everything" (Doc. 22-1, Tr. of June 27, 2007 hearing at 30; Tr. of June 13, 2007 hearing at 24). In addition, after the parties rested in the mitigation phase, the trial court questioned trial counsel about their preparation efforts for this phase of the trial:

| | |
|---|---|
| The Court: | I would indicate that just for the record, that as part of the trial preparation in this matter the Court had provided at the defense request various experts and other tools that were made available. The Court authorized the expenditure of funds for defense to explore the mitigation in this matter. And, counsel, that was followed through with all of that; is that correct? |
| Mr. Koukoutas: | Yes, Your Honor, it was. |
| | |
| The Court: | In fact, one of the experts was here today in the courtroom. |
| Mr. Koukoutas: | That is correct. |
| | |
| The Court: | That was? |
| Mr. Koukoutas: | James [Crates]. |
| | |
| The Court: | And I note that you were advising with him from time to time throughout the course of the mitigation; is that correct? |
| Mr. Koukoutas: | That is correct. |
| | |
| The Court: | Anything further you want to put on the record? |
| Mr. Koukoutas: | Not at this time, Your Honor. |

(Doc. 22-3, Mitig. Tr., at 85–86.)

Therefore, the Ohio court did not unreasonably decide that trial counsel's efforts to prepare for the mitigation phase of trial were constitutionally adequate.

**Presentation of Evidence.** Nor did the Ohio court unreasonably conclude trial counsel's presentation of the mitigation evidence was constitutionally adequate. Lang argues that counsel's

"cursory investigation" led to their "abandonment" of "substantial psychological, medical, social and education evidence" and the "presentation of uncorroborated, incomplete and inaccurate mitigation" through only two witnesses, Lang's mother, Tracie Carter, and his step-sister, Yahnena Robinson (Doc. 33 at 12, 28–29).  He points to his trial counsel's remark in closing arguments that Lang had a "'pretty normal childhood up until he was ten'" as evidence that trial counsel "were utterly ignorant of their client's real history" (Doc. 33 at 29, quoting Doc. 22-3, Mitig. Tr., at 96).

This Court "begin[s] with the premise that 'under the circumstances, the challenged action[s] might be considered sound trial strategy.'"  *Pinholster*, 131 S. Ct. at 1404 (quoting *Strickland*, 466 U.S. at 689).  Indeed, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  *Strickland*, 466 U.S. at 690.  Thus, the Court has held that counsel is not ineffective for deciding to offer little or no mitigation evidence where that decision is based on sound professional judgment.  *See*, *e.g.*, *Bell v. Cone*, 535 U.S. 685, 702 (2002); *Burger v. Kemp*, 483 U.S. 776, 793–95 (1987); *Darden v. Wainwright*, 477 U.S. 168, 184 (1986); *Strickland*, 466 U.S. at 699–700.

Here, the Ohio court accepted the trial court's determination that trial counsel's decision to offer the testimony of only Lang's mother and step-sister was based on sound trial strategy.  It concluded that counsel sought "to treat [Lang's] mother as a sympathetic character and not to portray her in a negative light" and to "humanize [Lang's] difficulties, rather than present them in detailed scientific terms."  *Lang*, 2010-Ohio-3975, at ¶ 45 (quotation marks omitted).

A court may infer from record trial counsel's strategic basis for presenting (or not presenting) certain evidence in mitigation:

> Although courts may not indulge post hoc rationalization for counsel's decisionmaking that contradicts the available evidence of counsel's actions, . . . neither may they insist counsel confirm every aspect of the strategic basis for his or her actions.  There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect.

*Harrington*, 131 S. Ct. at 790 (internal citations omitted).  Trial counsel articulated their strategy for the mitigation phase of the trial during opening arguments:

> I'm here to tell you about Edward Lang or Eddie as I have come to know him as I have been meeting with him quite often.  I am here to tell you about Eddie Lang, the person, the human being, not Eddie Lang the name on a case number, the Defendant.  You will hear from two witnesses today.  They will tell you a little bit about Eddie and the kind of person he is.  And you will hear from his mom, Tracey [*sic*] Carter and you'll also hear from his half-sister, Yahnene [*sic*] Robinson.

(Doc. 22-3, Mitig. Tr., at 31.).  Trial counsel reiterated the same strategy during closing argument:

> I told you that I wanted all of you to learn something about Eddie, learn about who he was, is, where he came from, I want to show you that he's not just a name on a case file or a name that appears in the newspaper, that he's an actual human being, he's an actual person.

(Doc. 22-3, Mitig. Tr., at 95–96).  The record supports the Ohio court's conclusion that trial counsel pursued a "humanizing" strategy.

Moreover, as the Ohio court reasoned, much of the evidence Lang claims should have been presented to the jury in mitigation would have been cumulative of other evidence that was presented.  The Ohio court carefully examined and summarized the evidence Lang presented during postconviction review.  It concluded that Lang's mother and step-sister presented "a detailed picture" of  Lang's mental illness and the "horrors of his life growing up."  *Lang*, 2010-Ohio-3975, at ¶¶ 43–44.  "'[T]he failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation.'"  *Eley v. Bagley*, 604 F.3d 958, 968 (6th Cir. 2010) (quoting *Nields v. Bradshaw*, 482 F.3d 442, 454 (6th Cir. 2007)).

The Ohio court also reasonably concluded that the mitigating evidence Lang argues should have been presented at trial may have exposed him to potentially devastating rebuttal and cross-examination.  *See, e.g.*, *Wong v. Belmontes*, 130 S. Ct. 383, 391 (2009) (rejecting petitioner's "'more-evidence-is-better' approach to mitigation" where it would have opened door to evidence of past murders); *Strickland*, 466 U.S. at 699 ("Restricting testimony on respondent's character to what had come in at the plea colloquy ensured that contrary character and psychological evidence and respondent's criminal history, which counsel had successfully moved to exclude, would not come in.").

The records trial counsel did not offer in mitigation are replete with references to Lang's violent and defiant behavior.  For example, Lang's postconviction expert psychologist summarized hospital records from 2001 as indicating that:

> Edward's mother had reported that Edward was unable to make or maintain friendships.  He struggled to accept consequences for his behavior or take responsibility for his actions.  Edward had numerous psychiatric hospitalizations that year, with extremely aberrant behaviors that included repeated incidents of suicidal ideation, threatening others, fire setting, and engaging in inappropriate sexual behaviors . . . .  Edward struggled with frustration tolerance and impulse control problems and had become aggressive and violent with peers.

(Doc. 18-4 at 2299).  She wrote that in July 2003, Lang "act[ed] out so severely that he was denied a placement at the Chesapeake Youth Center, a residential treatment center for violent and behaviorally disturbed youth[,] because he was considered too violent for placement at that site" (*id.*).  In addition, in 2003 a school psychologist reported:

> On one occasion, Edward came to school stating that he had been pursued in an attempted assault by drug dealers who wanted to kill him for stealing their stash of drugs.  He was soon thereafter arrested for destroying the interior of his mother's home in a violent outburst.  During this period of time, Edward was assigned to participate in outpatient therapy through Johns Hopkins, but he did not comply with his medication regimen.

(Doc. 18-5 at 2372).  And in December 2006, Lang pled guilty to a felonious assault while in county jail awaiting his capital murder trial (Doc. 19-3 at 2610–20).

The records also contain a substantial amount of information about Lang's mother that could have undermined her credibility and the jury's sympathy for her.  Numerous governmental agencies documented how she neglected, abused and abandoned Lang and his siblings (*see, e.g.*, Doc. 19-3 at 2627–39).

Thus, Lang has not "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Strickland*, 466 U.S. at 689 (quotation marks omitted).

**Prejudice.**  Nor did the Ohio court unreasonably conclude that trial counsel's performance during mitigation did not prejudice Lang under *Strickland*.  Lang's mother and step-sister testified to his troubled childhood and mental health problems.  The records Lang submitted during postconviction review as overlooked mitigation evidence also contained evidence that could have damaged his mitigation case.  Considering these factors, together with the aggravating circumstances the jury found, the Ohio court reasonably decided that Lang cannot show a reasonable probability that the jury would have imposed a lesser sentence if it had been presented the additional "mitigation" evidence.

### Failure to Challenge Weak DNA Evidence

Lang asserts several claims regarding trial counsel's performance during the guilt phase of his trial.  He first argues that trial counsel were ineffective for failing to mount a "forceful" challenge to the State's DNA evidence and "incorrectly conceding [during closing argument] that there was a DNA 'match' that identified Lang as the principal offender" (Doc. 16 at 51).  He contends that trial

counsel's deficient performance regarding the DNA evidence prejudiced him because it undermined his otherwise strong defense that Walker was the shooter (*id*. at 51–53).

The Ohio Supreme Court rejected this claim:

First, Lang argues that his counsel were ineffective by failing to forcefully challenge the state's DNA evidence.  However, the record belies this claim. During cross-examination, defense counsel elicited from Michele Foster, the state's DNA expert, that there was such a small amount of DNA obtained from the handgun that the DNA profile could not be entered into the CODIS database.  Counsel also elicited from Foster, "[W]hen we say to a reasonable degree of scientific certainty this person is a source, that statistic has to be more than 1 in 280 billion."

Lang also argues that defense counsel should have moved to suppress the DNA evidence under Evid. R. 401 through 403 (relevant evidence).  As discussed in proposition II, the state's DNA evidence was relevant because it tended to connect Lang to the handgun used to kill the victims.  In addition, the trial court could have determined that the admission of the DNA evidence outweighed any danger of unfair prejudice, confusion of the issues, or misleading the jury.  Thus, this ineffectiveness claim also lacks merit.

Next, Lang argues that his counsel were ineffective by conceding that the DNA found on the handgun matched his DNA. During closing argument, his counsel stated:

"The gun.  I was interested in noting how Mr. Barr misstated the facts.  He said Eddie Lang's DNA is on the gun.

"That's not what I heard.  I think the Crime Lab people said that he can't be excluded.  I think that's what they said.  I don't think they said it is conclusive.

"Plus, there was some minor DNA that they couldn't identify whose DNA it was.  *But maybe I am wrong.  Maybe they did say that.  It is conclusively Eddie Lang's DNA.  Maybe that's true.*" (Emphasis added.)

Counsel's argument was a poor attempt to rectify his previous misstatements about the DNA evidence.  But Lang contends that defense counsel's concession was unduly prejudicial because there was no conclusive proof that his DNA was found on the handgun. Even assuming that counsel's approach was deficient, Lang fails to establish prejudice under the *Strickland* test.  Evidence that Lang's DNA might be on the handgun was not surprising, because the handgun was his.  Moreover, such evidence was not crucial to the outcome of the defense case. Lang's defense was that he gave Walker his handgun, and Walker shot the victims.  Thus, testimony that Walker's

36

DNA was not found on the handgun was the key evidence, and testimony about Lang's DNA was not.  This ineffectiveness claim is rejected.

*Lang*, 129 Ohio St. 3d at 538–39.

Lang argues the Ohio court acted unreasonably by finding trial counsel's cross-examination of the State's DNA expert adequate.  The expert's testimony, Lang argues, was "worthless, unreliable, unscientific, and junk science" (Doc. 33 at 60).  But he does not specify what trial counsel should have done differently in his cross-examination or explain why the State's expert's testimony was "junk science," as opposed to just weak evidence.  Lang only states that trial counsel should have moved to suppress the DNA evidence and objected to Foster's testimony (Doc. 16 at 52).  The Ohio Supreme Court reasonably concluded that a motion to suppress or objections at trial would not have been successful.

With regard to trial counsel's DNA-related remarks during closing argument, Lang first argues the Ohio Supreme Court assumption that trial counsel's conduct was deficient is a "binding" determination under AEDPA, or, alternatively, allows *de novo* review in this Court because no state court adjudicated the issue on its merits (Doc. 33 at 60).  But aside from providing no authority for this assertion, and aside from the rule that even summary adjudications by state courts are considered adjudications on the merits for purposes of AEDPA, *see Harrington*, 131 S. Ct. at 784–85, Lang must still satisfy both prongs of *Strickland* to prevail on an ineffective-assistance claim, *Strickland*, 466 U.S. at 687.  (Lang asserts this argument in connection with many of his ineffective-assistance sub-claims; this Court rejects the argument as it relates to those claims as well.)

Lang further asserts that the Ohio court's conclusion that Lang suffered no prejudice as a result of counsel's remarks during the closing argument is predicated on an unreasonable determination of fact.  He argues that the Ohio court "found that the absence of Walker's DNA was the critical fact but

37

a review of the evidence and the prosecutor's arguments reveal that the critical fact was Lang's DNA and Foster's junk science testimony" (Doc. 33 at 61).  He points to the following statement of the prosecutor during his closing argument:

> Then what else tells us that Eddie Lang is the principal offender?  This gun, right here, tells you beyond a reasonable doubt that Eddie Lang is the principal offender.
>
> Why?  Because it is not human.  It is the only thing in this trial that is not capable of being dishonest.

(*id*. at 61, quoting Doc. 22-3 at 1273–74).  This statement does not contradict the state court's conclusion that the key issue in the case with respect to DNA evidence was the absence of Walker's DNA on the gun pointing to Lang as the principal offender, not the possible presence of Lang's DNA on the gun.

Moreover, as the State notes, while trial counsel may have misstated the expert's conclusion regarding the DNA on the gun as being "conclusively Eddie Lang's," trial counsel never conceded that the DNA identified Lang as the principal offender (Doc. 23 at 59–60).  The distinction is important. The Ohio court could reasonably conclude that, during closing argument, trial counsel dismissed as unimportant the presence of Lang's DNA on his own gun.

### Comparison of the Jury to a Lynch Mob

Lang further claims that his attorney lost credibility and alienated the jury when he compared the jury to a lynch mob.  He argues the all-white jury could have perceived the argument as accusing them of racial bias against Lang (Doc. 16 at 54–55).

The Ohio Supreme Court addressed this claim on the merits:

> Second, Lang argues that counsel were ineffective during final argument by comparing the jury to a lynch mob. During final argument, trial counsel stated:

38

"A lynch mob is made up of the same people that make up a jury.  They are citizens of the community, employers, employees, taxpayers, voters, they are the same people.

"So what separates them?  One thing separates a lynch mob from a jury and one thing only.  That's your oath of office.

" * * *

"They (a lynch mob) are not interested in evidence.  They are not interested in the fact that there is no forensic evidence linking Eddie Lang to either one of those murders.  They are not interested in that.

"A jury is.  A jury is interested, and they want to know of four people in that vehicle on October 22, why do you run tests on three of them and not the guy that got the deal?

"Why run tests on Jaron Burditte's clothes?  Why run tests on Marnell Cheek's clothes?  Why run tests on Eddie Lang's clothes, and stop, come to a halt with Antonio Walker's clothes?  Why?

"A jury, not a lynch mob, would be interested in that.  They are made up of the same people.

"Now, just because a jury takes an oath of office does not mean that they have to act like a jury.  They can go in the jury room, close the jury door, hey, let's flip a coin.  So guilty, let's go.  Okay.  Jury has spoken.

"But the problem is violence was done to not only the Defendant but beyond that.  Violence was done to the system.  If I am indicted, if the Court is indicted, Prosecutor is indicted, if Mr. Koukoutas is indicted, even if one of those Deputies are indicted, the only safeguard we have is the oath of office.

"Life will go on for everybody in this courtroom.  If you act like a jury or if you act like a lynch mob."

Lang argues that trial counsel lost credibility and alienated the jury when he made his lynch-mob argument.  Lang contends that the jury may have perceived counsel's lynch-mob comparison as an attempt to play the race card, particularly because an African-American counsel made the argument on behalf of an African-American defendant.

Counsel for both sides are afforded wide latitude during closing arguments.  Debatable trial tactics generally do not constitute a deprivation of effective counsel.  Trial

counsel's lynch-mob argument focused the jury's attention on their oath and obligation as jurors. Counsel's argument also highlighted the lack of forensic testing conducted on Walker's clothing.  Lang's claim that counsel's argument alienated the jury by presenting the imagery of racist brutality is speculative.  Thus, counsel's decision to make this argument was a "tactical" decision and did not rise to the level of ineffective assistance.

*Lang*, 129 Ohio St. 3d at 539–40 (internal citations omitted).

The right to effective assistance of counsel extends to closing arguments.  *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003).  "[C]ounsel has wide latitude in deciding how best to represent a client," and counsel's tactical decisions in closing argument are accorded deference "because of the broad range of legitimate defense strategy at that stage."  *Id*. at 5–6. "Judicial review of a defense attorney's summation is therefore highly deferential and doubly deferential when it is conducted through the lens of federal habeas."  *Id*. at 6.

Lang argues that the Ohio Supreme Court's decision was unsupported by the record and that trial counsel's remarks "could have no genesis in tactic" (Doc. 33 at 62).  Here, the state court reasonably determined that defense counsel's lynch-mob argument was a strategic attempt to emphasize to the jury their obligation to view the evidence carefully and critically.  This strategy falls "well within the range of professionally reasonable judgments."  *Strickland*, 466 U.S. at 699.

**Failure to Question the Entire Jury Regarding Excused Juror**

Lang next asserts that trial counsel were ineffective because they did not request permission from the court to question each juror about their possible discussions with a juror who was removed from the jury because she was related to Cheek (though not by blood) (Doc. 16 at 55–58).  The Ohio Supreme Court summarily rejected this claim, reasoning that even if it were to assume deficient performance by counsel, Lang suffered no prejudice.  *Lang*, 129 Ohio St. 3d at 542.  As this Court

finds no merit in Lang's underlying claims regarding the trial court's failure to question each juror, Lang cannot show prejudice for purposes of this Sixth Amendment claim.

### Failure to Contest Prejudicial Testimony

Lang complains that trial counsel failed to contest prejudicial testimony that Lang's nickname was "Tech," and that Lang vomited after the murders and said "every time I do this [*i.e.*, commit violence or murder someone], this same thing happens" (Doc. 16 at 58–59). The Ohio Supreme Court denied this claim, finding the statements did not prejudice Lang. *Lang*, 129 Ohio St. 3d at 542. This Court agrees. The supposed connection between the name "Tech" and gangs and gun violence was never explained to the jury, nor is there an indication that the jurors were aware of the connection. Similarly, there were no additional references during the trial to other acts of violence committed by Lang, so it would be speculative to assume the jury gave any weight to the vomit comments, either.

### Failure to Test Walker's Clothing

Lang also argues that trial counsel were ineffective because they failed to secure a forensic expert to independently test the clothes Walker wore during the murder. Lang asserts such testing would have produced evidence to support his claim that Walker was the principal offender (Doc. 16 at 59–60). The Ohio Supreme Court addressed this claim:

> The police seized Walker's shoes and the hooded sweatshirt he was wearing on the night of the murders, but not his pants. Foster examined Walker's shoes and hooded sweatshirt and found no blood or trace evidence. Gunshot-residue tests were not conducted on these clothes, because the state never requested it.
>
> Lang argues that defense counsel were ineffective by failing to secure a forensic expert to test the pants that Walker was wearing on the night of the murders for bloodstains and gunshot residue. However, counsel could not make such a request, because the police never seized his pants. Thus, this ineffectiveness claim lacks merit.
>
> As for the other clothing, counsel's failure to pursue independent testing of them appears to have been a tactical decision. Moreover, defense counsel used the state's

> failure to conduct testing of Walker's clothing during closing arguments as a reason for finding [Lang] not guilty.  Finally, resolving this issue in Lang's favor would be speculative.  "Nothing in the record indicates what kind of testimony an * * * expert could have provided. Establishing that would require proof outside the record, such as affidavits demonstrating the probable testimony. Such a claim is not appropriately considered on a direct appeal."

*Lang*, 129 Ohio St. 3d at 540–41 (internal citations omitted).  This decision does not unreasonably apply *Strickland*.

Shifting his focus to postconviction proceedings, Lang contends that "[t]he failure of postconviction counsel to conduct this testing constitutes ineffective assistance of postconviction counsel and serves as cause and prejudice permitting this Court to grant discovery and an evidentiary hearing on this matter."  He cites for support *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), *Trevino v. Thalor*, 133 S. Ct. 1911 (2013), and *Sutton v. Carpenter*, 745 F.3d 787 (6th Cir. 2014) (Doc. 33 at 70).  These cases, however, are inapposite.

In *Martinez*, the Supreme Court held that the "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."  *Id.* at 1315.  The Court emphasized that its holding in *Martinez* represents a "narrow exception" to the procedural-default bar.  *Id.* at 1319.  In *Trevino*, the Supreme Court expanded the scope of *Martinez* to apply when a state, by reason of the "design and operations" of its procedural framework, permits but "makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal."  *Trevino*, 133 S. Ct. at 1921.  And in *Sutton*, the Sixth Circuit applied *Trevino* to Tennessee ineffective-assistance claims.  *Sutton*, 745 F.3d at 790.  These cases apply only to excusing the procedural default of ineffective-assistance-of-trial-counsel claims in federal habeas actions; they have no bearing on discovery or evidentiary hearings relating to such claims.

42

Lang also argues that the state postconviction court's denial of his request for discovery "means that the state courts did not adjudicate this claim on the merits and therefore the limitations of the AEDPA do not apply" (Doc. 33 at 68).  Lang cites no authority for this proposition, which also fails.

### Failure to Move to Seal the Prosecutor's File

Lang contends that trial counsel were ineffective because they failed to ask the trial court to seal the prosecutor's file for appellate review (Doc. 16 at 60).  The Ohio Supreme Court rejected this claim:

> Sixth, Lang argues that his counsel were ineffective by failing to request the court to seal the prosecutor's file for appellate purposes.  Lang contends that sealing was necessary to ensure the complete disclosure of exculpatory evidence as required by *Brady v. Maryland*.  But the court was not required to seal the prosecutor's file based on speculation that the prosecutor might have withheld exculpatory evidence.  Moreover, we denied a defense motion to seal the prosecutor's file that was filed with this court.  Thus, this claim is also rejected.

*Lang*, 129 Ohio St. 3d at 542 (internal citations omitted).

Lang argues this decision contradicts *State v. Brown*, 115 Ohio St. 3d 55 (2007) (Doc. 33 at 68–69).  In *Brown*, the trial court granted a defense motion to seal the prosecutor's files and make the files part of the record for appellate review.  *Brown*, 115 Ohio St. 3d at 63.  The Ohio Supreme Court later determined that several documents in the file satisfied the *Brady* standard for exculpatory evidence that should have been disclosed to the defense.  *Id*. at 63–65.  It vacated the judgment against the defendant and remanded the case for a new trial.  *Id*. at 69–79.

*Brown* does not help Lang.  "[F]ederal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  *See also Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the

Constitution, laws, or treaties of the United States.").  "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

### Failure to Object to Instances of Prosecutorial Misconduct and Improper Evidence Admitted During the Culpability Phase of Trial

Lang complains that trial counsel failed to object to numerous instances of prosecutorial misconduct and the improper admission of evidence during the guilt phase of trial (Doc. 16 at 60–61). The Ohio Supreme Court summarily rejected this claim on the ground that even if it were to assume deficient performance by counsel, trial counsel's performance would not have prejudiced Lang. *Lang*, 129 Ohio St. 3d at 542.  As this Court finds no merit in Lang's underlying claims regarding prosecutorial misconduct and trial error, Lang cannot show prejudice for purposes of this Sixth Amendment claim.

### Failure to Object to Walker's Prior Consistent Statement

Lang contends that trial counsel were ineffective for failing to object to admission of Walker's prior consistent statement (Doc. 16 at 61).  The Ohio Supreme Court again summarily rejected this claim on the ground that even if it were to assume deficient performance by counsel, it would not have prejudiced Lang.  *Lang*, 129 Ohio St. 3d at 542.  This Court finds no merit in Lang's underlying claim regarding Walker's testimony.  As a result, Lang cannot show prejudice on this Sixth Amendment claim.

### Reference to Lang's Childhood as "Normal"

Lang asserts trial counsel was ineffective for remarking in closing argument that Lang had a "pretty normal childhood up until he was ten."  He argues the comment was a "gross

misrepresentation of the record and detrimental to [Lang]'s interest" (Doc. 16 at 106).  The Ohio

Supreme Court addressed this claim:

> Lang argues that his counsel misrepresented the evidence during closing argument by telling the jury, "You learned that [Lang] had siblings, that * * * like the prosecutor said, *pretty normal childhood up until he was ten.*"  Lang argues that counsel's argument misrepresented the evidence about his childhood and was prejudicial.
>
> Defense counsel's argument did not misrepresent the evidence.  Carter testified that Lang did not meet his abusive father until he was ten years old.  As discussed in proposition XII, Robinson also testified that before Lang was ten years old, they "had a typical brother sister relationship."
>
> Counsel's argument also maintained defense credibility and allowed the defense to focus the jury's attention on defense counsel's argument that addressed Lang's abuse after his father abducted him. Thus, counsel's characterization of Lang's early childhood did not result in ineffective assistance of counsel.

*Lang*, 129 Ohio St. 3d at 551–52 (internal citations omitted).

Considering all the evidence -- including the evidence presented on postconviction review --

Lang did not have a "normal" life before age ten.  But the Ohio court reasonably determined that trial

counsel's comment during closing did not misrepresent the testimony presented in mitigation.  That

evidence centered on Lang's experiences at the hands of his father who, as Lang's mother testified,

was absent until Lang was ten years old.

### Broken Promises Made to the Jury During Opening Argument in the Mitigation Phase of Trial

Lang complains that trial counsel were ineffective because they failed to carry through on a

promise made during opening argument to present certain mitigating evidence (Doc. 16 at 106–07).

Specifically, trial counsel promised to provide evidence that the neighborhood in which Lang grew

up was "one of the most dangerous ones in the State of Maryland" (Doc. 16 at 107(quoting Doc. 22-3,

Mitig. Tr., at 96)).  Trial counsel also promised to offer evidence that Lang suffered from suicidal

45

thoughts (Doc.16 at 107).  Lang claims that this evidence would have "explained where Lang came from, his emotional state, and shed light on whether death was the appropriate sentence in this case" (*id.*).  He further argues that trial counsel's failure to present this evidence "hampered their credibility in the jurors' eyes [and] weaken[ed] Lang's overall mitigation case" (*id.*).

> The Ohio Supreme Court addressed this claim:
>
> Lang claims that his counsel broke his promise to present evidence showing that he grew up in "one of the most dangerous" neighborhoods in Baltimore.  However, counsel did not make a direct promise that he would present such evidence.  Rather, trial counsel told the jury, "[Y]ou will *probably* hear the neighborhood is now known as one of the most dangerous ones in the State of Maryland."  Thus, Lang has failed to show that his counsel broke such a promise to the jury.
>
> Lang also argues that his counsel broke a promise to present testimony that he suffered from thoughts of suicide.  During opening statements, defense counsel stated that Lang was a "different person" after he returned home following his abduction.  Counsel also stated, "You'll hear about Eddie's thoughts of suicide."
>
> Defense counsel presented no evidence during the mitigation case that Lang had considered suicide.  Thus, counsel were deficient in failing to keep this promise.  But Lang has not established that this deficiency was prejudicial.  He merely speculates that such an omission caused the defense to lose credibility and weakened the overall defense case.  Accordingly, this claim is rejected.

*Lang*, 129 Ohio St. 3d at 552.  The Ohio Supreme Court's decision is neither contrary to, nor an unreasonable application of, *Strickland*.

### Failure to Object to Various Instances of Prosecutorial Misconduct

Lang complains that trial counsel failed to object to various instances of prosecutorial misconduct during the mitigation phase of trial (Doc. 16 at 107).  The Ohio Supreme Court denied this claim because it found no merit in the underlying prosecutorial-misconduct claims.  *Lang*, 129 Ohio St. 3d at 552–53.  This Court rejects the claim for the same reasons.

**Cumulative Effect of Errors**

Lang contends that the cumulative effect of his trial counsel's performance violated his right to effective assistance of counsel (Doc. 33 at 74).  However, Lang has not overcome the strong presumption that trial counsel's performance lies within the wide range of reasonable professional conduct.  *Strickland*, 466 U.S. at 689.  Nor has he shown prejudice from trial counsel's conduct.  *Id.* at 694.  Because Lang has not shown that any of the alleged instances of ineffective assistance of counsel deprived him "of a fair trial, a trial whose result is reliable," *id.* at 687, he cannot show that the cumulative effect of these alleged deficiencies amounted to ineffective assistance of counsel, *see, e.g.*, *Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004) (concluding the accumulation of non-errors cannot establish constitutionally ineffective assistance of counsel).

**Fourth Ground for Relief**
*Ineffective Assistance of Appellate Counsel*

Lang contends he received ineffective assistance from his appellate counsel.  He complains that appellate counsel did not present the following issues on direct appeal to the Ohio Supreme Court:

1.    Trial counsel were ineffective for failing to request, and the trial court erred by failing to sua sponte provide, a limiting instruction to the jury regarding the proper use of a co-defendant's guilty plea to complicity to commit murder;

2.    The trial court violated *Batson v. Kentucky*, 476 U.S. 79 (1986), and trial counsel were ineffective for failing to object to the *Batson* violation;

3.    The trial court erred by denying access to the grand jury transcripts of Walker's indictment;

4.    The trial court erred by admitting evidence of Lang's gang involvement; and

5.    Trial counsel were ineffective for failing to request permission from the court for a more substantial group inquiry regarding the excluded juror.

47

(Doc. 16 at 62–70).

Because Lang presented these claims in a timely application to reopen his direct appeal before the Ohio Supreme Court, an application that was summarily denied (Doc. 18-4 at 2158), he preserved the claims for federal habeas review.

A criminal defendant is entitled to effective assistance of counsel in the defendant's first appeal as a matter of right. *See Evitts v. Lucey*, 469 U.S. 387, 396 (1985). *Strickland* analysis applies to claims of ineffective assistance of appellate counsel. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000). Thus, Lang must demonstrate that appellate counsel's performance was deficient, and that the deficient performance so prejudiced the appeal that the appellate proceedings were unfair and the result unreliable. *See Strickland*, 466 U.S. at 687.

But a criminal defendant does not have a constitutional right to have every non-frivolous issue raised on appeal, *Jones v. Barnes*, 463 U.S. 745, 750–54 (1983), and tactical choices regarding issues to raise on appeal are left to the sound professional judgment of counsel, *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). "[O]nly when issues are clearly stronger than those presented[] will the presumption of effective assistance of [appellate] counsel be overcome." *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003) (internal quotation marks and citations omitted).

### Jury Instruction Regarding Walker's Plea

On direct appeal, appellate counsel did not argue that (1) Lang's trial counsel was ineffective for failing to request a limiting instruction related to the proper use of Walker's plea of guilty to complicity to commit murder, or (2) the trial court erred by failing to *sua sponte* provide such an instruction (Doc. 16 at 62–64). For all of Lang's ineffective-assistance-of-appellate-counsel claims relating to failure to raise arguments regarding his trial counsel's performance, the State argues it is

48

"apparent" that appellate counsel reviewed the record to identify viable ineffective-assistance-of-trial-counsel arguments; indeed, appellate counsel raised other *Strickland* arguments.  The State argues appellate counsel reasonably could have concluded that omitted *Strickland* claims were less likely to succeed than were the *Strickland* claims that were raised on direct appeal (Doc. 23 at 61).  The State does not address the standalone claim of error regarding the trial court's failure to *sua sponte* issue a jury instruction regarding the jury's use of the Walker plea.

"To warrant habeas relief because of incorrect jury instructions, [a petitioner] must show that the instructions, as a whole, were so infirm that they rendered the entire trial fundamentally unfair." *Murr v. United States*, 200 F.3d 895, 906 (6th Cir. 2000).  Lang notes the well-established principle that the guilty plea of a co-defendant cannot be used as substantive evidence of a defendant's guilt, and that any use of a co-defendant's guilty plea to impeach a witness must be paired with a limiting jury instruction.  *See, e.g.*, *United States v. Dougherty*, 810 F.2d 763, 767–68 (8th Cir. 1987); *United States v. Bright*, 1995 WL 98816, at *4 (6th Cir. 1995).  But Lang does not cite any controlling Supreme Court precedent finding constitutional error in the failure to give a limiting instruction in these circumstances.  *Cf. Carey v. Musladin*, 549 U.S. 70, 76 (2006) ("Given the lack of holdings from this Court regarding the potentially prejudicial effect of spectators' courtroom conduct of the kind involved here, it cannot be said that the state court 'unreasonably appli[ed] clearly established Federal law.'").

Moreover, even if AEDPA deference did not apply because the state courts unreasonably applied clearly established federal law in failing to grant a limiting instruction, Lang cannot establish this error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  "If [the court] is sure that the error had no or very

49

slight effect or influence on the jury's decision, the verdict and judgment must stand." *Murr*, 200 F.3d at 906 (citing *O'Neal v. McAninch*, 513 U.S. 432, 436–38 (1995)).  Given the overwhelming weight of the evidence of Lang's guilt, Lang has not established that the absence of the limiting instruction he proposes had a substantial effect on the jury's verdict.[3]

The Ohio Supreme Court did not contravene or unreasonably apply clearly established federal law in denying Lang's claim of ineffective assistance of appellate counsel based on the trial court's failure to instruct the jury regarding Walker's plea or trial counsel's failure to object to the jury instructions on that ground.

### *Batson* violation

Lang's next sub-claim is based on *Batson v. Kentucky*, 476 U.S. 79 (1986), which bars a party from striking potential jurors on the basis of race.  Lang asserts appellate counsel should have raised on direct appeal claims that (1) the trial court violated the Equal Protection Clause when it excused an African-American man from serving on the jury, and (2) trial counsel was ineffective for failing to object on that ground (Doc. 16 at 64–66).  The State did not specifically address this claim.

Under the Equal Protection Clause of the Fourteenth Amendment, "no State shall . . . deny to any person within its jurisdiction the equal protection of the law."  U.S. CONST. amend. XIV, § 1.  The Equal Protection Clause prohibits a state from trying a defendant before a jury from which members of his race purposefully have been excluded.  *See, e.g.*, *United States v. Harris*, 192 F.3d 580, 586 (6th Cir. 1999) (citing *Strauder v. West Virginia*, 100 U.S. 303 (1879)).  The "harm from discriminatory

---

[3]

As noted above, Lang argues strenuously throughout his Petition that the evidence against him at trial was weak and therefore the constitutional errors that occurred during his trial prejudiced him (*see, e.g.*, Doc. 16 at 62, 85–86).  This Court rejects this argument, as will be discussed in greater detail in relation to Lang's sufficiency-of-the-evidence claim.

jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community.  [Such procedures] undermine public confidence in the fairness of our system of justice." *Batson*, 476 U.S. at 87.

Under *Batson*, a three-step process applies to evaluate a claim that a prosecutor used peremptory challenges to strike a potential juror on the basis of race.  *Id*. at 96–98.  First, the court must determine if the defendant has made a *prima facie* showing that the prosecutor exercised a peremptory challenge on the basis of race.  *Id.* at 96–97.  Second, if the defendant makes such a *prima facie* showing, the prosecutor must present a race-neutral explanation for the strike.  *Id*. at 97–98.  "Although the prosecutor must present a comprehensible reason, '[t]he second step of this process does not demand an explanation that is persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices."  *Rice v. Collins*, 546 U.S. 333, 338 (2006) (quoting *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995)).  Indeed, "[t]he fact that a prosecutor's reasons may be founded on nothing more than a trial lawyer's instincts about a prospective juror does not diminish the scope of acceptable invocation of peremptory challenges, so long as they are the actual reasons for the prosecutor's actions."  *United States v. Power*, 881 F.2d 733, 740 (9th Cir. 1989).  Third, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.  *See Batson*, 476 U.S. at 98.  "This final step involves evaluating 'the persuasiveness of the justification' proffered by the prosecutor, but 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'"  *Rice*, 546 U.S. at 338 (quoting *Purkett*, 514 U.S. at 768).  "'[T]he court presumes that the facially valid reasons proffered by the [party exercising the peremptory challenge] are true.'"  *Braxton v. Gansheimer*, 561 F.3d 453, 459 (6th Cir. 2009) (quoting *Lancaster v. Adams*, 324 F.3d 423, 433 (6th Cir. 2003)).  Therefore, a

*Batson* challenge ultimately "comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003). "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Id*.

Trial-court findings on the issue of discriminatory intent must be afforded "great deference." *See Hernandez v. New York*, 500 U.S. 352, 364–66 (1991).

> There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province.

*Id*. at 365 (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)). "The credibility of the prosecutor's explanation goes to the heart of the equal protection analysis, and once that has been settled, there seems nothing left to review." *Id*. at 367. Thus, "in the absence of exceptional circumstances, [habeas courts should] defer to state-court factual findings." *Id*. at 366.

Lang argues the trial court improperly excused Juror 405, an 81-year-old African-American man. The prosecutor offered a race-neutral reason for the peremptory challenge: Juror 405's apparent confusion during questioning, confusion that deputies and the jury commissioner confirmed (Doc. 22-2 at 746–47). Lang's counsel objected on the ground that Juror 405 was one of only four African-Americans left on the venire panel (*id*. at 747). The judge then questioned the man as follows:

| The Court: | . . . I think maybe you are the senior member of this jury panel in terms of you are 81, is that correct? |
| Juror No. 405: | Yes. |
| The Court: | Is your health okay that you are able to be able to stay with us and everything is okay from that standpoint? |

| Juror No. 405: | Well, the only thing is my wife is sick and under a doctor's care.  I don't have nobody but my daughters to take care of her, and they are working. |
|---|---|
| | So that's the only consideration that I have. |
| The Court: | How about your own personal health? |
| | The reason I ask is that one of the Jury Commissioners had indicated to me that you had had some confusion as to when you were supposed to come back or not come back. |
| Juror No. 405: | Yeah, I did have. |
| The Court: | Okay.  Are you being able to understand everything that has been going on here in the courtroom? |
| Juror No. 405: | Yeah. |
| The Court: | Have you?  Okay. |

(*Id.* at 748–49).  The prosecutor again stated the basis for his challenge, adding Juror 405's concerns about his wife and his own physical condition.  The trial court agreed that it had noticed the potential juror was "a little unstable on his feet."  The trial court explained that it questioned Juror 405 to confirm the jury commissioner's account of his confusion, and not because the trial court doubted the prosecutor's basis for the challenge (*id.* at 751).  The trial court then granted the prosecutor's challenge (*id.*).

Apparently believing the trial court addressed the *Batson* challenge in too cursory a fashion, Lang argues the decision to excuse Juror 405 was constitutional error.  Not so.  The trial court adhered to *Batson*'s three-step burden-shifting framework.  The prosecutor presented a reasonable rationale for challenging the juror, grounded in record facts.  "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot." *Hernandez*, 500 U.S. at 359.  *See also United States v. McAllister*, 693 F.3d

53

572, 579 (6th Cir. 2012).  The trial court confirmed the prosecutor's reasons for the challenge, and independently concluded that Lang had failed to meet his burden of proving intentional discrimination.  This is sufficient under Batson.  "[A] state court need not make detailed findings addressing all the evidence before it" to reach a proper *Batson* ruling.  *Miller-El*, 537 U.S. at 322.  *See also Purkett*, 514 U.S. at 766, 769–70 (holding that a federal court failed to adequately defer to the state trial court's factual finding of no racial motive, even though the trial court rejected the *Batson* objection "without explanation"); *Braxton*, 561 F.3d at 462 ("In the absence of clearly established Supreme Court authority requiring further elaboration," the state trial court, "albeit in abbreviated fashion, adequately and reasonably conveyed its decision.").

Further, Lang has not demonstrated that "exceptional circumstances" exist in this case that would permit this Court to reject the trial court's *Batson* findings.  *See Hernandez*, 500 U.S. at 365–66.  The Ohio Supreme Court did not contravene or unreasonably apply *Batson* nor make an unreasonable determination of fact when it rejected Lang's ineffective-assistance-of-appellate-counsel claim based on Juror 405's removal.

### Access to Grand Jury Transcripts

On direct appeal, Lang's appellate counsel argued the trial court erred when it failed to release certain grand jury transcripts that led to Walker's indictment.  Lang now argues appellate counsel was ineffective for failing to argue the grand jury transcripts contained relevant mitigating evidence (Doc. 16 at 66–67).  The State counters that Lang essentially argues appellate counsel failed to make convincing arguments in support of the transcript-disclosure claim, not that appellate counsel failed to raise that claim.  "[A]ppellate counsel's choice of arguments should be deemed virtually unchallengeable," the State argues, especially "given the lack of any indication that counsel failed to

54

fully review the record or conduct necessary research" (Doc. 23 at 61–62).  This Court agrees. Moreover, the claim is speculative.  Counsel could not have argued that the transcripts provided any particular evidence, much less mitigating evidence, when appellate counsel had no access to the sealed transcripts.

### Evidence of Gang Activity

Lang contends that appellate counsel failed to cite the "seminal Supreme Court authority" in support of his argument, raised on direct appeal, regarding admission of evidence that suggested Lang was a gang member (Doc. 16 at 67–68).  But Lang has not demonstrated that counsel's failure to cite a particular case was objectively unreasonable, or that the citation failure so prejudiced Lang's appeal that the appellate proceedings were unfair and the result unreliable.  *Strickland*, 466 U.S. at 687.

### Voir Dire of Jurors Regarding Excluded Juror

Lang argues he received ineffective assistance of appellate counsel because appellate counsel did not argue trial counsel was ineffective for failing to request that the trial court individually question jurors about whether an excused juror spoke to them about her relation to one of the victims (Doc. 16 at 68–70).  For reasons described below, this Court finds the trial court did not err by failing to conduct juror-by-juror questioning on this topic.  Therefore, trial counsel was not ineffective for not requesting juror-by-juror questioning, and appellate counsel was not ineffective for failing to raise a losing argument regarding trial counsel's performance.

### Second and Sixteenth Grounds for Relief
### *Jury Challenges*

Lang argues he was denied a fair and impartial jury in violation of the Sixth and Fourteenth Amendments, raising juror-bias and jury-composition claims.  His juror-bias claim argues the trial court erred in the way it removed a juror who was related to Cheek, one of the murder victims (Doc.

55

16 at 48).  His jury-composition claim finds error in the trial court's failure to seat African-American jurors (*id*. at 112).

### Procedural Posture

Lang raised the juror-bias claim on direct appeal to the Ohio Supreme Court, which adjudicated the claim on the merits.  *Lang*, 129 Ohio St. 3d at 520–23.  He preserved the claim for federal habeas review.

The State argues Lang procedurally defaulted his jury-composition claim because the "Ohio courts" found *res judicata* barred review of the claim (Doc. 23 at 92–94).  Lang raised the jury-composition claim in his postconviction petition (Doc. 18-4 at 2239–41), and submitted three exhibits to support the claim: (1) information from the Stark County Jury Commissioner's Office explaining its juror selection process; (2) the report of the Ohio Commission on Racial Fairness, Commissioned by the Supreme Court of Ohio, published in 1999; and (3) information from the U.S. Census Bureau regarding Stark County's population (Doc. 19-2 at 2509–85; Doc. 19-3 at 2586–2607).  He asserted that trial counsel were ineffective for failing to ensure that the jury included African-Americans (*see* Doc. 18-4 at 2239, ¶ 125).  Ruling on Lang's postconviction petition, the trial court found it "unclear" whether Lang was asserting an ineffective-assistance-of-trial-counsel claim or a trial-error claim (Doc. 19-5 at 2898).  But it concluded that in either case *res judicata* barred both claims because the issues could have been raised on direct appeal, but were not (*see id*. at 2899).

Lang then appealed the denial of his postconviction petition to the Ohio court of appeals, raising both the ineffective-assistance and trial-error claims (*see* Doc. 20-1 at 2953–54).  The Ohio court of appeals addressed only the ineffective-assistance-of-trial-counsel claim (*see id*. at 3087–88), affirming the trial court's application of *res judicata* to that claim.  The court noted that the Ohio

Commission on Racial Fairness report Lang offered in support of his postconviction claim was published in 1999, "well before [Lang's] . . . trial, and [that Lang] point[ed] to no part of the report that would have made a difference in his case" (*id.*).  The Ohio court of appeals' decision is the last-explained state-court judgment regarding procedural default of the jury-composition claim, and is therefore the focus of this Court's review for procedural default.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000).

Under Ohio law, *res judicata* precludes postconviction relief on "any defense or any claimed lack of due process that was *raised or could have been raised by the defendant at trial*, which resulted in that judgment or conviction, *or on an appeal* from that judgment," *State v. Cole*, 2 Ohio St. 3d 112, 113 (1982) (emphasis in original), unless the petition presents extra-record evidence to support a postconviction-review claim, *see, e.g.*, *State v. Smith*, 17 Ohio St. 3d 98, 101 n.1 (1985); *State v. Perry*, 10 Ohio St. 2d 175, 179 (1967) (concluding that if defendant "had no means of asserting the constitutional claim there asserted until his discovery, after the judgment of conviction, of the factual basis for asserting that claim," then the claim "was not one that could have been raised . . . before the judgment of conviction, and hence could not reasonably be said to have been . . . waived").

However, extra-record evidence will not overcome the *res judicata* bar when "the allegations outside the record upon which [a petitioner] relies appear so contrived, when measured against the overwhelming evidence in the record . . . as to constitute no credible evidence . . . justify[ing] the trial court's application of the principles of *res judicata*" despite the extra-record evidence.  *Cole*, 2 Ohio St. 3d at 114.  Ohio courts have limited this "new evidence" exception to extra-record evidence that "demonstrate[s] that the petitioner could not have appealed the constitutional claim based upon information in the original record."  *State v. Lawson*, 103 Ohio App. 3d 307, 315 (Ct. App. 1995).

57

The extra-record evidence must be "competent, relevant and material," and meet a "threshold standard of cogency; otherwise it would be too easy to defeat the holding of *Perry* by simply attaching as exhibits evidence which is only marginally significant and does not advance the petitioner's claim beyond mere hypothesis and a desire for further discovery."[4]  *Id.* (internal quotation marks and citation omitted).

If *res judicata* applies to a claim, it serves as an adequate and independent state ground to bar review of the claim by a habeas court.  *See, e.g.*, *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007); *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000).  But, "an incorrect application of a state *res judicata* rule does not constitute reliance on an adequate and independent state ground."  *Wogenstahl v. Mitchell*, 668 F.3d 307, 341 (6th Cir. 2012) (citing *Durr*, 487 F.3d at 434–35, and *Richey v. Bradshaw*, 498 F.3d 344, 359 (6th Cir. 2007) (noting the Sixth Circuit has "declined to observe Ohio's procedural bar and instead [has] proceeded to the merits of an ineffective-assistance claim when we have concluded that Ohio improperly invoked its *res judicata* rule")).

Lang argues that his jury-composition claim is not procedurally defaulted because the Ohio postconviction court improperly applied the *res judicata* rule to the claim.  He points to *Hill v. Mitchell*, 400 F.3d 308 (6th Cir. 2005), for the proposition that "[u]nder Ohio law, a petitioner properly presents a claim in postconviction when the claim relies on evidence *de hors* the record" (Doc. 33 at 134).

---

[4]

For example, Ohio courts have found the following extra-record evidence sufficient to overcome the *res judicata* bar: evidence withheld by the state; a post-trial affidavit by a witness stating that his trial testimony was false; and a DNA finding in a case tried to conviction before the trial use of DNA evidence.  *State v. Jones*, 2002-Ohio-6914, at ¶19 n.2 (Ct. App.).

But it is clear in *Hill* and related cases that a habeas court cannot circumvent Ohio's *res judicata* doctrine and reach the merits of any claim dismissed on *res judicata* grounds because a petitioner presented *some* supporting, extra-record evidence on postconviction review. Rather, a habeas court may disregard the procedural bar only where the extra-record evidence is competent, relevant, and material. In *Hill*, a capital habeas case, the petitioner presented an affidavit of an addiction specialist who testified during the mitigation phase of petitioner's trial. The addiction specialist stated that trial counsel contacted him only after the guilt phase of the trial; he did not meet the petitioner until the morning he testified; and, had he earlier evaluated the petitioner, he could have testified about the petitioner's specific addictions, not simply addiction in general. *Hill*, 400 F.3d at 314.

This Court has thoroughly examined the extra-record evidence Lang submitted with his postconviction petition in support of his jury-composition claim. For the reasons explained more fully below, this Court finds that the extra-record evidence would not have materially changed the jury-composition claim that Lang could have presented on direct appeal without the evidence. Because the Ohio courts properly applied *res judicata* to the jury-composition claim, it is procedurally defaulted. *See Wogenstahl*, 668 F.3d at 342.

Lang further argues that his postconviction review counsel's ineffective assistance should excuse procedural default of the jury-composition claim, asserting counsel failed "to fully and exhaustively develop the factual predicate, including rebuttal of facts that were only to be created by the court of appeals" (Doc. 33 at 135). He cites to *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), in which, as explained above, the Supreme Court held that the "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim

of ineffective assistance at trial." *Id.* at 1315.  *Martinez* applies only to claims of ineffective assistance of trial counsel.  *See Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013) ("The Court in *Martinez* purported to craft a narrow exception to *Coleman* [*v. Thompson*, 501 U.S. 722 (1991)]. We will assume that the Supreme Court meant exactly what it wrote.").

Finally, Lang claims that the procedural posture of this case makes procedural default "inappropriate."  He contends that because he filed his postconviction petition before completion of his direct appeal, the postconviction court "suggest[ed] that the petitioner brought this claim too soon, not too late" (Doc. 33 at 135).  There is no authority for this argument.  Lang procedurally defaulted his jury-composition claim.

**Merits Analysis**

The Sixth Amendment commands that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury"  U.S. CONST. amend. VI.  The Sixth Amendment "reflect[s] a profound judgment about the way in which law should be enforced and justice administered. . . .  Providing an accused with the right to be tried by a jury of his peers g[ives] him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge."  *Duncan v. Louisiana*, 391 U.S. 145, 155–56 (1968).  Indeed, the right to a trial by an impartial jury "lies at the very heart of due process."  *Smith v. Phillips*, 455 U.S. 209, 224 (1982).  Due process requires "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."  *Id*. at 217.

**Juror Bias**

The Ohio Supreme Court addressed on direct appeal Lang's second ground for relief, predicated on juror bias.  It first provided the following summary of the relevant facts:

> In proposition of law I, Lang argues that he was denied a fair trial because one of the jurors was related to Marnell Cheek, one of the victims.
>
> Before she was seated as a juror, [Juror 386] failed to disclose that her stepfather was Cheek's brother.  [Juror 386] failed to mention this relationship on either her juror questionnaire or her pretrial-publicity questionnaire.  When asked to disclose her "personal knowledge" about the shooting deaths, [Juror 386] wrote, "Well the newspaper stated that both of them were shot execution style in the back of the heads over drugs."  When asked to disclose what she had "heard, read, discussed or seen" concerning the shootings "from any source including * * * friends, neighbors, relatives, co-workers or family," [Juror 386] wrote, "None."
>
> [Juror 386] also failed to disclose her relationship to Cheek during voir dire.  [Juror 386] indicated that she learned about the shootings from reading the newspaper but provided no further information about her relationship to Cheek during the questioning.
>
> Following the testimony of the state's first two witnesses, the prosecutor notified the court that Cheek's father had informed him that "[Juror 386]'s mother is married to Marnell's brother."  The trial court stated that he would address the matter during the "very next break."
>
> After the testimony of two more witnesses, the trial court, the prosecutor, and the defense counsel questioned [Juror 386] about her relationship to Cheek.  [Juror 386] acknowledged, "My mom is married to [Cheek's] brother" and that she had failed to previously disclose that information.  [Juror 386] also stated that she knew two of the spectators in the courtroom who were related to her mother through marriage.  [Juror 386] stated that she had met Cheek and had attended her funeral.  However, [Juror 386] said that she had not talked to her mother, other relatives, or anybody else about the case.  Despite her relationship to Cheek, [Juror 386] stated that she could remain fair.  Finally, [Juror 386] stated that she had not talked to any of the other jurors about her relationship to Cheek.
>
> Following questioning, the prosecution moved to excuse [Juror 386], and the defense agreed.  The trial court excused [Juror 386] and instructed her not to talk with any of the jurors about the case or why she was excused from the jury.  Before leaving the courtroom, [Juror 386] reiterated that she had not previously talked to other jurors about this matter.

61

> Before the trial continued, the trial court informed the jurors that [Juror 386] had been excused because "she may have had a relative relationship with either a witness or a party or somebody that was involved in the case."  The trial court then asked the jurors as a group whether any of them had had any discussions with [Juror 386] about this matter, and they indicated that they had not.  The trial then resumed.

*Lang*, 129 Ohio St. 3d at 520–21 (paragraph numbers omitted).

The Ohio Supreme Court first addressed Lang's claim that Juror 386's presence on the panel tainted the rest of the jury.  It ruled:

> First, Lang argues that the presence of [Juror 386] on the jury, even for a short period of time, deprived him of an unbiased jury.  Yet "due process does not require a new trial every time a juror has been placed in a potentially compromising situation. * * * Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.  Such determinations may properly be made at a hearing like that ordered in *Remmer* [ *v. United States* (1954), 347 U.S 227, 74 S.Ct. 450, 98 L.Ed. 654] * * *."  *Smith v. Phillips* (1982), 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78; *see also Remmer* (when integrity of jury proceedings is in question, court "should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate").  Moreover, "a court will not reverse a judgment based upon juror misconduct unless prejudice to the complaining party is shown."  *State v. Keith* (1997), 79 Ohio St. 3d 514, 526, 684 N.E.2d 47.

> Nothing in the record supports Lang's claim that the jury was tainted by the presence of [Juror 386].  Before being excused, [Juror 386] assured the court that she had not talked to any of the other jurors about her relationship to Cheek.  The other jurors also indicated during group questioning that they had had no conversations with [Juror 386] about this matter.  Thus, Lang's bias claim is speculative and unsupported by the evidence.

*Id*. at 521 (paragraph numbers omitted).

### Right to an Impartial Jury

The Sixth Amendment "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (quoting *In re Murchison*, 349 U.S. 133 (1955)).  An impartial jury is one in which every juror is "'capable and willing to decide the case

solely on the evidence before [the juror]." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984).  However, the Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982). "Qualified jurors need not . . . be totally ignorant of the facts and issues involved."  *Murphy v. Florida*, 421 U.S. 794, 799–800 (1975).  The Supreme Court has explained:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of the accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin*, 366 U.S. at 723.  Moreover, in addition to AEDPA's statutory presumption that state-court factual findings are correct, the Court has emphasized that habeas courts must give "special deference" to a trial court determination of juror credibility.  *See, e.g.*, *Darden v. Wainwright*, 477 U.S. 168, 176–78 (1986); *Patton v. Yount*, 467 U.S. 1025, 1038 (1984).

*McDonough Power Equip. v. Greenwood.*  Lang argues that the Ohio Supreme Court's analysis of his juror-bias claim contravened or unreasonably applied *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984) (plurality opinion), which governs claims that a juror deliberately concealed information during voir dire.  *Zerka v. Green*, 49 F.3d 1181, 1185 (6th Cir. 1995).[5]  He claims that Juror 386 "lied in response to a material voir dire question," and that her presence on the jury "even for a moment" violated Lang's right to an impartial jury, warranting "automatic reversal" of his conviction (Doc. 16 at 45–46, 34; Doc. 33 at 47–48).

---

[5]

The Ohio court did not mention *McDonough* in its decision.  A state court has adjudicated a claim "on the merits," and AEDPA deference applies, regardless of whether the state court provided little or no reasoning at all for its decision.  "[A] state court need not cite or even be aware of our cases under § 2254(d)."  *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 784 (2011).

*McDonough* involved a products liability claim based on a lawnmower accident.  During voir dire, plaintiffs' counsel asked prospective jurors, as a group, whether anyone in the jurors' immediate family had sustained "severe" injuries.  A three-week trial resulted in a defense verdict.  Soon thereafter, plaintiffs discovered a juror failed to disclose during voir dire that the juror's son suffered a broken leg when a tire exploded.  Plaintiffs moved for a new trial, in part because the court had denied their motion to approach the jury (a motion not specifically based on the juror's failure to respond to questioning about family member injuries).  The district court denied the motion for a new trial, finding the trial had been fair in all respects.  The Tenth Circuit reversed the district court's judgment and ordered a new trial, holding the juror's failure to respond to questioning about a family member's injuries prejudiced the plaintiffs' right to a peremptory challenge.  The Supreme Court reversed, holding that the plaintiffs were "not entitled to a new trial unless the juror's failure to disclose denied [them] their right to an impartial jury."  *McDonough*, 464 U.S. at 549.

*McDonough* thus recognized that a litigant "is entitled to a fair trial but not a perfect one, for there are no perfect trials."  *Id.* at 553 (internal quotation marks and citations omitted).  Harmless error rules, the Court explained, embody the principle "that courts should exercise judgment in preference to the automatic reversal for 'error' and ignore errors that do not affect the essential fairness of the trial."  *Id.*  The Court also observed that voir dire is designed "to protect [the right to an impartial jury] by exposing possible biases, both known and unknown, on the part of potential jurors."  *Id.* at 554.  But on balance, the Court concluded the "important end of finality" would be ill served if it were "[t]o invalidate the result of a three-week trial because of a juror's mistaken, though honest, response to a question, [as that would] insist on something closer to perfection than our judicial system can be expected to give."  *Id.* at 555.  "[T]o obtain a new trial in such a situation, a party must first

64

demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id*. at 556. "The motives for concealing information may vary," the Court explained, "but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *Id*.

The Sixth Circuit has interpreted the rule announced in *McDonough* to apply only in cases where the juror's failure to disclose information was deliberate, not merely a mistake. *Zerka*, 49 F.3d at 1185; *see also Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003).  In cases where a juror's failure to respond to voir dire questioning is the result of an honest mistake, the pre-existing rule applies, requiring proof of actual juror bias or, in exceptional circumstances, implied bias. *Zerka*, 49 F.3d at 1186 n.7.  This view is supported by Justice Blackmun's concurring opinion in *McDonough*, joined by Justices Stevens and O'Connor, in which he noted:

> [I]n most cases, the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial. . . .  I understand the Court's holding not to foreclose the normal venue of relief available to a party . . . .  [R]egardless of whether a juror's answer is honest or dishonest, it remains within a trial court's option, in determining whether a jury was biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias or, in exceptional circumstances, that the facts are such that bias is to be inferred.

*McDonough*, 464 U.S. at 556–57 (Blackmun, J., concurring).

Lang argues that he is entitled to relief under *McDonough*.  First, Lang claims Juror 386 "lied" about her relationship to Cheek during voir dire by not answering the questions posed to her "fully, fairly or truthfully," and that "her dishonesty was neither a result of a misunderstanding nor a technical falsehood."  Second, Lang claims that if Juror 386 had been honest, Juror 386 would have been challenged for cause (Doc. 33 at 47–48).  But the Ohio Supreme Court made no finding of deliberate concealment; it determined only that Juror 386 "failed to disclose" the information.  *See*

*Lang*, 129 Ohio St. 3d at 520.  And Lang offers no evidence of the juror's deliberate dishonesty other than conclusory assertions.

Moreover, the record does not establish that Juror 386 intentionally withheld information about her relationship to Cheek.  As noted by the Ohio court, many questions posed to the jurors through questionnaires and voir dire focused on the depth and source of the jurors' knowledge about the victims' deaths and the criminal case arising from their deaths (*see, e.g.*, Doc. 22-1 at 142–48).  The jurors also were asked if they had any relationship to the judge, witnesses, or counsel in the case (*see, e.g.*, *id.* at 26, 54, 56–57, 59).  This Court reviewed the voir dire proceedings and questionnaires, but found no question specifically asking jurors if they were related to either Burditte or Cheek.  However, the trial court did ask if any of the potential jurors or "someone [who] is very close to [them]" had any involvement in the criminal justice system, including as a victim or offender (*id.* at 63–64).  However, as explained below, based on Juror 386's responses to the trial court's questions after the parties learned of Juror 386's relationship to Cheek, Juror 386 apparently did not consider Cheek someone "very close" to her.  Thus, Lang has not demonstrated that Juror 386 deliberately concealed information, and *McDonough* does not apply to this case.

**Doctrine of Implied Bias.**  Lang argues in the alternative that because Juror 386 concealed her personal relationship with one of the victims, her bias and the resulting prejudice should be "presumed" (Doc. 16 at 46).  Lang points to Justice O'Connor's concurring opinion in *Smith v. Phillips*, 455 U.S. 209, 222 (1982), and *Dyer v. Calderon*, 151 F.3d 970, 984–85 (9th Cir. 1998), as authority for such a presumption (Doc. 16 at 46; Doc. 33 at 47–48).  This Court interprets Lang's presumed-prejudice argument as based on the doctrine of implied bias, the traditional avenue for relief in juror-bias cases before *McDonough*.

66

Implied bias is found only in "certain 'extreme' or 'exceptional' cases." *Johnson v. Luoma*, 425 F.3d 318, 326 (6th Cir. 2005) (quoting *United States v. Frost*, 125 F.3d 346, 379 (6th Cir. 1997)). A finding of implied bias is appropriate "only 'where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances.'" *Id*. (quoting *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988)).

However, the implied-bias doctrine is not supported by clearly established Supreme Court precedent. In *Smith*, the defendant discovered after his trial that, while the trial was pending, the prosecutors handling his case had learned (but not disclosed) that a juror applied for a job in the prosecutor's office. *Smith*, 455 U.S. at 212–24. The Court held neither the juror's conduct nor the prosecutor's failure to disclose the juror's job application denied the defendant due process. *Id*. at 220–21. It refused to impute bias to the juror, explaining:

> due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in *Remmer* and held in this case.

*Id*. at 217.

Further, the Sixth Circuit repeatedly has expressed doubt over the continued viability of the implied-bias doctrine since *Smith*. *See Johnson*, 425 F.3d at 326 ("Courts that have reviewed the *Smith* decision, including this circuit, have suggested that the majority's treatment of the issue of

67

implied juror bias calls into question the continued vitality of the doctrine."); *see also Treesh v. Bagley*, 612 F.3d 424, 437 (6th Cir. 2010) (same).

Moreover, even if the implied-bias doctrine were clearly established federal law, Lang has not demonstrated the doctrine applies here.  When the trial court questioned Juror 386 about her relationship to Cheek, she immediately admitted her stepfather was Cheek's brother (Doc. 22-2 at 940).  She explained to the court that she lived with her grandparents in Ohio, not with her mother and stepfather in Florida, and does not "really talk to her [mother] that much" (*id.* at 941); "[i]t had been a while" since she had seen Cheek (*id.* at 942); while she attended Cheek's funeral with her stepfather, she denied knowing anything about her death or the case, other than what she read in the newspaper (*id.* at 943–46); and she did not talk to anyone in her family about the case (*id.* at 944).  She assured the court that her relationship to Cheek did not "cause [her] any personal problem" or prevent her from being impartial (*id.* at 943).

Juror 386's relationship to Cheek is not the type of close relationship that permits application of the implied-bias doctrine.  *See United States v. Weir*, 2014 WL 5002080, at *4 (6th Cir. 2014) (unpublished) ("Even assuming implied bias is still a basis for finding juror disqualification (a question we do not answer), the relationship at issue in this case (where the juror's sister's husband's brother had been married to the victim's daughter) is not sufficiently close to warrant the doctrine's application."); *Hedlund*, 750 F.3d at 808 n.11 (9th Cir. 2014) (finding that even if implied bias doctrine were clearly established federal law, doctrine would not apply where one of the victims had been married to a cousin of the juror's stepfather).

**Reasonableness of State Court Decision.**  The Ohio Supreme Court's decision is consistent with *McDonough* and *Smith.*  The Supreme Court defined the key inquiry in *McDonough* as whether

68

"the juror's failure to disclose denied [the plaintiffs] their right to an impartial jury."  *Id*. at 549; *see also id*. at 556 (Blackmun, J., concurring) ("I agree with the Court that the proper inquiry in this case is whether the defendant had the benefit of an impartial trier of fact."); *Zerka*, 49 F.3d at 1187 ("The pertinent issue [in *McDonough*] is whether a party received a fair trial by an impartial jury, keeping in mind that '[a litigant] is entitled to a fair trial but not a perfect one, for there are no perfect trials.'") (quoting *McDonough*, 464 U.S. at 553).  *McDonough* is based in harmless-error principles.  In *Smith*, the Court stressed due process principles, finding the procedural safeguards of an evidentiary hearing sufficient to protect a defendant's right to an impartial jury.  *Smith*, 455 U.S. at 217.

The Ohio court could reasonably conclude that Juror 386's brief presence on the jury did not affect the fundamental fairness of Lang's trial by denying him the right to an impartial jury.  Juror 386's relationship to Cheek was brought to the trial court's attention on July 12, 2007, only hour into the trial and long before the start of jury deliberations (Doc. 22-2 at 864).  The trial court found "no risk" that Juror 386 would talk to other jurors prior to the first break on July 12, when Juror 386 was questioned about her relationship to Cheek (*id*. at 866).  Juror 386 readily confirmed her relationship to Cheek and admitted to attending Cheek's funeral with her stepfather (*id*. at 940, 943–44).  She denied saying anything to the other jurors about the relationship (*id*. at 944–45).  The trial court then granted the parties' joint motion to exclude Juror 386 (*id*. at 948, 950), and questioned, as a group, the remaining jurors about whether Juror 386 had spoken to them about her relationship to Cheek.  The remaining jurors were silent (*id*. at 953).  Trial counsel did not object to trial resuming or move for a new trial on the ground of juror bias at any time.

**Reasonableness of Ohio Court Determination of Facts.**  Lang also argues that the state-court decision resolving this sub-claim violates § 2254(d)(2), because "the state courts had no basis

for making the credibility determination that is the foundation for full and proper state court review of this issue" (Doc. 33 at 50).  This argument lacks merit.  Lang first asserts that "[t]he presumption of correctness does not apply because [the question of] juror bias is 'essentially one of credibility,'"citing *Patton v. Yount*, 467 U.S. 1025, 1038 (1984) (Doc. 33 at 50).  True, the Supreme Court there observed that the determination of juror bias is "essentially one of credibility."  *Patton*, 467 U.S. at 1038.  But it continued: "As we have said on numerous occasions, the trial court's resolution of such questions is entitled, even on direct appeal, to 'special deference.' . . .  The respect paid such findings in a habeas proceeding certainly should be no less." *Id*.

Lang next contends that "[t]he state courts could not make a credibility determination because no evidence was taken about the impact of Juror 386 on the remaining jurors" (Doc. 33 at 50).  But as discussed below, the Ohio Supreme Court reasonably determined that the trial court conducted a hearing that comported with due process, a hearing in which "[t]he other jurors . . . indicated . . . that they had had no conversations with [Juror 386] about this matter."  *Lang*, 129 Ohio St. 3d at 521.

Accordingly, in rejecting this claim, the Ohio Supreme Court did not contravene or unreasonably apply clearly established Supreme Court precedent, nor did it make an unreasonable determination of fact.  Lang's juror-bias claim fails.

**Timeliness of Juror's Removal.**  Lang further claims that the trial court erred by not removing Juror 386 as soon as it learned of Juror 386's relationship to Cheek.  The Ohio Supreme Court addressed this argument:

> Second, Lang argues that the trial court erred by failing to excuse [Juror 386] from the jury immediately after being informed of the juror's relationship to the victim.  Lang contends that the continued presence of [Juror 386] during the testimony of two more witnesses tainted the jury.

70

> Defense counsel requested that the trial court talk to [Juror 386] before other witnesses testified, to eliminate any risk that the juror's presence might taint the jury.  The trial court replied, "There is no risk at this point. * * * We will do it at the very next break.  We will do it before this juror has any opportunity to go down and talk to the jury.  We won't let the juror leave the courtroom before she has a chance to go down and talk to them."  The trial court then questioned [Juror 386] at the next break, and the juror was excused before she had had an opportunity to talk with the other jurors.  Thus, this claim lacks merit.

*Lang*, 129 Ohio St. 3d at 521 (paragraph numbers omitted).

Lang does not explain why the trial court's decision violates § 2254(d)(1) or (d)(2).  *See, e.g.*, *United States v. Crosgrove*, 637 F.3d 646, 663 (6th Cir. 2011) ("Because there is no developed argumentation in these claims, the panel declines to address [the defendant's] general assertions of misconduct in witness questioning and closing statements.").  Moreover, as discussed below, the Ohio Supreme Court reasonably decided that the trial court's actions with regard to Juror 386 comported with due process.  This sub-claim fails.

**Failure to Conduct a *Remmer* Hearing.**  Lang also asserts that the trial court should have conducted a proper hearing regarding Juror 386, following the standards set forth in *Remmer*.  The Ohio Supreme Court denied this claim, reasoning,

> Finally, Lang argues that the trial court failed to conduct a hearing into the juror's misconduct and its possible effect on the other jurors as required by *Remmer*, 347 U.S. 227, 74 S. Ct. 450, 98 L.Ed. 654, and *State v. Phillips* (1995), 74 Ohio St. 3d 72, 88–89, 656 N.E.2d 643.  *Remmer* set forth the procedures that a trial court should follow for inquiring into possible jury misconduct: "The trial court should not decide and take final action ex parte * * * but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate."  *Remmer* at 229–230, 74 S. Ct. 450, 98 L.Ed. 654.
>
> The trial court conducted a *Remmer* hearing in the presence of the prosecutor, defense counsel, and the accused.  The trial court and both counsel questioned [Juror 386].  During questioning, [Juror 386] discussed her relationship to Cheek, admitted that she had failed to disclose this information to the court, and assured the court that she had not discussed this matter with any of the other jurors.  Thereafter, the trial court

71

questioned the other jurors as a group and obtained their assurance that they had not discussed this matter with [Juror 386].  Neither the state nor the defense counsel objected to the questioning or requested an additional inquiry.  Under these circumstances, we hold that no further inquiry was required.

Nevertheless, Lang argues that the trial court was obligated to individually question each of the jurors to ensure that [Juror 386] had not spoken to them about Cheek.  The trial court asked the jurors as a group: "Is there any member of the jury -- I will take your silence if none did -- but is there any member of the jury that she did discuss this with at all?"  The trial court then stated, "I take it by your silence that she did not."

No case authority support's [*sic*] Lang's position.  "The scope of voir dire is generally within the trial court's discretion, including voir dire conducted during trial to investigate jurors' reaction to outside influences."  The trial court's questioning and the jurors' negative response obviated the need for individual questioning.  Moreover, neither the state nor the defense requested that the trial counsel individually question the jurors following this response.  Thus, the trial court did not abuse its discretion by stopping there. . . .

However, Lang contends that the trial court should have individually questioned [Juror 387], because the judge noted that [Juror 386] and [Juror 387] were seated next to each other and had been friendly.  But [Juror 386] assured the court that she had not talked to [Juror 387] about Cheek.  [Juror 387's] silence during group questioning indicated that she had not talked to [Juror 386] about her relationship to any parties involved in the case.  The trial court was permitted to rely on [Juror 387's] silence in determining that juror's impartiality.  Trial counsel's failure to ask [Juror 387] any questions about possible conversations with [Juror 386] also indicated that the defense was satisfied with [Juror 387's] response.  Thus, the trial court did not abuse its discretion by failing to interrogate [Juror 387]individually.

*Lang*, 129 Ohio St. 3d at 521–23 (paragraph numbers and internal citations omitted).

"[T]rial judges are afforded considerable discretion in determining the amount of inquiry necessary, if any, in response to allegations of jury misconduct," *United States v. Logan*, 250 F.3d 350, 378 (6th Cir. 2001) *superseded by rule on other grounds as recognized in McAuliffe v. United States*, 514 F. App'x 542, 549 (6th Cir. 2013), because "'the trial judge is in the best position to determine the nature and extent of the alleged jury misconduct,'" *United States v. Griffith*, 17 F.3d 865, 880 (1994) (quoting *United States v. Shackelford*, 777 F.2d 1141, 1145 (6th Cir. 1985)).

72

In *Remmer*, a criminal tax evasion case, the Court observed that "[t]he integrity of jury proceedings must not be jeopardized by unauthorized invasions." *Remmer*, 347 U.S. at 229.  Thus, once a jury in a criminal case is empaneled, "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." *Id.*  While the presumption is not conclusive, the Court in *Remmer* held that the government bears the burden of showing the contact with the juror was harmless to the defendant.  *Id.*  When informed of any improper communication with a juror, the trial court "should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate."  *Id.* at 229–30.

Lang contends that the Ohio court unreasonably applied *Remmer* by shifting the burden to Lang to prove prejudice when Juror 386's conduct was "presumptively prejudicial" (Doc. 33 at 49). Lang is mistaken.  The Supreme Court modified the *Remmer* rule in *Smith v. Phillips*, placing the burden on the defendant to show actual prejudice from juror misconduct.  *Smith*, 455 U.S. at 215 ("This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias.").  *See also Sheppard v. Bagley*, 657 F.3d 338, 348–49 (6th Cir. 2011) (Batchelder, J., concurring) ("*Remmer* was abrogated in part by the Supreme Court in *Smith v. Phillips*, which held that the defendant has the burden to show that there has been *actual* prejudice.") (emphasis in original).  The Court explained in *Smith*, "due process does not require a new trial every time a juror has been placed in a potentially compromising situation.  Were that the rule, few trials would be constitutionally acceptable. . . .  [I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Smith*, 455 U.S. at

73

217.  The Court also noted that state-court findings are presumptively correct in habeas actions.  *Id.* at 218.

Lang also argues that the Ohio Supreme Court improperly applied *Remmer* by failing to question Juror 386 more extensively, or to question each juror individually to determine bias (Doc. 16 at 48; Doc. 33 at 48–49).  This Court disagrees.  The Ohio Supreme Court complied with *Remmer* and *Smith* when it decided that the trial court's inquiry into Juror 386's potential misconduct and its effect on the other jurors was sufficient to comport with due process.  The Ohio court also reasonably determined the facts supporting its decision.[6]

**Jury Composition.**  Lang, an African-American, claims the trial court and Stark County failed to ensure that there were African-Americans on his jury in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment and the Sixth Amendment's "fair cross-section" requirement (Doc. 16 at 112).  Though this Court finds Lang procedurally defaulted the claim, on its merits the claim fails.

"[T]he selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial."  *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975).

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

---

[6]

Lang requests discovery, an evidentiary hearing, and *de novo* review on this, and several of his other claims.  Because the claims fail on other grounds as explained in this Memorandum Opinion and Order, this Court denies this and all other such requests made in Lang's Petition as moot.

74

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).  However, a defendant "must show more than that their particular panel was unrepresentative.  *Duren* requires [this Court] to look at the 'venires' from which 'juries' are selected, . . . and it has long been the case that defendants are not entitled to a jury of any particular composition -- only to a panel from which distinctive groups were not 'systematically excluded.'"  *United States v. Allen*, 160 F.3d 1096, 1103 (6th Cir. 1998) (quoting *Taylor*, 419 U.S. at 538).

> Lang alleges the following facts to support this claim:
>
> (1) there were no African-Americans on his jury;
>
> (2) after challenges for cause, only four African-Americans remained out of "around" 140 prospective jurors;
>
> (3) the prosecutor "promptly" used a peremptory challenge to remove Juror 405, to which defense counsel objected and stated, "that's all that is left from the initial jury pool of 140 some odd jurors";
>
> (4) Stark County relies on voter registration as the basis for gathering potential jurors;
>
> (5) although African-Americans make up 7.5 percent of Stark County's population, "very few" African-Americans were included in Lang's petit venire.

(Doc. 16 at 112).  The only evidence Lang offers to support these allegations or to demonstrate racial disparity is the Ohio Commission on Racial Fairness's 1999 report.  The 1999 report is insufficient evidence to meet the *Duren* test or otherwise establish that the racial composition of Lang's jury violated his constitutional rights.  In relevant part, the 1999 report merely notes various comments made at Commission public hearings and lists recommendations for improving minority representation in jury pools, like the use of "driver's license records[ or] state identification records" as additional sources for potential jurors (Doc. 16 at 112–13). Lang does not cite to portions of the 1999 report showing "systemic exclusion" in Stark County, Ohio.  Indeed, the 1999 report

recommends further research to "determine accurately the pattern of minority under-representation in juries in Ohio state courts" (*id*. at 113).

### Fifth, Eighth, Ninth, Tenth, and Fifteenth Grounds for Relief
#### *Trial Court Error*

Lang claims the trial court committed numerous errors, including:

1.      Admitting unreliable scientific evidence (fifth ground for relief);

2.      Denying access to grand jury transcripts (eighth ground for relief);

3.      Admitting prior consistent statements (ninth ground for relief);

4.      Admitting prejudicial evidence (tenth ground for relief), including

   a.      Walker's testimony that Lang wore red clothing;

   b.       Dittmore's testimony that he was part of the police gang unit;

   c.      Testimony regarding Lang's nickname, "Tech";

   d.      Dittmore's testimony about drug dealing;

   e.      Walker's testimony that Lang vomited after the murders;

   f.      Lang's recorded statement to the police;

   g.      Walker's testimony that he only learned later what kind of gun Lang had; and

   h.      Testimony about unreliable DNA evidence; and

5.      Trivializing mitigating evidence (fifteenth ground for relief).

(*See* Doc. 16 at 70, 82, 84, 86–88, 95–98, and 108).  Lang claims each of these errors (or all the errors together) violated his constitutional rights.

**Procedural Posture**

The Ohio Supreme Court addressed on the merits claims 2, 4.a and 4.f, and 5, as enumerated above.  Lang preserved these claims for federal habeas review.  *See Lang*, 129 Ohio St. 3d at 518–20, 529–30, 531–32, 554–55.

However, Lang procedurally defaulted the remaining trial-error claims (*see* Doc. 23 at 69–70, 72, and 84).  The Ohio Supreme Court found Lang waived these claims because his trial counsel failed to object to the evidence at trial.  *See Lang*, 129 Ohio St. 3d at 523, 528, 530–31, 532.  Failure to adhere to Ohio's well-established "contemporaneous objection rule" is an independent and adequate state ground that bars federal habeas review.  *See, e.g.*, *Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006).  The procedural bar remains even if the state appellate court affirmed the trial court's ruling on plain-error review.  *See, e.g.*, *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006) ("[A] state court's plain error analysis does not save a petitioner from procedural default"); *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000) ("[P]lain error review does not constitute a waiver of state procedural default rules[.]").

Lang responds that because he received ineffective assistance of trial counsel, this Court must excuse the procedural defaults (Doc. 33 at 87–88, 99–100, 105).  Even considered on their merits, this Court finds the trial court either did not err in admitting certain evidence, or committed only harmless error.  Therefore, Lang cannot show trial counsel's failure to object to the evidence prejudiced him.

**Merits Analysis**

 "[F]ederal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  The Supreme Court declared in *Estelle v. McGuire*, 502 U.S. 62 (1991):

> Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.

*Id*. at 67–68.  Generally, "alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review." *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012).  Evidentiary rulings made by state courts may "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).

An erroneous evidentiary ruling is subject to harmless-error review.  A habeas petitioner may be entitled to relief based on a constitutional error at trial only if the petitioner "can establish that [constitutional error] resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  A petitioner suffers actual prejudice when an error has a "substantial and injurious effect or influence in determining the jury's verdict." *Id*. at 623.  "The proper standard by which to gauge the injurious impact of the admission of constitutionally infirm evidence is to consider the evidence before the jury absent the constitutionally infirm evidence." *Brumley v. Wingard*, 269 F.3d 629, 646 (6th Cir. 2001).

**Admission of DNA Evidence.**  Lang argues that the expert testimony identifying him as a possible source of DNA found on the murder weapon was unreliable and should not have been admitted.  Even if this claim were preserved for habeas review, it is meritless.

This Court reviews this claim *de novo*.  As noted above, the Ohio Supreme Court found that Lang waived this claim and conducted a plain-error review of the issue.  The Sixth Circuit has held that a state court's review of a procedurally barred claim for plain error does not constitute an "adjudication on the merits" under AEDPA.  Because AEDPA deference does not apply to such a

78

claim, a federal court reviews the claim *de novo*.  *See, e.g.*,  *Frazier v. Jenkins*, 770 F.3d 485, 496 n.5 (6th Cir. 2014) (collecting cases); *Benge v. Johnson*, 474 F.3d 236, 246 (6th Cir. 2007) ("Because Benge could have met his burden under *Strickland* despite not being able to demonstrate plain error, this analysis did not constitute an 'adjudication on the merits' of Benge's ineffective-assistance-of-counsel claim."); *Lundgren*, 440 F.3d at 765 ("Plain error analysis is more properly viewed as a court's right to overlook procedural defects to prevent manifest injustice, but is not equivalent to a review of the merits.").[7]

The Ohio Supreme Court provided the following factual account:

Michele Foster provided expert testimony about the DNA found on the handgun used in the killings.  She stated that DNA was detected from "at least two individuals" at three different locations on the handgun.  The prosecutor then questioned Foster about the comparison of Lang's and Walker's DNA with the DNA found on the handgun:

Q:   Do you have an opinion as to a reasonable degree of scientific certainty as to whose DNA appears on that handgun?

A:   In this particular case, we can say that Antonio Walker is not the major source of DNA that we detected from the swabbing of the pistol.

In this case we, based on our comparison, we can say that Edward Lang cannot be excluded as a possible minor source to the DNA that we found on the weapon.

---

[7] The Sixth Circuit generally follows this rule, "refus[ing] to give AEDPA deference to a state appellate court review for plain error."  *Vasquez v. Bradshaw*, 345 F. App'x 104, 111 n.1 (6th Cir. 2009) (citing *Benge* as support for the general rule).  But in at least one other case, the Sixth Circuit has "focused on the merits of the reasoning actually followed by the state court and not the standard of review applied."  *Id.* (citing *Fleming v. Metrish*, 556 F.3d 520 (6th Cir. 2009), for the exception).  In *Fleming v. Metrish,* the Sixth Circuit held that AEDPA deference applied to a claim reviewed by a state court for plain error and distinguished *Benge* on the ground that, in *Fleming*, the state appellate court first determined the merits of the claimed error before holding that it did not effect substantial rights.  *Fleming*, 556 F.3d at 531–32 ("*Benge* does not demonstrate, as the dissent suggests, that the state court's application of plain-error review *per se* insulated the claim from AEDPA deference.").  *See also Frazier*, 770 F.3d at 505–06 (Sutton, J., dissenting).  Here, the Ohio Supreme Court reviewed Lang's claim only under a plain-error analysis, and the general rule, permitting *de novo* review of habeas claims reviewed only for plain error in state court, applies.

> Q:    When you say not excluded, what do you mean by that?
> A:    Well, in this particular case, because we had such low level DNA, we can't say to a reasonable degree of scientific certainty that this person is the source.
>
> In this particular case, the chance of finding the major DNA profile that we found on that pistol is 1 in 3,461," meaning that "1 of 3,461 people could possibly be included as a potential source of the DNA."

*Lang*, 129 Ohio St. 3d at 523 (paragraph numbers omitted).

Lang complains that Foster's opinion was unreliable, and the trial court erred in admitting it. First, Lang argues that the DNA evidence's admission violated the Equal Protection Clause of the Fourteenth Amendment.  He asserts that Ohio evidentiary rules and governing case law allow a scientific expert to testify in a criminal case in terms of "possibility."  In civil cases, an expert must express opinions in "probability" terms.  By lowering the standard of admissibility for expert opinions in criminal cases, he argues, Ohio's expert-opinion evidentiary rules undermine the reliability of evidence and infringe on a criminal defendant's right to a fair trial (Doc. 16 at 71–73).

The Ohio Supreme rejected this claim on plain-error review, reasoning:

> Ohio has a split application of Evid. R. 702.  Criminal cases adhere to the *D'Ambrosio* standard in allowing expert opinion in terms of possibilities to be admitted under Evid. R. 702.  In contrast, Ohio courts require expert opinions in civil cases to rise to the level of probabilities before being admitted under Evid. R. 702.
>
> The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Section 1, commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  The Equal Protection Clause does not prevent all classification, however.  It simply forbids laws that treat persons differently when they are otherwise alike in all relevant respects. *Nordlinger v. Hahn* (1992), 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1.  Lang's equal protection argument can be rejected because criminal defendants and civil litigants have vastly different stakes and concerns and are not similarly situated.

*Lang*, 129 Ohio St. 3d at 525 (paragraph numbers and internal citations omitted).  This Court agrees with the state court's analysis.

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  Thus, "[t]he threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006).

As the Ohio Supreme Court reasoned, Lang cannot prevail on this claim because he cannot show that criminal defendants and civil litigants are similarly situated.  Criminal prosecutions and civil litigation are governed by different laws and separate rules of evidence and procedure; they implicate and protect entirely distinct rights and interests.  Indeed, the Supreme Court has observed that "the equal protection clause [does not] exact uniformity of procedure.  The legislature may classify litigation and adopt one type of procedure for one class and a different type for another." *Dohany v. Rogers*, 281 U.S. 362, 369 (1930).  *See also Glatz v. Kort*, 650 F. Supp. 191, 198–99 (D. Colo. 1984) (finding individual committed pursuant to criminal procedures not similarly situated to those committed involuntarily pursuant to civil procedures); *Higgs v. Neven*, 2013 WL 5663127, at *16 (D. Nev. 2013) ("Because [p]etitioner, a criminal defendant, is not similarly situated to a civil litigant, the fact that different state rules exist in criminal and civil contexts provides no basis for an equal protection claim."); *Harris v. Ashby*, 2001 WL 863601, at *6 (N.D. Tex. 2001) ("For equal

81

protection purposes, it is clear from the purpose and nature of the penalties that civil contemnors are not similarly situated with criminal contemnors.").[8]

Lang further argues that the admission of Foster's testimony violated his Sixth Amendment right to confrontation because "[n]o amount of cross-examination could remedy the improper admission of this evidence and the subsequent argument of the prosecutor" (Doc. 33 at 93). The Sixth Amendment's Confrontation Clause protects a defendant's right "to be confronted with the witnesses against him." U.S. CONST. amend. VI. Lang's counsel effectively cross-examined Foster, eliciting favorable testimony. Lang is entitled to nothing more. "'[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam) (emphasis in original)). *See Lang*, 129 Ohio St. 3d at 525.

Finally, Lang argues this evidence should have been excluded under due process principles because the prosecutor used it in an unfair manner during closing arguments to show that Lang was the principal offender (Doc. 16 at 73–76). "Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest decision on an improper basis." *United States v. Bonds*, 12 F.3d 540,

---

[8]

The State contends that granting habeas relief based on Lang's equal protection argument would violate limitations on the retroactive application of a new constitutional rule of criminal procedure in violation of *Teague v. Lane*, 489 U.S. 288 (1989) (Doc. 23 at 69). The State also asserts this defense in relation to Lang's seventh, eighth, eleventh, twelfth, thirteenth, and seventeenth grounds for relief (*see* Doc. 23 at 63, 78–79, 81, 84–85, 87, 95–96). Here, and with regard to each of those other claims, this Court will not address the complex rules that govern application of *Teague* because the claims lack merit on other grounds. *See Byrd v. Wilson*, 1995 WL 649423, at *2 (6th Cir. 1995) (declining to address the "byzantine rules that govern whether a subsequent decision should be applied retroactively" where the petitioner's claim lacked merit for other reasons).

567 (6th Cir. 1993) (internal quotation marks and citations omitted).  Nothing in Foster's testimony was improper.  She did not "tell the jury that Lang's DNA was on the gun" as Lang argues (Doc. 16 at 73).  Rather, she clearly and accurately explained to the jury the results of her testing, which showed that Lang "could not be excluded" as a source of the DNA on the weapon.

**Denial of Access to Grand Jury Transcripts.**  Lang argues that the trial court erred by denying his request for access to grand jury transcripts.  The Ohio Supreme Court addressed this claim:

> Lang made various pretrial motions requesting the names of the witnesses who testified before the grand jury and the transcripts of the grand jury testimony.  The trial court ruled that the defense had failed to provide "any particularized need" for the transcripts and denied the request.  The trial court also denied the defense motion to disclose the names of the grand jury witnesses.  In a subsequent judgment entry, the trial court stated that it had reviewed the grand jury transcripts, which included the testimony of four witnesses, and determined that "the defendant has not provided a particularized need for the transcripts" and has "not met the burden to establish the disclosure" of them.  The trial court also found that "no exculpatory or other information which must be disclosed to the defendant exists within said transcripts."  The transcripts were sealed and made part of the appellate record.
>
> We have recognized a limited exception to the general rule of grand jury secrecy: an accused is not entitled to review the transcript of grand jury proceedings "unless the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy."  A particularized need is established "when the circumstances reveal a probability that the failure to provide the grand jury testimony will deny the defendant a fair trial."  Determining whether a particularized need exists is a matter within the trial court's discretion.
>
> Lang argues that the trial court erred by failing to disclose the grand jury testimony of his codefendant, Walker.  But review of the grand jury testimony shows that Walker never testified before the grand jury.  Thus, this claim lacks merit.
>
> Lang also makes a generalized argument that he needed the grand jury testimony to prepare for cross-examination of the witnesses and to adequately prepare for his defense.  Lang also argues that he was unable to establish a particularized need without knowing who testified at the grand jury or the content of their testimony.

Lang's speculative claim that the grand jury testimony might have contained material evidence or might have aided his cross-examination does not establish a particularized need.

Lang's assertion that he did not know who testified during the grand jury or what they said provides no excuse for failing to establish a particularized need. Lang was required to show that nondisclosure of the grand jury transcripts would probably deprive him of a fair trial. Lang has failed to make such a showing, and nothing in the record (including the testimony under seal) supports it here. We find that the trial court did not abuse its discretion in ruling that Lang failed to establish a particularized need for the grand jury testimony.

*Lang*, 129 Ohio St. 3d at 518–19 (paragraph numbers and internal citations omitted).

Lang claims that AEDPA does not apply to this claim because the Ohio Supreme Court did not refer to or discuss "federal standards" (Doc. 16 at 83). As already discussed, a state court need not cite any federal law for AEDPA deference to apply. Lang argues in the alternative that the Ohio court's decision rejecting this claim violates both § 2254(d)(1) and (d)(2) (Doc. 16 at 84).

There is no clearly established Supreme Court precedent recognizing a constitutional right to obtain access to grand jury transcripts under any circumstances. "Of course, the standard practice since approximately the 17th century has been to conduct grand jury proceedings in secret, without confrontation, in part so that the defendant does not learn the State's case in advance." *Giles v. California*, 554 U.S. 353, 371 (2008) (parentheses omitted) (citing S. Beale, W. Bryson, J. Felman, & M. Elston, Grand Jury Law and Practice § 5.2 (2d ed. 2005)). Lang also does not specify any unreasonable state court factual findings.

**Admission of Walker's Prior Consistent Statement.** Lang asserts the trial court erred by admitting co-defendant Walker's prior consistent statements. Walker testified at trial that his trial testimony matched statements he made to police before he entered into a plea agreement. Even if this claim were not procedurally defaulted, it would fail. This Court reviews this claim *de novo*.

The Ohio Supreme Court explained the context of the testimony at issue.  It recounted:

> During his opening statement, defense counsel told the jury that Walker had entered into a plea agreement that allowed him to plead guilty to lesser charges.  Defense counsel also informed the jury that in exchange for this deal, Walker signed an agreement to "testify truthfully at any proceeding, including trials, involving the case of [his] Co–Defendant, Edward Lang."  Defense counsel recited Walker's agreement: "I further understand that if I fail to cooperate and testify truthfully as agreed, this agreement and sentence can be voided by the State of Ohio, and I can be prosecuted to the fullest extent as allowed by law including have a consecutive sentence imposed."  Defense counsel then concluded his opening statement by stating: "[A]fter you have heard all of the evidence you will come to the conclusion that the only evidence against Eddie Lang are *the statements of a person or persons with an interest in the case.*"

*Lang*, 129 Ohio St. 3d at 528 (emphasis in original).  Defense counsel's suggestion that Walker may have a motive to lie in exchange for a favorable plea agreement, the state court explained, allowed the State to introduce Walker's prior consistent statements to rehabilitate his testimony.  It summarized:

> During the state's direct examination, Walker testified about his plea deal.  He said that he had pleaded guilty to two counts of complicity to murder with firearm specifications and one count of complicity to commit aggravated robbery with a firearm specification. Walker also testified that he had received concurrent sentences for these offenses of "18 to life."   The prosecutor then elicited the following testimony:
>
>> Q:    And what were you asked to do because you were given that sentence?
>> A:    Testify.
>>
>> Q:    Testify, how?
>> A:    To give truthful testimony of the events of October 22.
>>
>> Q:    And that's the same story that you gave Detective Kandel when you were arrested on October 27?
>> A:    Yes.
>>
>> Q:    Before you had any deal?
>> A:    Yes.

*Id*. at 527.

85

Lang agues that Walker's prior consistent statement violated his right to confrontation because Walker was not subject to cross-examination when he made the earlier statement to the police.  He cites *Crawford v. Washington*, 541 U.S. 36 (2004), arguing hearsay statements, including prior consistent statements, are inadmissible unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant with respect to the hearsay statement (Doc. 16 at 84–85).

Lang misstates *Crawford*'s holding.  As the Ohio Supreme Court noted in its plain-error analysis of this claim, the Court in *Crawford* held that the Confrontation Clause bars "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  *Crawford*, 541 U.S. at 53–54.  However, the Court also noted, "[W]e reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. . . .  The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it."  *Id*. at 59 n.9 (citing *California v. Green*, 399 U.S. 149, 162 (1970)).  Walker testified at trial and was subject to cross-examination.  Therefore, admission of his prior statement to police did not violate the Confrontation Clause.

**Admission of Prejudicial Evidence.**  Lang argues that, on eight occasions during trial, the trial court erred by admitting irrelevant and prejudicial evidence.  Lang argues these errors deprived him of a fair trial and due process under the Fourteenth Amendment.  This Court disagrees.

<u>Walker's Testimony that Lang Wore Red Clothing</u>.  Lang complains that the trial court permitted Walker to testify, over defense objection, that Lang wore red "all the time."  Although the trial court then sustained a defense objection when the prosecutor asked Walker whether he was

86

"familiar with the significance of red," Lang claims the exchange implied that he was a member of the notorious Bloods street gang (Doc. 16 at 87).

> The Ohio Supreme Court addressed this claim on the merits:
>
>> Lang argues that Walker's testimony about the color red should not have been admitted because the implication was that Lang was a member of the "Bloods" gang. The state counters that the testimony that Lang wore red was relevant in showing his familiarity with firearms and the drug culture, and it contends that the very nature of these crimes pointed to gang-related homicides. However, no evidence was presented at trial linking the two murders to gang activity. Accordingly, testimony that Lang frequently wore red was irrelevant and should not have been admitted. But the testimony was brief, and no explanation was presented linking the color red to gang activity. Given the substantial evidence of Lang's guilt, such testimony constituted harmless error.

*Lang*, 129 Ohio St. 3d at 529–30.

Lang argues that evidence regarding a defendant's gang involvement is "inherently prejudicial." He cites *Dawson v. Delaware*, 503 U.S. 159, 165 (1992), which found constitutional error in a stipulated admission that the defendant belonged to a white racist prison gang. The evidence was irrelevant at the punishment phase of his trial (Doc. 33 at 104).

Here, the Ohio court found the gang evidence of which Lang complains irrelevant and inadmissable, but went on to find the error harmless, a conclusion not contrary to, or an unreasonable application of, *Dawson*. The majority opinion in *Dawson* concluded by stating, "The question whether the wrongful admission of the Aryan Brotherhood evidence at sentencing was harmless error is not before us at this time, and we therefore leave it open for consideration by the Supreme Court of Delaware on remand." 503 U.S. at 168–69. Justice Blackmun, in a concurring opinion, noted his "understanding that the Court . . . does not *require* application of harmless-error review on remand." *Id*. at 169 (Blackmun, J., concurring) (emphasis in original).

87

As courts have noted since *Dawson*, the Supreme Court has yet to resolve whether harmless error applies in this context. *See, e.g.*, *United States v. Kane*, 452 F.3d 140, 143 n.1 (2nd Cir. 2006); *Watts v. Quarterman*, 448 F. Supp. 2d 786, 813 (W.D. Tex. 2006). In light of absence of clearly established federal law, § 2254(d)(1) bars relitigation of this issue. Further, the Ohio court's finding of harmless error was reasonable.

Dittmore's Testimony that he was Part of the Gang Unit. Lang next complains that Sergeant John Dittmore improperly testified that he supervised the Canton police department's "Gang Unit." Lang argues the evidence was irrelevant and again implied he was a gang member (Doc. 16 at 87). This claim is both procedurally defaulted (as discussed above) and meritless.

As the Ohio court explained in its plain-error analysis, this testimony was irrelevant and should have been excluded. But the error was harmless, because Dittmore never testified that Lang was involved in a gang. Dittmore also testified that he worked closely with narcotics investigators, testimony that provided an alternative explanation for his involvement in this murder investigation. *See Lang*, 129 Ohio St. 3d at 530.

Testimony regarding Lang's Nickname, "Tech". Lang makes a similar argument about testimony from Walker and his friend Teddy Seery about Lang's nickname, "Tech" or "Tek." Lang claims that "Tech" or "Tek" is "shorthand" for a type of gun, suggesting that Lang was familiar with guns, violent, and therefore likely to be guilty of the murders (Doc. 16 at 87). This Court again agrees with the Ohio Supreme Court's decision finding no plain error in admission of this testimony. As the Ohio Supreme Court explained, it is speculative that the jury understood "Tech" or "Tek" as Lang now explains the term, or that the jury made a connection between Lang and guns based on the testimony. *See Lang*, 129 Ohio St. 3d at 530.

Dittmore's Testimony about Drug Dealing.  Lang further claims that Dittmore's testimony about drug dealing improperly suggested that Lang had previously purchased illegal drugs.  He complains about the following testimony: that drug dealers do not sell drugs to strangers; that a dealer's decision to sell drugs to a stranger may be affected by the quantity of drugs for sale; that large amounts of cocaine cannot be bought on the street, but must be bought surreptitiously; and that a dealer might sell drugs to a stranger if someone the dealer knows vouches for the stranger (Doc. 16 at 87).  On plain-error review the Ohio Supreme explained:

> Dittmore's redirect testimony showed the likelihood that Lang knew Burditte when he called him and set up the drug deal for a quarter ounce of crack cocaine.  Such testimony was relevant because Lang told police he did not know Burditte prior to calling him.  It also suggested that Lang's motive to kill Burditte was to avoid identification.  Thus, Dittmore's redirect testimony was relevant and did not constitute plain error.

*Lang*, 129 Ohio St. 3d at 531.  This Court agrees.

Testimony Lang Vomited After the Murders.  Lang contends that the trial court should not have admitted Walker's testimony that Lang (1) vomited and (2) stated "every time I do this, this same thing happens."  He argues that the testimony implied that Lang had previously committed murder (Doc. 16 at 87).  Again, this Court agrees with the Ohio Supreme Court's plain-error analysis:,

> Lang's conduct and comments after the murders were relevant in reflecting his consciousness of guilt.  Moreover, the prosecution made no attempt to use Lang's comments as showing that he had previously murdered other people.  No plain error occurred.

*Lang*, 129 Ohio St. 3d at 531 (internal citation omitted).  This claim also fails.

Lang's Recorded Statement to the Police.  Lang argues that the trial court erred by permitting the State to play for the jury Lang's recorded statement to the police in which he states that he may

89

be guilty of conspiracy to commit murder (Doc. 16 at 87).  The Ohio Supreme Court decided this

claim on the merits, stating:

> Lang argues that his statement admitting that he might be guilty of conspiracy to commit murder was improperly admitted.  During the state's case-in-chief, the prosecution played the tape-recorded statement that Lang made to the police.  The trial court, over defense objection, allowed the prosecutor to play a segment of the tape that included Lang's admission to conspiracy to commit murder:
>
>> "(Officer) Kandel: * * * When everything went bad and you felt so bad about it, why didn't you call the police?
>>
>> "Lang: Basically that he used my gun and then that I was in the car when that shit happenin'.  And then as though, you know what I'm sayin', that's *conspiracy to murder*.
>>
>> " * * *
>>
>> "Kandell: That's what you believe?
>>
>> "Lang: Yeah.  If you right there at the scene of a crime and you witness somethin' or you bein' a part of somethin' no matter how much you played a part in it, if you involved in it, * * * that's *conspiracy to murder*."
>
> After the tape was played, the trial court provided the jury with the following limiting instructions: "You may have heard in the statement some references by both sides to a concept known as conspiracy to murder.  I would indicate to you that there are no charges in this case that alleged conspiracy to murder.  You may take the Defendant's statement or the statements of the officers if they deal with the facts of this case, but not as they may discuss any legal conclusions because they may be correct or incorrect legally."
>
> Lang's opinion that he might be guilty of conspiracy to commit murder was irrelevant. No prejudicial error, however, resulted from playing this segment of Lang's statement, because the trial court's limiting instructions ensured that the jury did not improperly consider it.

*Lang*, 129 Ohio St. 3d at 531–32 (emphasis in original) (paragraph numbers and internal citation

omitted).

90

Lang does not explain how the Ohio Supreme Court's reasoning was contrary to, or an unreasonable application of, clearly established federal law. The state court's decision is reasonable, and Lang's claim fails.

Testimony that Walker Only Learned Later About Lang's Gun. Lang maintains that Walker falsely testified that he did not know the make and model of the murder weapon (Doc. 16 at 87). Walker testified, "It was a grey and black gun. I didn't know what kind of gun it was at the time, but I found out it was a .9 [*sic*] millimeter" (Doc. 22-2 at 879). Lang points out that Walker later testified that while waiting for Burditte to arrive at the meeting point, Lang had trouble placing a round in the handgun, and Walker knew how to chamber a round in a 9 millimeter handgun (*id*. at 882–83). This Court agrees with the Ohio Supreme Court's plain-error analysis finding the testimony admissible. As the Ohio Supreme Court explained, "Walker's statement that he knew how to load a 9 mm handgun does not establish that Walker lied when he stated, 'I didn't know what kind of gun it was at the time.' Walker's credibility was a matter for the jury to decide after they heard his testimony." *Lang*, 129 Ohio St. 3d at 532.

Testimony About Unreliable DNA Evidence. Finally, Lang again complains about Foster's "unreliable" DNA testimony and evidence (Doc. 16 at 88). This Court already has determined that the trial court did not err in admitting Foster's testimony about the DNA evidence.

**Comments Regarding Mitigating Evidence.** Lang claims, during its review of the jury's death-sentence recommendation, the trial court improperly "minimized and trivialized" Lang's mitigating evidence, presented at trial. Lang focuses on the court's treatment of evidence supporting three mitigating circumstances: (1) his age at the time of the murders, (2) the nature and circumstances of his offense, and (3) his history, character, and background (Doc. 16 at 108–11).

The Ohio Supreme Court addressed this claim on the merits, explaining:

Third, Lang argues that the trial court did not properly consider his youth as a mitigating factor and erroneously concluded that his conduct and taped statement show a street-hard individual." The "assessment and weight to be given mitigating evidence are matters for the trial court's determination." Here, the trial court identified Lang's youth (he was 19 at the time of the offense) as his strongest mitigating factor and fully discussed the weight it was giving to this mitigation. The trial court could reasonably assign minimal weight to this evidence.

Fourth, Lang claims that the trial court improperly considered the nature and circumstances of the offense even though the defense never raised it as a mitigating factor. Lang also argues that the trial court's finding that there was nothing mitigating in the nature and circumstances of the offense transformed them into an aggravating factor.

The trial court did not err in considering the nature and circumstances of the offense. R.C. 2929.04(B) provides that the court, in determining whether death is an appropriate penalty, "*shall consider*, and weigh against the aggravating circumstances proved beyond a reasonable doubt, *the nature and circumstances of the offense*." (Emphasis added.). Accordingly, the trial court was required to review these factors. Nothing, however, in the sentencing opinion indicates that the trial court viewed the nature and circumstances of the offense as an aggravating circumstance rather than a mitigating factor.

Finally, Lang argues that the trial court trivialized mitigating evidence about his history, character, and background. Lang claims that the trial court glossed over testimony about his father's abusive relationship with his mother, failed to fully consider the mental and psychological abuse he suffered after being abducted by his father, and faulted him for not always taking his medications.

Nothing in the sentencing opinion indicates that the trial court trivialized or glossed over mitigating evidence. The trial court thoroughly discussed mitigating evidence about his father's abuse, mentioned that Lang was treated at various psychiatric facilities on over 30 occasions, and properly summarized evidence that Lang did not always take his medications. The trial court also stated that it had "weighed all of the evidence presented as it relates to Mr. Lang's history, character, and background." Thus, this claim also lacks merit.

*Lang*, 129 Ohio St. 3d at 554–55 (paragraph numbers and internal citations omitted).

Lang first argues that the Ohio Supreme Court's conclusion that the trial court properly assessed his youth was an unreasonable application of *Lockett v. Ohio*, 438 U.S. 586 (1978), *Eddings*

92

*v. Oklahoma*, 455 U.S.104 (1982), and *Graham v. Collins*, 506 U.S. 461 (1993).  He contends the trial court effectively "failed to consider his youth or age" when it discounted the fact that he committed the crime just three days after his nineteen birthday because he was a "street-hard[ened] individual." He posits, "Regardless of the offender's sophistication, it is their actual age that is most significant in their adjudication" (Doc. 33 at 129–30).  In *Lockett*, the Supreme Court held:

> [T]he Eighth and Fourteenth Amendments require that [a] sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

*Id*. at 604.  In *Eddings*, the Court held that the sentencer may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence."  *Eddings*, 455 U.S. at 115 (emphasis in original).  "The sentencer . . . may determine the weight to be given relevant mitigating evidence.  But they may not give it no weight by excluding such evidence from their consideration." *Id*.  The Court noted that "the chronological age of a minor is itself a relevant mitigating factor of great weight," but stressed that "the background and mental and emotional development of a youthful defendant [must also] be duly considered in sentencing."  *Id*. at 116.  In *Graham*, the Court found that the Texas death penalty statute

> satisfied the commands of the Eighth Amendment: It permitted petitioner to place before the jury whatever mitigating evidence he could show, including his age, while focusing the jury's attention upon what that evidence revealed about the defendant's capacity for deliberation and prospects for rehabilitation.

*Graham*, 506 U.S. at 472.

The Ohio Supreme Court's resolution of Lang's claim regarding the mitigating factor of his youth is consistent with these cases: it found the trial court properly considered Lang's age a

93

mitigating factor, but assigned Lang's age minimal weight because Lang was a "street-hard[ened] individual."

The Sixth Circuit has rejected arguments like Lang's. In *Sheppard v. Bagley*, 657 F.3d 338 (6th Cir. 2011), the Ohio Supreme Court assigned little mitigation weight to the petitioner's youth (he was eighteen-years-old at the time of his crime) because he was a "man of full legal age" and an "adult with all the privileges and responsibilities of an adult." *Id*. at 346. The Sixth Circuit found the state court's conclusion complied with *Eddings*. The Ohio Supreme Court's analysis was "not a refusal to consider [the petitioner's] youth 'as a matter of law'; it [was] a decision on how to weigh the factor." *Id*. (citing *Eddings*, 455 U.S. at 115). The Sixth Circuit rejected the petitioner's contention that the state court decision was unreasonable because "he could not have been any younger and still be eligible for the death penalty [because that contention]. . . assume[s] that, for purposes of this factor, youth must be measured strictly by chronological age." *Id*. "Ohio courts see the factor as more complicated than that," the court continued. "That is their prerogative . . . ." *Id*. Lang, too, argues for a strict application of chronological age in mitigation, a rule that is not supported by *Eddings* or its progeny.

Lang next argues that the Ohio Supreme Court unreasonably concluded that the trial court did not err in considering the nature and circumstances of the offense, even though trial counsel never raised offense factors as a mitigating evidence. He contends that, in doing so, the trial court violated Ohio law and *Gardner v. Florida*, 430 U.S. 349 (1977) (Doc. 33 at 130–31). This argument fails because Ohio law requires trial courts to "consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense" in assessing a death

94

sentence.  Ohio Rev. Code § 2929.04(B).  This statute provided sufficient notice to Lang and his counsel, and the state court did not misapply *Gardner*.

Finally, Lang argues that the Ohio Supreme Court unreasonably applied *Eddings* and *Porter v. McCollum*, 130 S. Ct. 447 (2009) (per curiam), when it rejected his argument that the trial court "reduced to irrelevance and inconsequence" his history, character and background (Doc. 33 at 131–32).  In *Porter*, the Supreme Court found petitioner's trial counsel ineffective for failing to present mitigating evidence regarding the petitioner's mental health, family background, or military service.  The Court further found that the Florida Supreme Court's decision that the petitioner was not prejudiced by counsel's deficient performance at the mitigation phase of trial was an unreasonable application of federal law; the finding "either did not consider or unreasonably discounted the mitigation evidence adduced in the post-conviction hearing."  *Id*. at 454.  That is not the case here.  The Ohio Supreme Court reasonably found that the trial court carefully considered the mitigating evidence (*see* Doc. 17-5 at 1385–92).

Furthermore, the Ohio Supreme Court conducted a thorough, independent review of the mitigating and aggravating circumstances presented at the penalty phase of Lang's trial.  *Lang*, 129 Ohio St. 3d at 556–60.  It concluded:

> the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.  Lang's murder of Cheek during an aggravated robbery as the principal offender and his course of conduct in murdering Cheek and Burditte are grave aggravating circumstances.  Lang's mitigating evidence pales in comparison to these aggravating circumstances.

*Id*. at 560.  Lang does not object to the Ohio Supreme Court's reweighing of the evidence.  The Ohio Supreme Court's review of Lang's sentence cured any constitutional error the trial court may have

made in its sentencing opinion. *See, e.g.*, *Sheppard*, 657 F.3d at 347; *Hoffner v. Bradshaw*, 622 F.3d 487, 498 (6th Cir. 2010); *McGuire v. Ohio*, 619 F.3d 623, 630 (6th Cir. 2010).

### Sixth Ground for Relief
#### *Sufficiency of the Evidence*

Lang argues in his sixth ground for relief that the State failed to produce sufficient evidence demonstrating that Lang murdered Burditte and Cheek while "committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnaping, rape, aggravated arson, aggravated robbery, or aggravated burglary, and . . . was the principal offender in the commission of the aggravated murder" (Doc. 16 at 76–80 (citing Ohio Rev. Code § 2929.04(A)(7))). Lang raised this claim on direct appeal to the Ohio Supreme Court, which addressed it on the merits. *Lang*, 129 Ohio St. 3d at 542–45. Lang preserved this claim for federal habeas review.

The Due Process Clause of the Fourteenth Amendment requires a state to prove every element of a crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979). A habeas court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319 (emphasis in original). "[T]he *Jackson* inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993). This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. This Court must limit its review to evidence adduced during trial. *Herrera*, 506 U.S. at 402. Sufficiency-of-the-evidence claims are assessed "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16. Because

both *Jackson* and AEDPA apply to Lang's sufficiency claim, this Court's review requires deference at two levels.  "'First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'"  *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)).

The Ohio Supreme Court addressed this claim on the merits:

In proposition of law V, Lang challenges both the sufficiency and manifest weight of the evidence to convict him as the principal offender of the aggravated murders as charged in Specification Three of Counts One and Two.

A claim raising the sufficiency of the evidence invokes a due process concern and raises the question whether the evidence is legally sufficient to support the jury verdict as a matter of law.  In reviewing such a challenge, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St. 3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

A claim that a jury verdict is against the manifest weight of the evidence involves a different test.  "'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'"

Lang's sufficiency claims lack merit.  Walker's and Seery's testimony, evidence that the murder weapon was found in Lang's possession, and DNA evidence sufficiently established Lang's guilt as the principal offender.  The evidence showed that on the night of October 22, 2006, Lang and Walker agreed to rob a drug dealer.  Lang suggested that they rob Burditte.  Their plan was to meet Burditte, enter his car, and rob him.  Lang then called Burditte and arranged a meeting to purchase crack cocaine from him that evening.

Lang and Walker went to the meeting location later that night.  Lang carried a 9 mm handgun and loaded it while they waited for Burditte to arrive.  Shortly thereafter,

Burditte and Cheek arrived.  According to Walker, Lang got into the backseat of their vehicle and shot Burditte and Cheek.

On the following day, Lang went to Seery's house and admitted to him that he had shot the victims.  When the police later arrested Lang, they found a 9 mm handgun in the backseat of the car that he was driving.  Forensic examination of the handgun identified it as the murder weapon.  Additionally, Foster testified that Lang could not be excluded as a possible source of DNA that was found on the handgun.

Nevertheless, Lang argues that the evidence is insufficient to convict him.  Lang asserts that Walker's testimony was not credible, because he accepted a plea deal in exchange for his testimony against him.  He also argues that Seery's testimony should be discounted because Seery had initially told police that he did not know anything about the killings.  But these claims call for an evaluation of Walker's and Seery's credibility, which is not proper on review of evidentiary sufficiency.

Lang also argues that none of his clothing was found with blood or gunshot residue, and Walker's clothing was untested.  But Foster testified that she examined Walker's hooded sweatshirt and shoes and found no blood or other trace evidence linking Walker to the murders.

Finally, Lang argues that none of the scientific evidence established that he was the principal offender.  This argument overlooks evidence tending to show that Lang's DNA was found on the handgun and Walker's DNA was not.  However, Lang continues to argue that the DNA evidence was unreliable because testing did not establish that his DNA was found on the handgun to a reasonable degree of scientific certainty.  As discussed in proposition II, questions about the certainty of the DNA results went to the weight of the evidence and not its admissibility.

Despite some discrepancies, the jury accepted the testimony of the state's witnesses.  Furthermore, a review of the entire record shows that the testimony was neither inherently unreliable nor unbelievable.  Therefore, witness testimony, circumstantial evidence, and forensic evidence provided sufficient evidence to prove beyond a reasonable doubt that Lang was guilty of the R.C. 2929.04(A)(7) specifications.

Although Lang does not raise the point, we note that Foster provided conflicting testimony about the DNA evidence found on the handgun.  Foster testified that Lang could not be excluded as a possible minor source of DNA.  Foster then testified that the chance of finding the major DNA profile that was found on the pistol is 1 in 3,461.  Foster also testified that there was a minor contributor to the DNA but "[t]here wasn't enough there of that second person * * * to compare to anyone * * * [and] we couldn't say anything about that minor person that was present."  Thus, Foster's testimony that there was insufficient DNA to identify the minor contributor is inconsistent with her

testimony that Lang could not be excluded as a possible minor source of the DNA that was found.

It is apparent from the context of Foster's testimony that she misspoke about Lang's DNA.  It appears that Foster meant to say that Lang could not be excluded as a possible major source rather than a minor source of DNA found on the handgun.

Even discounting Foster's testimony, sufficient evidence was presented to prove beyond a reasonable doubt that Lang is guilty of the aggravated murders as the principal offender.  Walker's and Seery's testimony established that Lang was the principal offender.  The murder weapon belonged to Lang, and the police found it in the back of the car that Lang was driving.  Moreover, the presence of Lang's DNA on the handgun was not crucial to the state's case, because it was Lang's handgun, and his DNA could be expected to be found on it.  Accordingly, the jury could have found Lang guilty of Specification Three of Counts One and Two without the DNA testimony.

With respect to Lang's manifest-weight challenges, this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'"  Lang's challenge to the credibility of Walker's and Seery's testimony is unpersuasive.  Thus, the jury neither lost its way nor created a manifest miscarriage of justice in convicting Lang of Specification Three of Counts One and Two.

*Lang*, 129 Ohio St. 3d at 542–45 (paragraph numbers and internal citations omitted).

Lang argues that the Ohio court's decision was contrary to, or an unreasonable application of, *Jackson*, and was based on an unreasonable determination of the facts.  Lang contends that the evidence presented at his trial did not prove that he was the principal offender, or "actual killer," because it consisted primarily of Walker's and Seery's testimony, which was not credible, and unreliable DNA evidence (Doc. 16 at 79).  This claim fails.

This Court already has rejected Lang's claims regarding the reliability of the DNA evidence.  Consistent with *Jackson*, the Ohio Supreme Court rejected attacks on Walker and Seery's credibility.  *See, e.g.*, *Johnson v. Mitchell*, 585 F.3d 923, 931 (6th Cir. 2009) (explaining that a habeas court reviewing a state-court judgment for sufficiency of the evidence "do[es] not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [the habeas court's] judgment for that of the

jury").  The Ohio Supreme Court's analysis *Jackson* analysis was not an unreasonable application of clearly established federal law.  And Lang identifies no unreasonable factual determinations on the part of the state courts.

**Seventh Ground for Relief**
***Suppression of Exculpatory Evidence***

Lang claims the State violated his constitutional rights by hiding exculpatory evidence and improperly destroying potentially exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  He contends the police did not fully investigate Walker, Lang's accomplice.  And in ending their investigation "prematurely," Lang argues, the police "prevented the preservation of any other evidentiary materials; the effect was the equivalent of spoliation of collected evidence" (Doc. 16 at 80–81).

### Procedural Posture

The State argues that Lang did not present this claim to state courts.  The claim is unexhausted but procedurally defaulted (Doc. 23 at 79).  Lang replies that he did in fact raise this claim as his fifth proposition of law on direct appeal to the Ohio Supreme Court.  However, he argues that because the Ohio Supreme Court "refused to order the prosecutor to deliver the files so that *Brady* material could be discovered . . . . he could not develop this claim in that forum."  (Doc. 33 at 96).

The State is correct.  The claim to which Lang refers challenged the sufficiency of the evidence offered at trial to convict him as the principal offender; it was not a *Brady* claim (*see* Doc. 18-1 at 1519–21, 1576–84).  Although Lang's sufficiency-of-the-evidence claim is related to his habeas *Brady* claim in that they both concern evidence regarding Walker's role in the murders, they are different claims with distinct legal theories.  Lang did not present a *Brady* claim to a state court.

100

A federal habeas claim that was not raised in state court may be deemed unexhausted "if the state still provides a remedy for the habeas petitioner to pursue, thus providing the state courts an opportunity to correct a constitutionally infirm state court conviction." *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).  On the other hand, "if a state remedy is no longer available at the time of the federal petition, the exhaustion doctrine poses no bar to federal review." *Wagner v. Smith*, 581 F.3d 410, 415 (6th Cir. 2009) (citing 28 U.S.C. § 2254(b)(1)(B) and *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)). *Brady* claims generally rely on new evidence not found in the trial record, so a return to state court to litigate those claims is possible in some situations under Ohio law.  *See* Ohio Criminal Rule 33(B) (defendant may be entitled to new trial after deadline for filing motion for new trial if he was "unavoidably prevented" from filing motion or there is "newly discovered evidence"); Ohio Rev. Code § 2953.21(A)(1) (second, successive, or untimely postconviction petition permitted if petitioner shows: (1) that he was "unavoidably prevented from discovery of the facts" of the claim, or the claim is based on a new federal or state right the Supreme Court has recognized that applies retroactively; and (2) but for constitutional error at trial, no reasonable factfinder would have found petitioner guilty of an offense or eligible for a death sentence); *Hanna v. Ishee*, 694 F.3d 596, 613–14 (6th Cir. 2012) (recognizing that Ohio's postconviction statute codifies Ohio's *res judicata* rules, which generally bar courts from considering any issue that could have been, but was not, raised on direct appeal, unless the claim relies on evidence outside the record).

However, in this case Lang does not offer any evidence outside the record.  Instead he notes the absence of evidence, an argument that could have been made in his original postconviction petition.  Lang has no available state remedy for this claim in state court, therefore, and habeas review of this claim is not barred by the exhaustion doctrine.  Moreover, even if this claim were unexhausted,

101

§ 2254(b)(2) permits courts to deny unexhausted habeas claims on the merits where appropriate. *See Hanna*, 694 F.3d at 610 (denying petitioner's claim on the merits "notwithstanding a failure to exhaust" the claim).

As the State argues, this claim also is procedurally defaulted because Lang has no remaining avenues of relief in state court (Doc. 23 at 79).  *See O'Sullivan*, 526 U.S. at 848 (if a petitioner fails to fairly present any federal habeas claims to the state courts but has no remaining state remedies, then the petitioner has procedurally defaulted those claims); *Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001) (Ohio's doctrine of *res judicata,* barring courts from considering any issue that could have been, but was not, raised on direct appeal, is an "independent and adequate state ground" upon which to find habeas claim procedurally defaulted).

Lang argues this Court should excuse procedural default of this claim because of ineffective assistance of his postconviction counsel, who failed "to fully and exhaustively develop the factual predicate, including rebuttal of facts that were only to be created by the court of appeals" (Doc. 33 at 97–98).  As with his procedurally defaulted jury-composition claim, he relies on *Martinez*.  As explained above, *Martinez* is inapt.  Lang identifies no other grounds for excusing default of his *Brady* claims.

**Merits Analysis**

Lang's *Brady* claim also lacks merit.  "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. To establish a *Brady* violation "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by

102

the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

Lang argues here that the police *possibly* failed to preserve key evidence that *may* have shown Walker was the principal offender.  He provides no evidence to support these allegations.  Lang's claim is speculative.  *See, e.g.*, *United States v. Aleman*, 548 F.3d 1158, 1164 (8th Cir. 2008) ("[The defendant] only speculates that interviews of [the undisclosed] individuals would have provided evidence favorable to his defense, however, and mere speculation is not sufficient to sustain a *Brady* claim." (internal ellipses and quotation marks omitted)); *Cunningham v. City of Wenatchee*, 345 F.3d 802, 812 (9th Cir. 2003) (bad faith is not established when the exculpatory value of unpreserved evidence is entirely speculative).

### Eleventh and Thirteenth Grounds for Relief
#### *Prosecutorial Misconduct*

Lang alleges prosecutorial misconduct rendered his trial fundamentally unfair because the prosecutor:

1.  Asked prospective jurors if they would promise to return a death sentence;

2.  Presented evidence regarding gangs;

3.  Presented evidence regarding Lang vomiting;

4.  Argued that DNA evidence proved Lang was the principal offender;

5.  Speculated during closing argument;

6.  Vouched for witnesses;

7.  Engaged in such egregious prosecutorial misconduct during the guilt phase of the trial that prejudice from that misconduct carried over into the trial's penalty phase;

8.  Mischaracterized mitigating evidence;

103

9.      Alluded to gang activity; and

10.     Asked the jury to render justice.

(Doc. 16 at 88–95, 98–102).

**Procedural Posture**

The State argues that "insofar as the Supreme Court of Ohio invoked Ohio's contemporaneous objection rule," Lang's prosecutorial-misconduct claims are procedurally defaulted because Lang's counsel did not object to the alleged misconduct at trial (Doc. 23 at 81–82, 95).  Lang responds that the State has waived a procedural default claim -- the State does not identify the prosecutorial-misconduct sub-claims it claims are defaulted (Doc. 33 at 104–05).  Lang cites to *Slagle v. Bagley*, 457 F.3d 501, 514 (6th Cir. 2006), in which the Sixth Circuit noted that because the warden had "not identified with specificity which [prosecutor] statement[ claims] are allegedly defaulted," the warden waived her procedural default defense.  *Id.* at 514.  In addition to the warden's "vague assertion" of the procedural default defense, the court in *Slagle* could not determine if the relevant state court decision reached the merits of the prosecutor statement claims, or instead denied the claims by relying on a procedural bar.  *Id.* at 515.  But in Lang's case, the Ohio Supreme Court identified the prosecutorial-misconduct sub-claims -- specifically, all sub-claims except sub-claims 1, 6, and 7 (as numbered above) -- Lang had waived due to the contemporaneous objection rule.

Lang further agues that if this Court finds that he defaulted any of his prosecutorial-misconduct sub-claims, the default should be excused based on ineffective assistance of trial counsel (Doc. 33 at 105).  Because Lang's allegations of prosecutorial misconduct lack merit, he cannot show prejudice under *Strickland*.

104

**Merits Analysis**

"Although the State is obliged to 'prosecute with earnestness and vigor,' it 'is as much [its] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.'"  *Cone v. Bell*, 556 U.S. 449, 469 (2009) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).  A prosecutor's "improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."  *Berger*, 295 U.S. at 88.

*Darden v. Wainwright*, 477 U.S. 168 (1986), controls this Court's analysis of Lang's prosecutorial misconduct claims.  There, the Court held that to prevail on such claims, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned. . . .  The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id.* at 181 (internal quotation marks omitted).  *See also United States v. Young*, 470 U.S. 1, 11 (1985) ("Nevertheless, a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.").  "[T]he appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'"  *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 642).  "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  The *Darden* standard "is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case

105

determinations.'"  *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (quoting *Yarlborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

      **Commitment From Jurors to Impose Death Penalty.**  Lang argues the prosecutor improperly asked prospective jurors for a commitment to impose the death penalty, a request that, Lang claims, influenced the jurors' ultimate decisions regarding his conviction and sentence (Doc. 16 at 89–90).

      The Ohio Supreme Court rejected this claim on the merits:

> First, Lang argues that the prosecutor committed misconduct by improperly seeking a commitment from the prospective jurors that they would sign a death verdict. During voir dire, the prosecutor asked the prospective jurors whether they could sign a death verdict if all 12 of them agreed that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt.  The prosecutor then asked individual jurors whether they could do so.

> The prosecutor's questioning was proper because the relevant inquiry during voir dire in a capital case is whether the juror's beliefs would prevent or substantially impair his or her performance of duties as a juror in accordance with the instructions and the oath. *State v. Davis*, 116 Ohio St. 3d 404, 2008–Ohio–2, 880 N.E.2d 31, ¶ 76, citing *Wainwright v. Witt* (1985), 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841. "Clearly, a juror who is incapable of signing a death verdict demonstrates substantial impairment in his ability to fulfill his duties." Accordingly, Lang's argument in this regard is not well taken.

*Lang*, 129 Ohio St. 3d at 535 (paragraph numbers and internal citation omitted).

      The Ohio Supreme Court's analysis is correct.  "[A] criminal defendant [in a capital case] has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause." *Witherspoon v. Illinois*, 391 U.S. 510, 521 (1968).  At the same time, the State has a "legitimate interest in excluding those jurors whose opposition to capital punishment would not allow them to view the proceedings impartially, and who therefore might frustrate administration of a State's death penalty scheme." *Wainwright v. Witt*, 469

106

U.S. 412, 423 (1985).  Therefore, during voir dire, a prosecutor may probe into prospective jurors' views of the death penalty, and may challenge for cause a potential juror who appears unwilling to return a capital sentence.  *Id.* at 423–24.  The prosecution's conduct here, therefore, was proper, and this claim is meritless.

**Evidence Regarding Gangs.**  Lang argues the prosecutor improperly elicited evidence from witnesses suggesting that Lang was a gang member (Doc. 16 at 90–91).  The Ohio Supreme Court found that with this claim Lang was "recast[ing] several of his objections [to trial court rulings] into claims of prosecutorial misconduct."  It repeated its conclusion that testimony that Lang frequently wore red constituted harmless error, and that Dittmore's testimony that Dittmore was a member of the police department's gang unit and Walker's testimony that Lang's nickname was "Tech" did not rise to the level of plain error.  *Lang*, 129 Ohio St. 3d at 537–38 (paragraph numbers omitted).  This Court likewise finds no prosecutorial misconduct in eliciting admissible evidence.

**Evidence Regarding Lang Vomiting.**  Lang's next sub-claim faults the prosecution for introducing Walker's prejudicial testimony that Lang vomited after the murders and stated, "every time I do this, this same thing happens" (Doc. 16 at 91).  The prosecutor did not commit misconduct in eliciting this testimony for the same reasons the trial court did not err in admitting the evidence.

**DNA Evidence Proved Lang was the Principal Offender.**  Lang argues that during closing argument the prosecutor improperly stated DNA evidence proved Lang was the principal offender (Doc. 16 at 91–92).  The Ohio Supreme Court reviewed this claim for plain error:

> Lang also argues that the prosecutor committed misconduct during closing arguments by telling the jury that DNA evidence found on the handgun "proves * * * beyond a reasonable doubt that Eddie Lang * * * is the actual killer."  He contends that expert testimony offered in regard to the DNA evidence does not support the prosecutor's argument.  Lang incorporates his argument from proposition II in claiming that the DNA evidence was unreliable and should not have been admitted, because Foster

107

could not testify to "a reasonable degree of scientific certainty" that Lang was the source of DNA on the handgun.  However, as discussed in proposition II, the DNA evidence was properly admitted.  Thus, the prosecutor's argument about the DNA evidence was a reasonable theory and represented a fair inference based on the record.  No plain error occurred.

*Lang*, 129 Ohio St. 3d at 536 (paragraph number omitted).  Because, as explained above, this Court agrees that the DNA evidence was properly admitted, the prosecutor's arguments about the DNA evidence were proper.

**Closing Argument Speculation.**  Lang contends the prosecution committed misconduct by making speculative comments during closing argument (Doc. 16 at 93).  The Ohio Supreme Court rejected this claim in its plain-error review:

Fourth, Lang asserts the existence of prosecutorial misconduct in speculative comments made during closing argument, claiming that the prosecutor argued, over defense objection, that Lang "took the gun * * * and turned it toward Marnell who saw it coming because she put her hand up."  Lang asserts that the prosecutor's assertion that Cheek raised her hand to ward off the fatal gunshot was not supported by the evidence.

Dr. Murthy, the coroner, testified that Cheek was shot at close range, and the bullet had entered the left side of her head above the ear.  He also testified that there was a "prominent area of stippling" found on the back of Cheek's left hand, which indicated that her hand was only a "few inches" from the muzzle of the gun.  The evidence also showed that Cheek had been sitting in the front passenger seat and she had been shot from behind.  Thus, the prosecutor's argument represented a fair inference that could be made from the record.

Lang also claims that the prosecutor's argument that Cheek "saw it (the bullet) coming because she put her hand up" was a comment that improperly focused on what the victim experienced in the final moments of her life.  But the prosecutor's comments were not such remarks.  Even if the comments were improper, any errors were corrected by the trial court's instructions that the arguments of counsel were not evidence and that the jury was the sole judge of the facts.

Additionally, Lang contends that the prosecutor improperly speculated during his final argument that Lang's DNA was on the handgun "[f]rom firing the gun."  Michael Short, a forensic expert, testified: "The discharging of a firearm would greatly increase the probability of finding * * * what they call touch DNA on the surfaces of a

108

firearm." Lang's argument fails, because the prosecutor's argument represented a fair characterization of Short's testimony.  No plain error occurred.

*Lang*, 129 Ohio St. 3d at 536–37 (paragraph numbers and internal citations omitted).

This Court agrees.  "The prosecution necessarily has 'wide latitude' during closing argument to respond to the defense's strategies, evidence and arguments."  *Wogenstahl v. Mitchell*, 668 F.3d 307, 329 (6th Cir. 2012) (quoting *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009)).  The scope of permissible prosecution comments depends on the circumstances of the case and "what the defense has said or done (or likely will say or do)."  *Id.*  "To avoid impropriety . . .[the prosecutor's] comments must reflect reasonable inferences from the evidence adduced at trial."  *Id.* at 331 (internal quotation marks and citations omitted).  Here, the prosecutor's comments were not speculative; they constituted reasonable inferences from evidence in the record.  *See id.*

**Vouching for Witnesses.**  Lang further argues that the prosecutor improperly vouched for several prosecution witnesses (Doc. 16 at 93–95).  The Ohio Supreme Court addressed this claim on the merits:

> Fifth, Lang argues that the prosecutor improperly vouched for several of the state's witnesses.  An attorney may not express a personal belief or opinion as to the credibility of a witness.  "Vouching occurs when the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue."
>
> Lang claims that the prosecutor improperly vouched for Walker's testimony and bolstered Walker's claim that he did not shoot Cheek and Burditte.  The prosecutor argued: "We know Antonio didn't enter the truck because he tells us that."  These comments simply argue the evidence.  The comments do not vouch for Walker's veracity or imply knowledge of facts outside the record.
>
> Lang also claims that the prosecutor vouched for the testimony of Short and his identification of the handgun.  The prosecutor stated: "We know that this is the murder weapon beyond a reasonable doubt.  Mike Short told you that."  This is not vouching.  The prosecutor merely summarized the evidence supporting his argument by referring to the witness who provided the testimony.  Lang's argument is unpersuasive and rejected.

109

Lang further claims that the prosecutor vouched for Seery's testimony.  Here, the prosecutor argued: "But I submit to you, and you judge his credibility and you look at what he knew, he is telling the truth."  The trial court sustained a defense objection to these comments and instructed the jury to "disregard the Prosecutor's indication that he believes that he was telling the truth."  Thus, the trial court's instructions cured the effect of any improper vouching.

*Lang*, 129 Ohio St. 3d at 537 (paragraph numbers and internal citations omitted).

Lang argues that the Ohio Supreme Court's decision violates § 2254(d)(1) and (d)(2) (Doc. 16 at 89).  This Court disagrees.

"Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [government] behind the witness."  *Wogenstahl*, 668 F.3d at 328 (internal quotation marks omitted).

[S]uch comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

*United States v. Young*, 470 U.S. 1, 18 (1985).  But "[a] state's attorney is free to argue that the jury should arrive at a particular conclusion based upon the record evidence."  *Wogenstahl,* 668 F.3d at 329 (internal quotation marks and citations omitted). "Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding."  *Young*, 470 U.S. at 11.

Even assuming the prosecutor's closing argument statements were improper, the statements were not so flagrant as to render Lang's trial fundamentally unfair.  The prosecution's comments were made in closing argument in the context of an extensive trial record.  References to Walker, Seery, and Short were supported by evidence that had been presented in court and demonstrated no special

110

knowledge of the prosecution.  Finally, the prosecutor's comments were isolated and unlikely to mislead the jury or prejudice Lang.  The Ohio Supreme Court's decision rejecting this claim did not unreasonably apply clearly established federal law or rest on an unreasonable determination of fact.

**Penalty Phase Carryover.**  Lang claims this Court owes no AEDPA deference to the Ohio Supreme Court's decision  rejecting his claim that "[t]he extensive prosecutorial misconduct in this case may have a prejudicial 'carry over' effect on the trier of fact's penalty-phase deliberations (Doc. 16 at 95).  The Ohio Supreme Court rejected Lang's carry-over argument because it found no prosecutorial misconduct during the guilt phase of trial.  *See Lang*, 129 Ohio St. 3d at 538.

Lang cites only *DePew v. Anderson*, 311 F.3d 742 (6th Cir. 2002), in support of this claim (Doc. 33 at 107).  There, the Sixth Circuit observed, "When a prosecutor's actions are so egregious that they effectively 'foreclose the jury's consideration of . . . mitigating evidence,' the jury is unable to make a fair, individualized determination as required by the Eighth Amendment."  *DePew*, 311 F.3d at 748 (quoting *Buchanan v. Angelone*, 522 U.S. 269, 277 (1998)).  This claim fails because none of the prosecutor's actions during the guilt phase were "egregious" or otherwise constituted misconduct.

**Mitigating Evidence Mischaracterized.**  Lang contends the prosecutor misrepresented certain mitigating evidence during closing argument during the penalty phase of his trial (Doc. 16 at 99–100).  The Ohio Supreme Court considered this claim for plain error:

> First, Lang argues that the prosecutor misrepresented the evidence during final argument by stating, "We know now that Eddie was born in Baltimore, Maryland, that *until the age of 10 life seemed to be pretty good*." (Emphasis added.)  Lang argues that this argument mischaracterized the evidence because Yahnena Robinson, Lang's half-sister, testified, "A lot of times my mother didn't let him [Lang's father] come" to see Lang. Lang argues that Robinson's testimony shows that he did not have a good or normal childhood.

111

Other testimony supported the prosecutor's argument.  Robinson also testified, "We had a typical brother sister relationship.  We would watch movies and play school, other things that an older sister do [*sic*] with a younger brother we shared and did" before Lang was ten.  Thus, the prosecutor's argument represented fair comment.  No plain error occurred.

Second, Lang argues that the prosecutor misstated the evidence in arguing that the trauma he suffered while living with his father for two years was not supported by the evidence.  Robinson and Tracy Carter [*sic*], Lang's mother, testified about the trauma Lang suffered during the two years that he lived with his father and the counseling and psychiatric treatment that Lang received for this trauma after returning home.

During rebuttal argument, the prosecutor stated that the jury could discount testimony from Lang's mother and sister about Lang's trauma.  The prosecutor argued, "[I]t is all speculation as to what happened in that two-year period of time.  Nobody knows.  But they want you to speculate that bad things happened when there is *absolutely no evidence* of that."

The prosecutor's argument mischaracterized the evidence because Robinson's and Carter's testimony constituted evidence of what happened to Lang when he lived with his father.  Nevertheless, when viewed in its entirety, the prosecutor's misstatement did not contribute unfairly to the death verdict and did not create outcome-determinative plain error.

Third, Lang argues that the prosecutor improperly faulted him for not taking his medications as a child.  Lang complains that the prosecutor argued, "And we know that his mother on numerous occasions sought help for Eddie, but Eddie didn't take his medication."

During final argument, the prosecutor mentioned Lang's failure to take his medications while summarizing the mitigating testimony.  The prosecutor's argument followed Carter's testimony that Lang took medication for depression and other psychiatric or behavioral problems before and after he lived with his father.  But she also stated that Eddie "did not take it all the time."

Lang contends that the prosecutor's argument improperly criticized his struggle with mental health and turned a mitigating factor into an aggravating circumstance.  Review of the state's argument in its entirety shows that the prosecutor's argument about Lang's medications was an isolated remark that did not convey the improper meaning that Lang suggests.  Indeed, isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning.  *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 646–647, 94 S.Ct. 1868, 40 L.Ed.2d 431.  Moreover, the court's instructions clearly described the aggravating circumstances that the jury was to consider during deliberations.  No plain error occurred.

112

*Lang*, 129 Ohio St. 3d at 548–49 (paragraph numbers and internal citations omitted).

Lang argues that because the Ohio Supreme Court applied the wrong legal standard to this claim (*i.e.*, by failing to consider the cumulative effect of the challenged statements), AEDPA deference does not apply (Doc. 33 at 115).  AEDPA deference does not apply to this claim for a different reason: the Ohio Supreme Court reviewed the claim for plain error.

Lang first challenges the prosecutor's statements that "until the age of 10 life seemed to be pretty good" and that "there [was] absolutely no evidence" supporting Lang's half-sister and mother's testimony about Lang's time living with his father (Doc. 16 at 99 (quotation marks omited)).  Lang points to *Washington v. Hofbauer*, 228 F.3d 689 (6th Cir. 2000), in which the court stated that "[m]isrepresenting facts in evidence can amount to substantial error because doing so 'may profoundly impress a jury and may have a significant impact on the jury's deliberations.'"  *Id*. at 700 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974)).  "This is particularly true when a prosecutor misrepresents evidence," the court explained, "because a jury generally has confidence that a prosecuting attorney is faithfully observing his obligation as a representative of a sovereignty."  *Id*. (citing *Berger*, 295 U.S. at 88).  The Supreme Court in *Donnelly* distinguished the "'consistent and repeated misrepresentation' of a dramatic exhibit in evidence," like calling an exhibit "blood-stained" when the prosecutor knew the exhibit was stained with paint, from "[i]solated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion not of evidence."  416 U.S. at 646.

This Court agrees with the Ohio Supreme Court that the prosecutor's statement concerning Lang's childhood was supported by evidence in the record and therefore rested on a "reasonable inference[] from the evidence adduced at trial."  *Wogenstahl*, 668 F.3d at 331.  This Court also agrees

with the Ohio Supreme Court's finding that the prosecutors' remarks regarding the speculative nature of Lang's evidence concerning his time with his father are troubling.  Lang's step-sister and mother's testimony did, in fact, constitute evidence of this period of Lang's life, even if the State questions the weight this evidence should be given.

Nevertheless, these comments were isolated, spanning only seven sentences of the prosecution's 15-transcript-page-long closing argument (*see* Doc. 22-3, Mit. T., at 92, 102).  Viewed in context, the prosecutors' comments did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden*, 477 U.S. at 181 (internal quotation marks omitted).

Lang also asserts that the prosecutor improperly "faulted Lang" for not taking his medications when he was a child (*see* Doc. 16 at 99 (quoting Doc. 22-3, Mit. T., at 92)).  Lang argues this statement misrepresented facts in the record, turned mitigating circumstances into aggravating circumstances, and urged the jury to consider non-statutory aggravating factors.  In doing so, the prosecutor misled the jury and prejudiced Lang (Doc. 16 at 100).

This Court disagrees.  The prosecutor did not misrepresent the evidence.  Lang's mother testified that her son "did not [take his medication] all the time" (Doc. 22-3, Mit. T., at 74).  Nor was Lang denied due process by the prosecutor's argument.  The prosecution may offer, and the jury is free to consider, "a myriad of factors to determine whether or not death is the appropriate punishment" once statutory aggravating factors are met. *Barclay v. Florida*, 463 U.S. 939, 950 (1983).  And the "consideration of a non-statutory aggravating circumstance, even if contrary to state law, does not violate the Constitution." *Smith v. Mitchell*, 348 F.3d 177, 210 (6th Cir. 2003) (citing *Barclay*, 463 U.S. at 939).

114

**Alluding to Gang Activity.**  Lang argues the prosecutor repeatedly referred to Lang by the nickname "Tek" during his opening statement in the penalty phase of trial in an effort to associate Lang with gangs and violence (Doc. 16 at 100–01).  The Ohio Supreme Court reviewed this claim for plain error, concluding:

> Fourth, Lang argues that the prosecutor committed misconduct by referring to him by the nickname "Tek" during the penalty-phase opening statements.  During the state's opening statement, the prosecutor advised the jurors of the aggravating circumstances: "The first is that Eddie Lang, also known as Tek, committed the offense of * * *." The prosecutor repeated the reference to Lang's nickname in advising the jury about the second aggravating circumstance.  The prosecutor also completed his opening statement by stating, "Based upon that I submit that * * * two sentences of death shall by [sic] pronounced against Eddie Lang, also known as Tek * * *."
>
> Lang argues that the prosecutor's reference to his nickname was an improper attempt to associate him with gangs and violence.  As discussed in proposition VIII, no testimony was introduced explaining the meaning of Lang's nickname.  Thus, Lang's claim that the prosecutor was trying to paint him as a gang member is speculative.  Nevertheless, the prosecutor's use of Lang's nickname was unnecessary and may have been an attempt to impugn his character.  But the prosecutor did not repeat Lang's nickname during the remainder of the penalty-phase proceedings.  Although error, the prosecutor's brief remarks do not rise to the level of outcome-determinative plain error.

*Lang*, 129 Ohio St. 3d at 549 (paragraph numbers omitted).

This Court again agrees with the Ohio Supreme Court. Because there was no evidence offered at either phase of trial regarding the meaning Lang now ascribes to his nickname -- a nickname mentioned only three times in the prosecutor's brief opening statement, (Doc. 22-3, Mit. T., at 28–30) -- it is speculative to assume the jury understood the nickname in the same manner.

**Asking the Jury to Render Justice.**  Lang's final claim of prosecutorial misconduct is based on the prosecutor's request to the jury during his closing argument to "render justice" (Doc. 16 at 101(quoting Doc. 22-3, Mit. T., at 103)).  The Ohio Supreme Court rejected this claim on plain-error review, stating:

Finally, Lang argues that the prosecutor committed misconduct during closing argument by arguing that the jurors should "render justice" and impose a sentence of death.

"There is nothing inherently erroneous in calling for justice * * *." The prosecutor's argument was within the creative latitude afforded both parties in closing arguments. No plain error occurred.

*Lang*, 129 Ohio St. 3d at 550 (paragraph numbers and internal citations omitted).

In *Young*, the Supreme Court found error in a prosecutor's request that the jury "do its job." *Young*, 470 U.S. at 1047–48.  However, the Court found this comment did not "influence[ the jury] to stray from its responsibility to be fair and unbiased."  *Id.* at 1048.  This Court finds the prosecutor's remark did not undermine the jury's ability to fairly judge the evidence.

**Cumulative Effect.**  Lang argues that this Court must consider the cumulative effect of the purported prosecutorial misconduct discussed above (Doc. 33 at 115).  The prosecutor's conduct during trial should be viewed in the context of the entire trial.  *Darden*, 477 U.S. at 182.  *See also Young*, 470 U.S. at 12.  In judging whether prosecutorial misconduct denied a defendant a fair trial, a court may consider the "cumulative effect" of several instances of misconduct.  *See Berger*, 295 U.S. at 89.

Viewing all of Lang's allegations of prosecutorial misconduct cumulatively and in the context of the entire trial, this Court concludes Lang's claims do not entitle him to habeas relief.  This Court finds only a few instances of possibly improper conduct among these claims.  Even if those acts were improper, and this Court considered the misconduct as a whole, Lang has failed to demonstrate that the misconduct was "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial." *See Wogenstahl*, 668 F.3d at 335.

116

## Twelfth Ground for Relief
### *Arbitrary Sentencing*

Lang complains the trial court erred by accepting the jury's recommended sentence of death for Cheek's murder but only life without the possibility of parole for Burditte's murder.  He argues that because he was convicted of the same charges for both crimes, with the same aggravating factors, the jury and trial court "improperly weighed who the victim was as an aggravating circumstance" in violation of the Eighth and Fourteenth Amendments and Ohio law (Doc. 16 at 95–98).

Lang raised this identical claim on direct appeal (*see* Doc. 18-1 at 1519–20).  In his Petition, he implicitly concedes that the Ohio Supreme Court adjudicated the claim on the merits for purposes of AEDPA by arguing that the Ohio Supreme Court's decision violates § 2254(d)(1) and (d)(2) (Doc. 16 at 98).  However, in his Traverse, Lang argues the Ohio Supreme Court did *not* adjudicate this claim on the merits because it "misrepresented Lang's claim" as an inconsistent-verdict claim (Doc. 33 at 111).  As *Harrington* makes clear, the substance of a state court's analysis is irrelevant in determining whether the claim was "adjudicated on the merits" under AEDPA.  *Harrington*, 131 S. Ct. at 784–85.  Lang raised this claim in state court and the Ohio Supreme Court ruled on the claim.  Therefore, AEDPA applies.

In rejecting Lang's claim, the Ohio Supreme Court reasoned:

In proposition of law XI, Lang argues that his death sentence for Cheek's murder should be vacated because the jury's sentencing recommendations—life for Burditte's murder (Count One) and death for Cheek's murder (Count Two)—are arbitrary. Lang contends that the disparity in sentencing occurred because Burditte was a drug dealer and Cheek was not.  Consequently, Lang argues, the jury improperly considered the victim's status as an aggravating circumstance in reaching its death verdict.

We reject Lang's argument.  The jury verdicts are not inconsistent.  The jury was required to "consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense."  Here, the nature and circumstances of the offense showed that Burditte was involved in selling illegal drugs

117

to Lang at the time of his murder.  There was no evidence showing that Cheek was involved.  In weighing the nature and circumstances of the offense, the jurors might have determined that Burditte's murder was mitigated because of Burditte's involvement in the events leading up to his murder.  On the other hand, the jury might have decided that Lang's murder of Cheek was not mitigated at all.

Moreover, it is not for an appellate court to speculate about why a jury decided as it did.  "'Courts have always resisted inquiring into a jury's thought processes * * *; through this deference the jury brings to the criminal process, in addition to the collective judgment of the community, an element of needed finality.' "  *Id.*, quoting *United States v. Powell* (1984), 469 U.S. 57, 66–67, 105 S.Ct. 471, 83 L.Ed.2d 461.

Additionally, we reject Lang's claim that the jurors improperly considered Burditte's status as a drug dealer as an aggravating circumstance.  The trial court properly instructed the jury on the aggravating circumstances that they could consider during their deliberations.  The trial court's instructions included the admonition, "The aggravated murder itself is not an aggravating circumstance.  You may only consider the aggravating circumstances that were just described to you and which accompanied the aggravated murder."  It is presumed that the jury followed the trial court's instructions.  Based on the foregoing, we overrule proposition XI.

*Lang*, 129 Ohio St. 3d at 553 (paragraph numbers and internal citations omitted).

Neither Lang nor the State identify clearly established federal law governing Lang's argument comparing his sentences for the murders of Burditte and Cheek, respectively.  *See White v. Woodall*, 134 S. Ct. 1697, 1706–07 (2014) ("The critical point is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question.").  *Dunn v. United States*, 284 U.S. 390 (1932), on which the State relies (Doc. 23 at 87), governs a jury verdict with inconsistent findings of guilt on separate counts that involve the same evidence.  *See Dunn*, 284 U.S. at 393–94.  *Furman v. Georgia*, 408 U.S. 238 (1972), and *Gregg v. Georgia*, 428 U.S. 153 (1976), on which Lang relies (Doc. 33 at 108–09), govern challenges to state sentencing procedures which a defendant argues result in the arbitrary imposition of a capital sentence.  *See, e.g.*, *Godfrey*

118

*v. Georgia*, 446 U.S. 420, 428 (1980).[9]  Neither controls in this case, where Lang alleges "inconsistent" sentences on separate counts.

Lang also argues that his death sentence is arbitrary and capricious because the jury and trial court must have improperly considered the non-statutory aggravating circumstance that Cheek was not a drug dealer, which Lang claims is the only factor distinguishing her from Burditte (Doc. 33 at 111–12).  But the Ohio Supreme Court, addressing this very argument, found the sentences complied with state law, and "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction[,] binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2006).  And as a matter of federal law, in *Barclay v. Florida*, 463 U.S. 939, 950 (1983), the Court held that "[o]nce the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . the jury then is free to consider a myriad of factors to determine whether or not death is the appropriate punishment."  The Court continued:

> [w]e have never suggested that the United States Constitution requires that the sentencing process should be transformed into a rigid and mechanical parsing of statutory aggravating factors.  But to attempt to separate the sentencer's decision from his experiences would inevitably do precisely that.  It is entirely fitting for the moral, factual, and legal judgment of judges and juries to play a meaningful role in sentencing.  We expect that sentencers will exercise their discretion in their own way and to the best of their ability.  As long as that discretion is guided in a constitutionally adequate way, see *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), and as long as the decision is not so wholly arbitrary as to offend the Constitution, the Eighth Amendment cannot and should not demand more.

---

[9]

Lang states in his Traverse that his sentence was "arbitrary and disproportionate as compared to his co-conspirators [*sic*] and compared to others similarly situated" (Doc. 33 at 112).  This Court does not address Lang's perfunctory comparison of his sentence with Walker's sentence, a claim not included in Lang's Petition and not adequately developed in the briefs.  *See United States v. Hall*, 549 F.3d 1033, 1042 (6th Cir. 2008) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal quotation marks omitted).

*Id.* at 951.  Thus, even if the jury and trial court were influenced by Burditte's drug dealing in considering Lang's sentence, the "consideration of a non-statutory aggravating circumstance, even if contrary to state law, does not violate the Constitution."  *Smith v. Mitchell*, 348 F.3d 177, 210 (6th Cir. 2003) (citing *Barclay*, 463 U.S. at 939).

**Seventeenth Ground for Relief**
***Cumulative Error***

Lang asserts the cumulative effect of all the constitutional errors he alleges deprived him of a fair trial and penalty-phase hearing (Doc. 33 at 137–38).  Because Lang raised his cumulative-error claim in state postconviction proceedings, he preserved the claim for federal habeas review.  But "cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue."  *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006).

**CERTIFICATE OF APPEALABILITY ANALYSIS**

This Court must determine whether to grant a Certificate of Appealability ("COA") for any of Lang's grounds for relief.  The blanket grant or denial of a COA "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability."  *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001).  Lang may not appeal this Court's denial of any portion of his Petition "[u]nless a circuit justice or judge issues a certificate of appealability," which "may issue . . . only if the applicant has make a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c).  Lang must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000) (internal quotation marks omitted).  With respect Lang's procedurally defaulted

120

claims, Lang must show "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id*.

Applying these standards, this Court denies a COA for grounds for relief  3, 4, 6, 8, 10 (only sub-claims regarding Lang's red clothing and recorded statement), 11 (sub-claims A, F, and G), 12, 14, 15, and 17.  Similarly, this Court denies a COA for Lang's plainly defaulted grounds for relief, specifically grounds 5, 7, 9, 10 (except sub-claims relating to Lang's red clothing and recorded statement), 11 (sub-claims B, C, D, and E), 13, and 16.  This Court grants a COA for Lang's ineffective assistance of trial counsel claim regarding mitigating evidence (ground 1) and his juror bias claim (ground 2).

## CONCLUSION

For the foregoing reasons, this Court denies Lang's Petition for Writ of Habeas Corpus.  This Court further certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could be taken in good faith as to Lang's first and second grounds for relief, and this Court issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Federal Appellate Rule 22(b) as to those claims only.  As to all remaining claims, this Court certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability, 28 U.S.C. § 2253(c).

IT IS SO ORDERED.

    *s/ Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

March 27, 2015

121